**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
(Northern Division)

| | | |
|---|---|---|
| AMA SYSTEMS, LLC<br>8160 Lark Brown Road<br>Elkridge, Maryland 21075 | * | |
| and | * | |
| BLUEMAR PROMOTIONS, LLC<br>41 Industrial Drive<br>Suite 7<br>Exeter, New Hampshire  03833 | * | Case No. 1:21-cv-1472 |
|         Plaintiffs, | * | **COMPLAINT** |
| vs. | | **JURY TRIAL DEMANDED** |
| 3B TECH, INC.<br>3431 William Richardson Drive<br>Suite B<br>South Bend, Indiana 46628 | * | |
|     Serve On:<br>    Brett Barbour<br>    Registered Agent<br>    3431 William Richardson Dr.<br>    South Bend, Indiana 46628, | *<br><br><br><br>* | |
| and | | |
| PRO-COM PRODUCTS, INC.<br>1250 Bixby Drive<br>City of Industry, California 91745, | * | |
|     Serve On:<br>    Peggy Lin<br>    Registered Agent<br>    1250 Bixby Drive<br>    City of Industry, CA 91745 | *<br><br><br><br>* | |
| and | | |
| | * | |

SALUSEN, INC.
10034 Billet Court
Granger, Indiana 46530,

                                                 *

     <u>Serve On</u>:
     Brett Barbour
     10034 Billet Court
     Granger, Indiana 46530,       *

and

JIAN QING "JOHNNY" ZHU     *
10204 Adams Road
Granger, Indiana 46530,

and                              *

BRETT BARBOUR
10034 Billet Court
Granger, Indiana 46530,        *

and

MICHAEL JOHNSON      *
1250 Bixby Drive
City of Industry, California 91745,

and                              *

JOHN DOES 1-10,

             Defendants.       *

     *        *        *        *        *        *        *

## <u>COMPLAINT</u>

For their Complaint, Plaintiffs, AMA Systems, LLC ("AMA") and Bluemar Promotions,

LLC ("Bluemar") (collectively, "Plaintiffs") hereby state and allege as follows:

As the COVID-19 pandemic began to devastate human life and economies in early 2020,

Defendants began a fraudulent scheme to profit from the fear and uncertainty circling the globe.

In short, they conspired to manufacture, market and sell fraudulently certified personal protective equipment ("PPE") to Plaintiffs and others, knowing that the equipment was destined, in part, to reach desperate institutional and individual consumers.  Defendants' fraudulent and unlawful scheme is the subject of this litigation.

Defendants are individuals and companies operating in the United States and abroad, and comprise *inter alia* 3B Tech, Inc. ("3B Tech"); Pro-Com Products, Inc. ("Pro-Com"); Salusen, Inc. ("Salusen"); Jian Qing "Johnny" Zhu ("Zhu"); Brett Barbour ("Barbour"); Michael Johnson ("Johnson") (collectively, "Defendants"), and to include any unknown pseudonyms, affiliated entities or persons acting in concert.  Perhaps most troubling and as further detailed, Defendants are still engaged in this fraudulent scheme.

Defendants' conspiracy succeeded in exacting hundreds of thousands of dollars in payments from Plaintiffs, as well as others who purchased PPE that was falsely certified. Plaintiffs seek compensatory and treble damages, as well as attorneys' fees, punitive damages and any other relief this Honorable Court deems appropriate for the fraudulent deprivation of Plaintiffs' property in excess of $500,000 for this outrageous fraud.

## BACKGROUND

1.      On December 30, 2019, "the Program for Monitoring Emerging Diseases notified the world about a pneumonia of unknown causes in Wuhan, China."  "Undiagnosed pneumonia—China (Hubei): Request for information," ProMED post (2019); https://promedmail.org/promed-post/?id=6864153

2.      By January 9, 2020, the Centers for Disease Control and Prevention ("CDC") began screening international passengers arriving at JFK International, San Francisco International and Los Angeles International airports, and by January 21, 2020, the CDC had

confirmed the first reported case of Covid-19 in the United States.

https://www.ajmc.com/view/a-timeline-of-covid19-developments-in-2020

      3.      The United States declared a public health emergency on February 3, 2020, on the

heels of thousands of reported cases and a rising death toll worldwide.

https://www.ajmc.com/view/a-timeline-of-covid19-developments-in-2020  And, by "February 4,

2020, pursuant to Section 564(b)(1)(C) of the Federal Food, Drug, and Cosmetic Act (the Act)

(21 U.S.C. §360bbb-3(b)(1)(C)), the Secretary of the Department of Health and Human Services

(HHS) determined that there is a public health emergency that has a significant potential to affect

national security or the health and security of United States citizens living abroad, and that

involves the virus that causes Coronavirus Disease 2019 (COVID-19). Pursuant to Section 564

of the Act, and on the basis of such determination, the Secretary of HHS then declared on March

2, 2020, that circumstances exist justifying the authorization of emergency use of personal

respiratory protective devices during the COVID-19 outbreak, subject to the terms of any

authorization issued under that Section."  https://www.fda.gov/media/136664/download

      4.      By early March 2020, "the World Health Organization ("WHO") declared

COVID-19 a pandemic—a disease outbreak occurring over a wide geographic area and affecting

an exceptionally high proportion of the population."  https://www.yalemedicine.org/news/2019-
novel-coronavirus#:~:text=SARS%2DCoV%2D2,in%20Wuhan%2C%20China

      5.      Hospitals quickly became overwhelmed with intensely sick individuals and the

strain on the healthcare system, as well as the unprecedented increase in demand across all

sectors of healthcare and the public at large, resulted in a severe shortage of PPE.

      6.      In order to address, in part, the shortage of PPE, which was particularly acute in

certain areas in the United States, including Maryland, the FDA "issued EUAs [emergency use

authorizations] for certain PPE products including face shields, other barriers, and respiratory

protective devices such as respirators."  If face masks, or filtering facepiece respirators ("FFRs")

manufactured in China satisfied the EUA requirements, then the product and manufacturer were

identified on the FDA's "Appendix A."

7.      KN95 technology refers to filtering facepiece respirators that are manufactured in

China. KN95 masks are identified by the Centers for Disease Control and Prevention ("CDC") as

"a type of filtering facepiece respirator that are commonly made in China and are similar to N95

masks commonly used in the United States."  *See*  https://www.cdc.gov/coronavirus/2019-

ncov/prevent-getting-sick/types-of-

masks.html#:~:text=KN95%20masks%20are%20a%20type,in%20the%20United%20States

8.      If PPE was stamped with a CE mark, that mark identified to the purchaser/user

that the product meets the requirements for health, safety and consumer protection that are

identified in European Union directives and regulations.  The CE mark allows the movement of

PPE within the internal market of the European Community.  FFP standards refer to the

European Standard (EN 149:2001) that identifies FFRs as: FFP1, FFP2, and FFP3 with

corresponding minimum filtration efficiencies of 80%, 94%, and 99%.  FFP2 respirators (94%)

are approximately equivalent to N95 face masks, making them recommended for use in the

prevention of airborne infectious diseases.

9.      To obtain these certifying marks, manufacturers have their products

independently tested.  Defendants, including 3B Tech, Barbour and Zhu represented at differing

times that the face masks manufactured in China, under the Salusen label as distributed by Pro-

Com to 3B Tech and sold to Plaintiffs and others, had been subject to testing by Shenzhen

Academy of Metrology & Quality Inspection ("SMQ"); SGS IBR Laboratories ("SGS"); the

Guangdong Testing Institute ("GQI"); and DEKRA Testing and Certification (Shanghai) Ltd. ("DEKRA"). Depending on the results of the tests, the face masks could then be identified as conforming to KN95 standards, CE Certified and/or FFP2 conforming (in conformance with European standards and meeting EN 149:2001), and/or meeting the FDA EUA requirements.

10.     When face masks are identified with these certifications, it signifies that the face masks meet certain filtration performance requirements, among other requirements. Thus, the certifications are significant as they provide assurance to the purchaser and ultimately, end-user about the efficacy of the product. It also means that a higher price can be charged for the PPE.

## NATURE OF THE ACTION

11.     Soon after the COVID-19 pandemic took grip of the United States in March 2020, Defendants began a fraudulent and criminal scheme to sell fraudulently certified KN95 face masks that were allegedly the subject of an Emergency Use Authorization ("EUA") application being sought from the Food & Drug Administration ("FDA") by Defendants. Defendants, including 3B Tech, Zhu and Barbour claimed that the face masks were: conforming KN95 technology; CE and FDA certified; stamped FFP2; EU conforming; and had been independently verified as conforming by third-party laboratories. Defendants' representations were false and the documents provided to support the false representations were altered and/or fake.

12.     Defendants' motivation was to profiteer from the public health emergency, which is not only unethical and fraudulent, but criminal.

13.     These were the early days of the pandemic and it was not yet known that fraudulent PPE was being sold as conforming product, nor was the extent of these fraudulent schemes even contemplated. Plaintiffs had no knowledge of any frauds concerning the sale of

PPE or the use of fraudulently altered certifying reports when it entered into the Purchase Orders with 3B Tech.

14.     In March 2020, Bluemar began discussions with 3B Tech for the purchase of PPE.  Defendants represented that the PPE being purchased from Defendants were certified KN95 Disposable face masks, which met or exceeded applicable governmental standards.

15.     The face masks, it was later learned, were not certified as alleged and had not met filtration and/or other standards.  The documentation that was provided as support for the conformity certifications had been altered and/or falsified, which meant that the product's ability to protect human life was not as represented; or, the documentation provided was authentic but it could not be connected to the product that was sold by Defendants.  These fraudulent representations were made all the worse because certified KN95 face masks could be used in healthcare and related settings, while nonconforming and uncertified face masks did not provide the same level of protection that was necessary and vital in those settings.

16.     Defendants claimed that Shenzhen Centurion Technology Company ("SCT"), located in Pinghu District, Shenzhen City, China, manufactured the face masks that were being offered for sale to Plaintiffs.  SCT, on its website, claims and continues to claim to manufacture KN95 masks that are EU, CE and FDA certified.

17.     Specifically, 3B Tech alleged that "[t]he enterprise has passed the white list of the Ministry of Commerce, and its products have passed the EU en149, en14683, type IIR certification standards, CE and FDA certification issued by DEKRA, Germany, ASTM, level 3 and other international test reports.  Based on strict quality control and assurance system, we can ensure a higher and more stable quality level."

18.     Together with its co-conspirators Pro-Com, Salusen, Brett Barbour, Michael Johnson and SCT (and others yet to be identified), 3B Tech altered testing documentation to include false and misleading representations regarding the PPE, and tried to conceal their fraud through various companies, communications and reports, violating the law and done to profit illegally.

19.     The fraudulent representations, certifications and documents were all meant to "authenticate" the masks manufactured by SCT: as conforming KN95 technology; having FDA and CE Certifications; FFP2 and EU conforming; and that the face masks had been independently validated by SMT, SGS, GQI and DEKRA.

20.     These representations were part of the illegal and deceptive scheme perpetrated on Plaintiffs and others, including hospitals and governmental agencies during the pandemic to extract higher fees for the face masks.

21.     Bluemar ordered face masks from 3B Tech, which were delivered to AMA and paid for through a series of wire transfers.  It was later discovered by Plaintiffs that the face masks did not comply with FFP2 technology, were not CE or FDA certified as alleged, and were stamped with fraudulent certifications.

22.     Defendants are continuing to perpetrate their fraud and engage in illegal activity as they continue to offer for sale the non-conforming KN95 face masks through websites, including Salusen.com, procomproducts.com and centurion-med.com.

23.     Defendants' masks also are offered for sale on splatterguard.com, which makes the same false claims as Defendants have made regarding the authenticity and conforming nature of the face masks.

## JURISDICTION AND VENUE

24.     There are three sources of jurisdiction in this Court.  First, this is an action to prevent and restrain violations of 18 U.S.C. § 1962.  18 U.S.C. § 1964.  Second, the Parties' citizenship is completely diverse and the amount in controversy exceeds $75,000 exclusive of interests and costs.  28 U.S.C. § 1332.  Third, a substantial part of this action arises under the laws of the United States.  28 U.S.C. § 1331.

25.     Venue is proper in the United States District Court for the District of Maryland, Northern Division because a substantial part of the events or omissions giving rise to the claims occurred in the District.  28 U.S.C. § 1391(b)(2).  *See also* 28 U.S.C. § 1965(b) (providing that a suit may be brought in a district as the ends of justice require).

## PARTIES

26.     Plaintiff AMA Systems, LLC is a "Concept-to-Market" Maryland Limited Liability Company that provides analysis and deployment services for products and services both domestically and globally.  AMA has its principal place of business in Elkridge, Maryland.

27.     Plaintiff Bluemar Promotions, LLC is a New Hampshire Limited Liability Company that provides logistics and distribution of products, among other services.  Bluemar has its principal place of business in Exeter, New Hampshire.

28.     Defendant Jian Qing "Johnny" Zhu is a resident of the State of Indiana and believed to reside at 10204 Adams Road, Granger, Indiana 46530.  Zhu has represented that he is an owner of SCT and that SCT is "our factory" where the KN95 face masks at issue are manufactured.

29.     Defendant 3B Tech, Inc. is a corporation organized under the laws of the State of Indiana with its principal place of business at 3431 William Richardson Drive, Suite B, South

9

Bend, Indiana and is an importer/distributor of various products, including those manufactured

by Chinese factories owned by Zhu.  3B Tech's Incorporator, President and owner is Zhu.  Its

registered agent is identified as Defendant Brett Barbour.

30.     Defendant Pro-Com Products, Inc. describes itself as "a full-service distributor

specializing in consumer electronics and packaged goods" and is located at 1250 Bixby Drive,

City of Industry, California 91745.  Pro-Com does not manufacture KN95 face masks, but rather

imports products into the United States on behalf of SCT.  Defendant Michael Johnson is

identified on its website as a Senior Vice-President of Pro-Com.  The companies and products

identified for sale on the Pro-Com website are owned by or associated with Defendant Zhu

and/or 3B Tech.  Pro-Com is owned by Defendants Zhu and Barbour based on information and

belief.

31.     Defendant Salusen, Inc. describes itself as a supplier of PPE, providing products

"through our expertise and partnerships in development, manufacturing and logistics" and which

has "partnered with the leading global logistics company, Pro-Com Products."  Salusen also does

not manufacture face masks.  Defendant Brett Barbour is identified as the Incorporator, President

and Resident Agent of Salusen.  It is believed that Defendants Barbour and Zhu are owners of

Salusen.

32.     Defendant Brett Barbour is a resident of the State of Indiana and believed to

reside at 10034 Billet Court, Granger, Indiana 46530.  Barbour is the President and Resident

Agent of Salusen.

33.     Defendant Michael Johnson is identified as the Sr. Vice President of Pro-Com.

He is identified on the FDA registration as the contact point for Pro-Com.  It is believed that he

is a resident of the State of California.

34.    Defendants 3B Tech and Salusen share the same office address in South Bend, Indiana.

35.    Defendant Does 1-10 are unknown to Plaintiffs who therefore sue them under fictitious names.  Plaintiffs will amend their Complaint to add such names and capacities when they become known.

## THE SCHEME

36.    In response to the critical shortage of and need for PPE, including filtering facepiece respirators ("FFRs") in the United States, the FDA issued an umbrella EUA for certain FFRs manufactured in China.  Defendants saw an opportunity and willingly engaged in a fraudulent and criminal scheme to sell fraudulently certified PPE to unsuspecting third-parties, including Plaintiffs, hospitals and governmental entities.  Defendants continue to sell the fraudulently certified PPE.

37.    Defendants represented to Plaintiffs, at various times and as further detailed herein, that the face masks manufactured by SCT in China were conforming KN95 technology, FDA and CE Certified, FFP2 conforming, and had been tested by SMQ, SGS, GQI and DEKRA.

38.    With regard to the testing performed by DEKRA and SMQ related to the SCT face masks relevant to Defendants' fraudulent scheme, the face masks that were tested were provided by and identified as manufactured by SCT.  After testing, reports were issued to Defendants.  Defendants criminally altered those reports and/or fraudulently represented that the reports were linked to the SCT manufactured face masks.

39.    With regard to the testing performed by SGS and GQI, the face masks presented for declaration of conformity to FFP and CE Certification requirements did meet those

requirements.  However, the face masks that were tested by these facilities cannot be connected or otherwise linked to SCT's face masks that were sold to Plaintiffs and others.

### A. Sale of the Fraudulently Certified KN95 Face Masks

40.     As the nation was in the grip of the early days of the pandemic and as first responders, businesses, State and local governments, hospitals, and individuals were left scrambling to find and purchase PPE, including face masks, AMA undertook to fill the void for its customers.

41.     In late March 2020, AMA began contacting its business connections to determine their ability to supply PPE.  AMA reached out to Bluemar to inquire as to whether Bluemar could secure PPE, including face masks.

42.     Bluemar, in turn, reached out to 3B Tech to purchase certified PPE.  3B Tech had contacted Eddie Chung of Bluemar in early March 2020, informing him that Zhu was the owner of Shenzhen Centurion Technology Co., Ltd., a manufacturing plant located in China that had switched over to manufacturing PPE products, and that 3B Tech could supply certified PPE.

43.     SCT represents on its website that the KN95 face masks that it manufacturers have "CE and FDA certification issued by DEKRA, Germany, ASTM, level3 and other international test reports."  *See* https://www.centurion-med.com  These were the same representations that 3B Tech, Zhu, Barbour and others at various times had made to Bluemar as further and more specifically detailed herein.

44.     Based on the representations made to Bluemar by 3B Tech that it could supply certified KN95 face masks, on April 6, 2020, Bluemar placed Purchase Order #100058 with 3B Tech for 50,000 "K95 Masks—FDA Approved" at a cost of $100,000.

45. By email dated April 13, 2020, forwarded to Eddie Chung of Bluemar, Zhu and 3B Tech confirmed that the KN95 face masks being ordered by Bluemar and sold to AMA were FDA and CE Certified and had passed filtration tests required to be identified as FFP2.

46. Bluemar then placed a second Purchase Order #100061 dated April 15, 2020, for 250,000 "KN95 Disposable Face Mask—Packaged 50 per carton in sleeves of 10 each." The Purchase Order required that the face masks "must say KN95," were to be manufactured by Salusen and be FDA Certified with CE Certificate No.: 4Q200407M.SCTUU98. The cost was $500,000.

47. Bluemar requested images or photographs of the product to be supplied so that Bluemar could provide those to AMA. On April 16, 2020, 3B Tech sent to Bluemar a number of images of the Salusen face masks, the inner packaging and cartons. Bluemar forwarded the images to AMA. In response, AMA raised questions regarding the face masks, asking for further clarification of the certifications and manufacturer.

48. On April 17, 2020, John Cosco of Bluemar sent an email to Barbour raising questions regarding the product based on the images that 3B Tech had provided. Specifically, John Cosco asked whether all packaging, bags and cartons would be branded with the Salusen logo; whether all of the images sent to Bluemar by Barbour were of the Salusen product; whether the face masks would be stamped with the certifications; and asked that 3B Tech confirm the FDA certification.

49. After various email communications between Zhu, Barbour, and Eddie Chung and John Cosco of Bluemar throughout the day on April 17, 2020, Zhu explained that although neither the face masks nor packaging would be identified with the Salusen label or logo, the face masks were KN95 Salusen masks as identified in the images and that the UPC (universal product

code) would remain the same.  Zhu further explained that to manufacture the face masks with the Salusen labels and logos, the cost would be higher and the delivery schedule would be delayed by weeks.  Zhu also stated that because of "Chinese Custom[s]" ever-changing rules, what would be printed on the masks would be dictated by regulations "to insure (sic) they can be exported."

50.     On April 19, 2020, John Cosco of Bluemar responded to Zhu and Barbour indicating that based on the representations made by Zhu and Barbour, including: confirming the UPC Code; that the face masks would be Salusen face masks but without the logos; that the cartons would have K95 or FFP2 printed on them; and that the masks themselves would also be stamped with the certifications, Bluemar, would move forward with purchasing the face masks. Bluemar revised Purchase Order #100061 to reflect the parties' discussions and representations made by Zhu and Barbour.

51.     In reliance on the representations made and certifications provided by 3B Tech, Bluemar entered into purchase orders with AMA for the face masks.

52.     To fulfill the AMA purchase order, Bluemar entered into three purchase orders with 3B Tech for KN95 face masks:

| Date | Purchase Order | Quantity Certified KN95 Face Masks |
| --- | --- | --- |
| April 6, 2020 | Purchase Order #100058 | 50,000 |
| April 15, 2020 | Purchase Order #100061 | 250,000 |
| April 29, 2020 | Purchase Order #22728 | 500,000 |

53.     The Purchase Orders between Bluemar and 3B Tech, as well as between Bluemar and AMA, specifically identified the type, certification and registration of the face masks to be purchased:  "FDA Certified: Certificate No.: JF-FDA-0328-0116" and "CE Certified: Certificate No.: 4Q200407M.SCTUU98."

54.     3B Tech shipped 250,000 face masks on April 27, 2020; 50,000 face masks on April 28; and 250,000 face masks on May 4.  Each time, the face masks were shipped from Pro-Com Products to AMA Systems by LTL carriers.  Each time, in addition to the cost of the face masks, freight was charged for each shipment that was paid by Bluemar and ultimately passed on as a cost to AMA.

55.     The face masks arrived and were stamped with what appeared to be the CE Certification identified on the Purchase Orders.



56.     In addition, the face masks were identified in packaging containing the designation "FFP2 Europe EN 149:2001 + A1:2009 Classified" and "FDA No.: 10066564."







57.    To pay for the product, AMA wired funds to Bluemar and Bluemar wired funds to

3B Tech.  *See* Chart below.

| Date | Amount | Wire Sent By | Wire Received By |
|---|---|---|---|
| April 7, 2020 | $77,031.74 | Bluemar | 3B Tech |
| April 16, 2020 | $250,000 | AMA Systems (deposit for masks) | Bluemar |
| April 16, 2020 | $250,000 | Bluemar | 3B Tech |
| April 20, 2020 | $27,000 | Bluemar | 3B Tech |
| April 22, 2020 | $50,000 | Bluemar | 3B Tech |
| April 28, 2020 | $268,802 | Bluemar | 3B Tech |
| April 29, 2020 | $200,000 | Bluemar | 3B Tech |
| April 30, 2020 | $739,698.21 | AMA Systems ($567,500 for KN95 + freight $60,288 for Nonsterile + freight $111,910.21 for KN95 + freight) | Bluemar |
| April 30, 2020 | $50,000 | Bluemar | 3B Tech |
| May 4, 2020 | $555,000 | AMA Systems (KN95) | Bluemar |
| May 4, 2020 | $250,000 | Bluemar | 3B Tech |
| May 6, 2020 | $310,700 | AMA Systems (KN95 + freight) | Bluemar |
| May 21, 2020 | $5,821.26 | Bluemar | 3B Tech |
| June 22, 2020 | $500,000 | 3B Tech | Bluemar |
| June 23, 2020 | $555,000 | Bluemar | AMA Systems |

58.     After the face masks were purchased from 3B Tech and delivered by Pro-Com/3B Tech to AMA, Plaintiffs became aware that the FDA did not issue a certification for SCT-manufactured KN95 face masks.  Rather, manufacturers register with the FDA for their devices to be sold in the United States.  However, a registration is not a certification.

59.     For the product to be CE Certified, the product must have a declaration of conformity and a marking.  A manufacturer declares by way of a declaration of conformity that the product at issue complies with applicable requirements to include having been testified by the appropriate body.  A CE marking must be affixed to a product in a manner that is legible and cannot be removed easily from the product.

60.     After the face masks were purchased and delivered, Plaintiffs became aware that the face masks were not CE Certified, and that the "CE Marking" stamped on the face masks is fraudulent and a misrepresentation.  There is no declaration of conformity for the face masks. Plaintiffs learned this on July 3, 2020, by way of an email from Entecerma to Jennifer Cosco at Bluemar.

61.     Plaintiffs also did not become aware until June 14, 2020 that the SCT-manufactured KN95 face masks had not passed filtration tests, among others, although Defendants had represented that the face masks had met or exceeded filtration and other certification requirements.

62.     Plaintiffs now know that the filtration tests results that were provided by Defendants were altered, tampered with, and/or were performed on different products as more fully described in the allegations herein.

### B.  *Sale of Face Masks by AMA to Third Parties*

63.     AMA began marketing for sale the SCT-manufactured KN95 face masks to end-users, including governmental agencies and health care providers as the product had been represented by Defendants: "FDA Certified: Certificate No.: JF-FDA-0328-0116" and "CE Certified: Certificate No.: 4Q200407M.SCTUU98."

64.     In May 2020, AMA was contacted by a prospective customer, who inquired as to authenticity and legitimacy of the KN95 face mask certifications.  A prospective customer asked AMA about the FDA Certification, the FFP2 certification, among other certifications, and also asked for documents supporting the claims of certification.

65.     In response to questions from a prospective customer, AMA reached out to Bluemar and asked for verification of the authenticity of the SCT-manufactured KN95 face masks.  Specifically, AMA on May 5, 2020 asked for written verification of the GB2626 testing, which must be performed by a CNAS accredited laboratory; the Chinese factory business license; and the Chinese local license showing that the factories had been approved to produce the KN95 face masks.

66.     Bluemar in turn contacted 3B Tech regarding the verification of testing and the information related to the manufacturer.  To support their scheme, Barbour in a Skype communication on May 8, 2020, to John Cosco and Eddie Chung of Bluemar represented to Bluemar that 3B Tech was selling millions of the SCT-manufactured KN95 face masks to customers, such as governmental agencies and private customers including SP Richards Co., a nationally-known distributor of janitorial, sanitizing, and other business supplies.  In the same Skype communication, Barbour represented that "KN95 is actually tougher than K95 standard which is what the U.S. uses. … We as an U.S. company have very restrict (sic) guidelines on the masks we purchased from the factories and we have QC [quality control] personnel stay at factories 24/7 to ensure the qualities.  We also on weekly perform informal random sample tests by third testing companies: that 3B Tech was selling the SCT-manufactured KN95 face masks to a hospital network in Indiana; and that 'we' have $5 million in product insurance covering masks."

67.     Barbour also informed Bluemar that "federal agents" had visited 3B Tech's warehouse to verify that 3B Tech had PPE stock to include certified, conforming face masks. Barbour represented that this verification permitted 3B Tech to sell PPE to governmental agencies.

### C.  Altered, Fraudulent and Misrepresented Certifications

68.     As further detailed, it is now known that the SCT-manufactured KN95 face masks that 3B Tech sold to Bluemar were not CE Certified, nor FDA Certified as the FDA does not certify individual product.  In these circumstances, the FDA would permit the import and sale of certain PPE that conforms to requirements based on the use.  It was discovered after the face masks had been delivered and paid for that the SCT-manufactured KN95 face masks failed conformity tests performed by two independent testing facilities.  And, it is now known that Defendants altered and/or tempered with the test results received from independent third-party testing facilities to make it appear that the masks had passed and were conforming.

#### 1.  The "FDA Certification"

69.     On May 11, 2020 John Cosco of Bluemar again contacted Barbour by email regarding the face masks.  Although Mr. Cosco had been informed that SCT had applied for and was in the process of receiving an EUA for the face masks, he contacted Barbour to determine why SCT (the factory) was not yet on the FDA-approved manufactures list for "non-NIOSH KN95 Masks."[1]  Mr. Cosco informed Barbour that the face masks were intended for sale to government agencies and as such, that the manufacturer was not on the FDA approved list was

---

[1]Non-NIOSH (National Institute for Occupational Safety and Health) KN95 Masks refers to those face masks that have not been approved by NIOSH and are manufactured in China (KN95 technology) but meet certain requirements with regard to filtration, among other requirements.  *See* https://www.fda.gov/medical-devices/coronavirus-disease-2019-covid-19-emergency-use-authorizations-medical-devices/faqs-euas-non-niosh-approved-respirators-during-covid-19-pandemic

problematic.  This was especially so given that Defendants had represented that the face masks were "FDA Certified."

70.     Barbour responded by email on May 11, 2020 that "[o]ur product does meet and exceed the KN95 standards and FFP2 Standards."  In the same email, Barbour pushed back against the questions from Bluemar, asking whether Bluemar had experienced any problems with the construction of the face masks.

71.     Barbour also stated in this email that the FDA was using alternative standards when FDA-cleared or NIOSH approved respirators were not available.  Those alternative standards were those "used in other countries."  Those certifications included the FFP standard (referring to the European Standard (EN 149:2001)), which Defendants represented the face masks met.  Defendants also alleged that the face masks had received CE Certification (European Union standards).

72.     Defendants knew that the face masks were not FDA Certified.  Defendants knew that they did not have certifications that were "used in other countries," yet continued to press to Plaintiffs that their product was certified and conforming.

73.     On May 20, 2020 during a Skype call with Eddie Chung of Bluemar, Barbour sent to him the alleged FDA Certification for SCT, the alleged CE Certification for the face masks and a test result report from SMQ that was alleged to be for the face masks.

74.     The FDA Certification that Defendants provided to Plaintiffs was not a certification, but rather was an FDA Registration, which in this case is notification that a foreign entity has registered to sell product in the United States.  An FDA Registration is not a certification by the FDA that the product is authentic or conforming.

75.     The FDA Registration identified J & F Technology Services, LLC in Union, New Jersey as the private registration agent.  Plaintiffs attempted to contact J&F Technology Services LLC by telephone at the number provided, but no one answered the phone.

76.     A potential customer of AMA had also reached out to J & F Technology Services directly to try and clarify information related to the alleged "FDA Certification."  When the potential customer called J & F Technology Services, the recording at that number stated that "we are not a PPE company."  John Cosco of Bluemar provided this information to Barbour on May 2, 2020.  In response, Barbour forwarded an email from Zhu dated May 2, 2020 and informed John Cosco of Bluemar that the phone number is for the agency that was authorized to issue FDA registration in China.  The email also stated that at the factory, no customer service center exists, there are no sales staff at the factory to take calls and that Pro-Com "will become [the factory's] U.S. distribution agent."

77.     Zhu represented by email dated May 27, 2020 to Eddie Chung of Bluemar that "our company Pro-com Products" had an FDA registration to distribute certified KN95 face masks.

78.     Zhu also informed Eddie Chung on May 27, 2020 that Pro-Com was responsible for the quality and authenticity of the face masks, as well as all issues or problems with the products once they were accepted for delivery within the United States.

79.     In that same email communication, Zhu stated that Pro-Com represented the factory in China—SCT.  Zhu stated that Pro-Com "acts as [SCT]'s sole agent in the U.S. and fully responsible for [SCT]'s products sold in the U.S. in this case, [SCT]'s independent FDA registration starts to fade, and it becomes appendix of Pro-com's FDA."  Zhu again represented

that Pro-Com had filed for and was seeking emergency use authorization ("EUA") from the FDA

for the KN95 face masks.

80.     The EUA required that certain information be provided to the FDA regarding the

product to be authorized.  Among the information that was requested by the FDA in support of

the EUA applications was:

> Indicate whether the product currently has marketing authorization in
> another regulatory jurisdiction, such as the European CE Mark, Australian
> Register of Therapeutic Goods (ARTG) Certificate of Inclusion, Health
> Canada License, or Shonin approval from the Ministry of Health, Labour,
> and Welfare in Japan, and attach any relevant documentation, such as the
> marketing authorization letter or certificate, or corresponding information
> such as the certificate of conformity.

81.     Based on information and belief, the test results provided to the FDA for the SCT-

manufactured KN95 face masks were the altered or fraudulent reports and/or reports that could

not be linked to a manufacturer of the product tested.  SCT does not appear on the FDA

"whitelist" for approved KN95 PPE.

82.     Barbour represented to Eddie Chung of Bluemar during a telephone call on May

27, 2020, that he would provide Pro-Com's FDA Certificate that linked Pro-Com products to the

SCT factory.

83.     Trying to obtain further information regarding the link between SCT, 3B Tech

and Pro-Com, John Cosco of Bluemar also asked Zhu by email on May 28, 2020, to provide

information that would link Pro-Com's FDA registration to SCT-manufactured KN95 face

masks.

84.     Also on May 28, 2020, Barbour also sent via email: "Johnny [Zhu], please see the

email below from John Cosco.  I have sent Eddie [Chung] the FDA provided by Mike [Johnson].

They do not refer to any specific manufacturer."

85.     No further information was provided by Defendants regarding the FDA "certification," the EUA approval or SCT's link to Pro-Com's FDA registration.

### 2. *Defendants Alter the SMQ Testing Results*

86.     In furtherance of the scheme, on or about May 20, 2020, 3B Tech sent the KN95/GB2626 report from the Shenzhen Academy of Metrology & Quality Inspection by attachment to Skype from Barbour to Eddie Chung of Bluemar.  The SMQ Report indicated that the face masks had passed the filtration tests required for certification.  As such, this report could provide the basis for claiming that the KN95 face masks met the FFP2 requirements, among others.  *See* Email below.



87.     The SMQ Report indicated that the test period was from April 2, 2020 through April 11, 2020.  The testing was of fifty (50) KN95 disposable respirators alleged to have been manufactured by SCT, and which product had been delivered by SCT representatives.  The purpose of the tests was to determine, among other things, whether the face masks met the required filtration efficiency percentages.  The conclusion on the face of the report that

Defendants provided to Plaintiffs was that the face masks were conforming, having met those requirements.

88.    On August 12, 2020, Bluemar reached out to SMQ and asked whether the report that had been provided to Bluemar by Defendants was authentic.  SMQ immediately responded that the report, No.: WT204021672 "is (sic) not conform with the original."  The SMQ Report that Defendants provided to Bluemar was confirmed by SMQ to have been altered.  The face masks had not met the filtration efficiency requirements.  The SMQ Report is fraudulent.

### 3.  *The Alleged CE Certification*

89.    The SCT-manufactured KN95 face masks had been stamped with a CE Certification.  *See* Paragraph 55 *supra.*

90.    To support their claims of conformity and authenticity, 3B Tech, Zhu and Barbour provided to Bluemar by email on April 13, 2020, an alleged "CE Certificate."  *See* Image below.



91.     On July 3, 2020, Jennifer Cosco of Bluemar reached out to Ente Certificazione Macchine ("ECM") by email to inquire as to the authenticity of the alleged "CE Certification."

92.     In response to Bluemar's inquiry, ECM informed Jennifer Cosco of Bluemar that the CE Certificate Validation that had been provided by Defendants was not a declaration of conformity as had been represented by Defendants, but rather was a documentation review related to a different product (surgical masks) and not even the product identified on the Purchase Orders.

93.     Thus, the "certification" provided by Defendants to support its claim that the KN95 face masks were CE Certified was neither a certification nor was the documentation review performed by ECM for the KN95 face masks.  Rather, the review was for surgical face masks.  However, Defendants had fraudulently identified and stamped the KN95 face masks as CE Certified.

### 4.   Defendants Alter the DEKRA Report Results

94.     On June 4, 2020, Eddie Chung of Bluemar asked Barbour by Skype for the EN149 Test.  This test was for the purpose of demonstrating the conformity of the KN95 face masks with FFP2 technology, which was printed on the face masks (in addition to the alleged CE Certification).

95.     On June 4, 2020, Barbour via a Skype attachment provided the "DEKRA Testing and Certification" Report dated May 19, 2020 ("DEKRA Report") that purported to demonstrate that the KN95 face masks manufactured by SCT and sold by 3B Tech and other Defendants was CE Certified (as stamped) and met the filtration requirements.

96.     DEKRA is an international testing and certification company that provides, among other services, testing and certification of products, including conformity to EU and FDA standards and directives for PPE.

97.     To determine the authenticity of the report, Ted Argeroplos of AMA contacted DEKRA by email communication on June 10, 2020 to inquire as to whether the face masks manufactured by SCT "had passed all the relevant tests relating to their CPA and that it is 100% FFP2 149:2001 + a1:2009 classified."  A copy of the DEKRA Report that had been provided by Barbour on June 4, 2020 was attached to the email.

98.     Daniel Marx of DEKRA responded on the same day stating that "as it seems this report is fraud.  The original of this report is different.  Did you receive this from the mentioned manufacturer?"

99.     Stunned, and trying to determine the extent of the misrepresentations, Eddie Chung of Bluemar contacted Barbour and Zhu by email on June 10, 2020 seeking an explanation for the DEKRA response.

100.    Initially, Zhu responded by email on June 10, 2020 that DEKRA's email statement was wrong, that the DEKRA Report was neither fraudulent nor altered and that he was going to "sue" anyone who said that it was.

101.    Zhu further wrote that "I have checked with China.  The report is absolutely genuine! I am not sure who this guy is but this becomes a very serious accusation and may trigger a law suite (sic) upon himself."  Zhu claimed that the KN95 face masks manufactured by SCT "have passed the test (which was provided to you), and they are waiting on getting certification from Deka (sic) at the moment."

102.    On June 12, 2020, Barbour provided by attachment to a Skype message to Eddie Chung of Bluemar the invoice for the DEKRA testing.  The invoice received from Barbour purported to represent that SCT had paid DEKRA 120,000 RMB plus tax for the testing.

103.    In response, John Cosco of Bluemar reached out to Daniel Marx of DEKRA on June 12, 2020 by email, attaching the invoice from DEKRA in Shanghai and asking if Mr. Marx could confirm that the report and invoice were authentic.  Maggie He of DEKRA in Shanghai was included on the email communication dated June 12, 2020.

104.    On Monday, June 15, 2020 Ms. He of DEKRA responded by email stating that "the report is fraudulent, you can find the genuine one as attached.  Also the quotation [invoice] is also."  She attached the authentic, unaltered DEKRA Report and Invoice to her email correspondence.  The authentic invoice, which was provided by Maggie He of DEKRA, provided that SCT had paid 100,000 RMG plus tax for the test.

105.    John Cosco of Bluemar responded by email on same date, again trying to reconcile the altered report and invoice with the representations that had been made by Zhu, Barbour and 3B Tech that the KN95 face masks had been tested and met filtration and other requirements.  John Cosco included Zhu, Barbour and Mike Johnson on the email communication.  John Cosco asked Ms. He of DEKRA: "Thank you for the feed-back and providing the correct report.  Can you please confirm that under the authentic report the product passed all relevant sections?"

106.    Maggie He responded by email and stated that the face masks had not passed the "Penetration of the filter medium" in clause 2.4, and thus, had not passed the conformity test. Defendants Zhu, Barbour and Johnson also received the email communication from Ms. He.

107.    The cover page of the altered DEKRA Report states that "the mask meet (sic) the Corona SARS-CoV-2 test requirement."  *See* Image below.



However, the authentic Report cover page provided that "[t]he pandemic respiratory protective mask does not meet the Corona SARS-CoV-2 test requirement."  *See* Image below.



DEKRA Testing and Certification GmbH
Standort Essen
Persönliche Schutzausrüstungen

Adlerstraße 29
45307 Essen, Germany

Tel      +49.201.52319-0
Fax      +49.201.52319-401
E-Mail   CPA@dekra.com

### Prüfbericht / Test report
### No. 3417252.10-CPA

| | |
|---|---|
| **Prüfgegenstand** *Testsubject* | Corona SARS-CoV-2 Atemschutzmaske *Coroan SARS-CoV-2 respiratory protective mask* |
| **Modell** *Type* | FFP2/N95 Adult |
| **Hersteller** *Manufacturer* | Shenzhen Centurion Technology Co., Ltd. 301. Building A, 38 Minan Road, Pinghu Community, Longgang District Shenzhen, CHINA |
| **Prüfgrundlage** *Test requirement* | Prüfgrundsatz für Corona SARS-Cov-2 Pandemie Atemschutzmasken Rev. 1 vom 26.03.2020 *Testing principle for Corona SARS-CoV-2 pandemic respiratory masks rev. 1 of 2020-03-26* |
| **Prüfergebnis** *Test result* | Die Pandemie Atemschutzmaske entspricht **nicht** den Corona SARS-CoV-2 Prüfanforderung *The pandemic respiratory protective mask does **not** meet the Corona SARS-CoV-2 test requirement.* |
| **Datum** *Date of issue* | 19.05.2020 |

Dieser Bericht besteht aus 10 Seiten. *This report consists of 10 pages.*
Eine auszugsweise Veröffentlichung dieses Berichtes bedarf der Zustimmung der DEKRA Testing and Certification GmbH. Juristisch bindend ist ausschließlich die deutsche Fassung dieses Berichtes.
*Publication of extracts of this report requires agreement of DEKRA Testing and Certification GmbH. We confirm the correctness of the translation of the German original. In the case of arbitration however only the German wording shall be valid and binding.*

DEKRA Testing and Certification GmbH, Handwerkstraße 15, 70565 Stuttgart
Zertifizierungsstelle *Certification Body*: Dinnendahlstraße 9, 44809 Bochum
Telefon +49.234.3696-400, Fax +49.234.3696-401, DTC-Certification-body@dekra.com

**Prüfbericht Nr. / Test report no.:**
3417252.10-CPA

**Seite / Page**
1 - 10

108.     Faced with their clear fraud, Zhu wrote to John Cosco of Bluemar on June 15, 2020 by email and stated, "I am still trying to sort out the issues with the factory and 3rd party that handled this."  Zhu also wrote that "[w]e have sent random samples to SGS facility to

perform testing on our products."  Zhu concluded by writing that if the face masks did not pass

"there is no reason we would not take them back."

5.  *The SGS and GQI Reports Cannot Be Linked to the SCT-Manufactured KN95 Face Masks*

109.    Barbour, represented in an email dated May 11, 2020 to John Cosco and Eddie

Chung, copying Zhu, that 3B Tech had gone "above and beyond we have also ordered testing

from SGS, to prove the filtering ability of our KN95 product."  Barbour was referring to SGS,

which company provides, among other services, certificates of conformity for products,

processes, systems or services demonstrating compliance with either national or international

standards and regulations.

110.    Barbour stated to Eddie Chung of Bluemar in a Skype communication that the

face masks passed KN95 filtration tests that had been performed by SGS.  Seemingly to support

this claim, on May 28, 2020 Barbour sent a copy of the SGS Test Report dated May 27, 2020

("SGS Report") as an attachment to the Skype communication.

111.    By its contents, the SGS testing had been requested by Pro-Com.  The SGS

Report provided that the product tested had passed certain filtration tests.

112.    After the other fraudulent reports that had come to light, Jennifer Cosco of

Bluemar reached out in early July 2020 to the to SGS Air Labs Manager and asked whether SGS

could validate the report as authentic. Ms. Cosco sent an email to Daniel R. Miller, CRS, Air

Labs Manager, SGS IBR Laboratories:

> We were provided this document by our supplier (Procom Products)
> regarding KN95 masks we have purchased from them.  Can you please
> share what this test is for?  NIOSH from what I have heard is related to N95.
> Is this a NIOSH level test on the KN95 mask pictured  Do the results of
> Efficiency % refer to filter %? Additionally, can you share how this test
> relates back to KN95 that Procom manufacturers?  It's confusing because

31

of the list of manufacturers below the results. How do they relate to Procom or why are they there?

113.    Daniel Miller of SGS responded by email that the report and the findings regarding the face masks tested were valid, meaning that the document was authentic.  He confirmed that the face masks were tested "for initial filtration efficiency only using the NIOSH N95 (TEB-APR-STP-0059) method.  It is very similar to the KN95 method (GB2626-2020) and determines whether or not the claimed certification is legitimate."

114.    Jennifer Cosco of Bluemar answered back to Mr. Miller, asking him whether SGS could confirm that the product that SGS tested were face masks manufactured by SCT.  Mr. Miller responded on July 3, 2020, stating that SGS could not link the face masks that SGS had tested to the face masks that were manufactured by SCT (or any manufacturer) and had been sold to Plaintiffs:

> **Unfortunately, we cannot link the masks for which you have provided images back to the report.  The non-powered respirators that were tested for that project arrived without any specific identification unique to the samples.  They were simply packaged in a brown cardboard box**.

(emphasis added).

115.    Jennifer Cosco of Bluemar responded on July 6, 2020 and asked about the "claimed certification" mentioned in the SGS email response because the face masks from Defendants did not contain the certification slip.  Mr. Miller replied, "[m]any of the non-powered respirators imported from China have slips of paper providing certification that the masks meet the requirements for KN-95."

116.    Although Pro-Com had provided a sampling of face masks to SGS, Pro-Com did not identify the manufacturer of the product nor was the manufacturer identifiable from the

product sample that was sent to SGS by Pro-Com: "they were simply packaged in a brown cardboard box."

117.    Effectively, by submitting the face masks to SGS in a "brown cardboard box," there was no way to link the masks provided by Pro-Com to any manufacturer.  As there were no identifying marks or identification of a manufacturer to link the face masks that were tested and the product sold by 3B Tech to Plaintiffs and others, the SGS Report is meaningless and of no probative value.

118.    Upon information and belief, Defendants provided face masks to SGS for testing that were not manufactured by SCT.  Pro-Com provided a non-descript brown box with no identifiable markings on the box or the mask and did not identify the manufacturer or the source of the face masks.  Plaintiffs also base this belief on the indisputable facts now known that the face masks manufactured by SCT and sold by Defendants to Plaintiffs, as well as others, and continuing to be offered for sale by Defendants, failed two other filtration tests.

119.    In addition to the SGS testing, Defendants also provided a test result from the Guangdong Testing Institute of Product Quality Supervision ("GQI").  According to its website, GQI is a third-party institute that specializes in product testing and certification.

https://gqi.org.cn/jsp/weben/article/ArticleView.xhtml?columnNo=F02001

120.    3B Tech sent the GQI report on June 5, 2020 to John Cosco of Bluemar to support the position that the KN95 face masks sold to Plaintiffs were conforming and authentic.  The GQI report, similar to the SGS report, is based on testing of face masks that were not the same face masks sold to Plaintiffs nor the face masks that were advertised for sale by Defendants.  The face masks that are pictured in the GQI report (as those that were tested) are not the same face masks sold to Plaintiffs nor are they the same face masks that were advertised on-line for sale by

Defendants.  Specifically, the face masks tested did not have the CE, FFP2 or KN95 marks stamped on the masks.  *See* Image below:



(And as compared to the masks in Paragraph 55 hereinabove.)

121.    Same as the SGS report results, there is no link from identifying marks or identification of a manufacturer between what was tested, and the product sold by Defendants to Plaintiffs and others and still is offering for sale.

## THE "SWAP"

122.    After Plaintiffs could not confirm the authenticity and conformity of the face masks, Plaintiffs demanded that 3B Tech refund the payments for the face masks.

123.    Realizing that their scheme had been uncovered and in response to clear and unmistakable proof that the KN95 face masks that 3B Tech was selling to Plaintiffs were non-conforming and did not have the certifications as had been represented, 3B Tech and Zhu agreed to provide a refund.

124.    More specifically, John Cosco sent an email on June 16, 2020 to Zhu demanding a refund, stating that:

> Thank you for time yesterday and understanding of the seriousness of the situation.  Per our conversation, I spoke with the customer and they're accepting of the 250K buy back with the promise that you will make all

reasonable efforts to take back the remaining 250K units for a full refund
upon your investigation of who is accountable for supplying the fraudulent
reports.

Can you supply the address of a local non-affiliated 3 party warehouse that
Ted can ship the units back at our expensive for your team to inspect and
release after payment confirmation.

125.    Instead of refunding the payments for the remaining face masks, 3B Tech and Zhu

offered during a telephone call on June 24, 2020 to "swap out" certified, authentic face masks for

the remaining non-conforming, fraudulently certified face masks that had been sold by

Defendants to Plaintiffs.

126.    3B Tech, Zhu and Barbour represented that Plaintiffs would receive FDA "white-

list" face masks in exchange for the remaining non-conforming, fraudulently certified KN95 face

masks and provided the name of the manufacturer to Plaintiffs: Zhejiang Lily.

127.    On July 23, 2020, Jennifer Cosco of Bluemar asked Zhu by email for images of

the certified, authentic face masks that were being shipped by 3B Tech to AMA.  In response,

Zhu asked Barbour on July 27, 2020 to provide the product information to Bluemar.  Two days

later, on July 29, 2020, Barbour sent an invoice to Bluemar identifying that the "swap out" face

masks would be coming from a different facility: "Hongwu International Limited."  That invoice

listed the replacement product as being manufactured by Guandong ViDao Medical Technology

Co., Ltd.

128.    Plaintiffs attempted to verify the authenticity of these newly identified face masks

with Barbour.  John Cosco of Bluemar asked why the manufacturer had changed, as Zhejiang

Lily had originally been identified as the manufacturer of the "swap out" face masks.  In

response, on July 29, 2020, Barbour stated that "Hongwu is our China Entity."

129.     By August 6, 2020, Defendants still had not provided the "swap out" face masks and Plaintiffs demanded a full refund.  Defendants refused to refund the monies paid for the non-conforming, fraudulently certified face masks.

### D.   The Non-Conforming, Falsely Identified KN95 Face Masks are Part of a Pattern of Fraudulent Activity and Continue to be Offered for Sale

130.     Representations on the SCT website at https://www.centurion-med.com[2] demonstrate that Defendants are continuing to market and sell the fraudulent KN95 face masks in interstate if not international commerce.  (The website offers translation in nine different languages, including Russian, Arabic, Japanese and Portuguese.)  SCT represents on the website that the KN95 face masks have passed the "European standards for the masks, i.e., EU en149, en14683, type IIR certification standards, CE and FDA certified issued by DEKRA, Germany, ASTM, level3 and other international test reports."  These statements are fraudulent and/or unsupported by test results.

131.     Pro-Com continues to offer for sale the KN95 face masks with the fraudulent certifications and altered filtration test results: https://procomproducts.com/our-brands/.  One of "our brands" identified on the Pro-Com website is the Salusen PPE, including the KN95 face masks.

132.     Salusen offers the KN95 face masks with the fraudulent certifications and altered filtration test results for sale: https://salusen.com/product/kn95-filtering-facepiece-respirator-mask-n95-ppe-alternative-50pk/.  Salusen's website states that the product had been tested to meet CE EN149 and GB2626.  The Salusen PPE can also be purchased on eBay.

---

[2] Website accessed last on May 31, 2021.

133.     Splatterguard.com is also offering for sale the same non-conforming, fraudulently

certified KN95 face masks and has represented on its website that the face masks have both

"FDA Certification" and CE Certification—neither of which exists.

<div align="center">

**FIRST CAUSE OF ACTION**
**Civil Violation of the Racketeer Influenced and**
**Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)**

</div>

134.     Plaintiffs restate and incorporate by reference the foregoing Paragraphs as if fully

set forth herein.

135.     Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who

conducted the affairs of the Enterprise through a pattern of racketeering activity in violation of

18 U.S.C. § 1962(c) as previously described herein.  This means committing or attempting to

commit federal mail and wire fraud.

*Qualifying Enterprise*

136.     Defendants are individuals, partnerships, corporations, associations, and other

legal entities, and any union or group of individuals associated in fact although not a legal entity

within the meaning of 18 U.S.C. § 1961(4).

137.     The association in fact consists of (i) Defendants, including their employees and

agents; (ii) SCT, as set forth herein.

138.     The Enterprise consists of persons associated together for the common and shared

purpose of the fraudulent manufacture, marketing and sale of PPE goods as described herein.

Defendants are directly engaged in the production, distribution, and/or acquisition of goods and

services in interstate and international commerce.

139.    The individual engaged in and the structure of the enterprise is ongoing and continuous, as described herein, with an ascertainable structure that is separate and distinct from that of the conduct of the pattern of racketeering activity.

140.    Other members of the enterprise may exist but are unknown at this time.

*Pattern of Racketeering Activity*

141.    Whether directly or indirectly, Defendants knowingly, willfully, and intentionally committed at least two acts of racketeering activity since March 2020 (or sooner) as described herein, constituting a pattern within the meaning of 18 U.S.C. §§ 1961(1) and l961(5).

142.    These acts of racketeering activity, advertising and selling fraudulently certified face masks, using altered test reports are related and amount to and/or pose a threat of continued unlawful activity.  As described herein, these acts have similar purposes, results, participants, methods of commissions and distinguishing characteristics such that they are not isolated events. These acts have similar goals and methodology, and they have a requisite degree of proximity.

143.    Through a pattern of racketeering activity Defendants knowingly, willfully, intentionally and unlawfully conducted or participated, whether directly or indirectly, in the affairs of the Enterprise.  Defendants intended the scheme to obtain money through false representations, fraud, deceit, and other improper and unlawful means.

144.    The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the Enterprise. Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

145.    Defendants' acts include acts of racketeering activity that are indictable under provisions of applicable State of Maryland and federal criminal laws as alleged herein.

146.     Defendants each committed numerous such acts, conspired to commit such acts as alleged herein, and/or aided and abetted such acts.

**Predicate Acts**

147.     Defendants participated in the operation and management of the association-in-fact enterprise and the alternative enterprises by overseeing and coordinating the commission of multiple acts of racketeering as described below.

### *Federal Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341 and 1343*

148.     Defendants willfully committed indictable offenses under §§ 1341 and 1343 in that they voluntarily and intentionally devised, intended to devise, and participated in a scheme or artifice with the intent to defraud Plaintiffs of their property (*i.e.,* money) and with the intent to defraud by means of false or fraudulent pretenses, representations and/or promises.

149.     Defendants committed these acts with actual knowledge of their illegality.

150.     For the purpose of executing their scheme or artifice, Defendants caused delivery of various documents and things, as described herein, by the U.S. Mail and/or by commercial interstate carriers.

151.     The use of the U.S. Mail and/or by commercial interstate carriers to execute Defendants' plan or scheme was reasonably foreseeable if not intended.

152.     Such documents and PPE travelled interstate and were delivered to AMA in the State of Maryland and within the jurisdiction of this Court.

153.     For the purpose of executing their scheme or artifice, Defendants caused the transmission and delivery of wire communications in interstate and foreign commerce to include various writings, signs and signals such as bank wire transfers, electronic mails and through Skype and telephone calls.

154.    Such wire communications travelled interstate and were delivered to AMA in the State of Maryland and within the jurisdiction of this Court.

155.    The use of interstate wire communications as part of Defendants' plan or scheme was reasonably foreseeable, if not intended.

156.    These aforementioned acts were done intentionally and knowingly with the specific intent to further Defendants' scheme or artifice.

157.    Defendants carried out the scheme in at least China and the United States and at least the State of Maryland and could not have done so without the use of the U.S. Mail, commercial interstate carries, and/or interstate wires.

158.    In furtherance of the scheme to defraud, Defendants communicated among themselves and with Plaintiffs.  These communications were transmitted interstate by wire (*e.g.,* electronic mail and telephone) and/or through the U.S. mail and/or commercial carriers.  Zhu and Barbour communicated with Bluemar repeatedly with regard to the sale of the PPE; Defendants sent fake and fraudulently altered testing results to Plaintiffs as part of Defendants' illegal scheme and applied for FDA authorization for the KN95 face masks, on information and belief by submitted the fake and fraudulently altered testing results to the FDA.

159.    Plaintiffs reasonably and justifiably relied on Defendants' fraudulent representations and deceptive communications.

160.    Plaintiffs have been damaged as a direct and proximate result of Defendants' acts and participation in such an unlawful enterprise as alleged herein.

### *Theft – Unauthorized Control of Property in Violation of Md. Code Ann. § 7-104(a)*

161.    Defendants   willfully   committed   indictable   offenses   under   Maryland   Code Annotated § 7-104(a).  They willfully and knowingly obtained and controlled the property (*e.g.,*

money) of Plaintiffs without authorization or conspired to do the same.

162.    Defendants committed these acts with actual knowledge of their illegality.
Defendants had the purpose of depriving Plaintiffs of the property.  Defendants withheld Plaintiffs'
property permanently.

163.    Defendants willfully and knowingly used or concealed the property in such a
manner as to deprive the owner of the property or knew that the use or concealment would deprive
the owner of the property.

164.    These acts were part of a scheme or continuing course of conduct beginning in early
2020 and lasting to the present.

165.    Plaintiffs were the owners of property (*e.g.*, money) at issue here.

166.    As aggregated, pursuant to Section 7-103(f), the value of the property was over
$100,000.

### *Theft – Obtaining Control by Deception in Violation of Md. Code Ann. § 7-104(b)*

167.    Defendants willfully committed indictable offenses under Maryland Code
Annotated § 7-104(b).  They willfully and knowingly obtained and controlled Plaintiffs' property
(*e.g.*, money) by deception or conspired to do the same.

168.     Defendants committed these acts with actual knowledge of their illegality.
Defendants had the purpose of depriving Plaintiffs of the property.

169.    Plaintiffs were the owners of property (*e.g.*, money) at issue here.

170.    Defendants were practically certain that they were creating and confirming a false
impression without believing it to be true.  Defendants made false and misleading representations
through wire communications, via Skype and other methods of communications.  Defendants
also failed to correct such a false impression once created or confirmed.  Defendants attempted to

prevent Plaintiffs from acquiring the correct information.  This deception constituted more than mere puffing, immaterial statements, and exaggerations that would be unlikely to deceive ordinary persons.

171.    Defendants had the purpose of depriving Plaintiffs of the property.

172.    These acts were part of a scheme or continuing course of conduct beginning in early 2020 and lasting to present.

173.    As aggregated pursuant to Section 7-103(f), the value of the property was over $100,000.

174.    A violation of Section 7-104(b) as alleged here involves an act or threat involving activity as enumerated by 18 U.S.C. § 1961(1)(A) and punishable by imprisonment for more than one year.

***Continuity of Conduct***

175.    Defendants' repeated acts of racketeering activity in violation of the laws of the State of Maryland and the United States have been continuous.

176.    Beginning in early 2020 and continuing to the present, Defendants' related acts of racketeering activity have occurred on numerous occasions, as described herein, constituting a continuous course of conduct.

177.    By its nature, this conduct poses a threat of future reoccurrence, as described herein, constituting an open-ended continuous course of conduct.

178.    Defendants' violations have directly, illegally, and proximately injured Plaintiffs and other market participants.  Other entities harmed by Defendants' conduct, as represented by Defendants, include SB Richards Company, hospitals, government entities—all of which Defendants claimed to have sold PPE to and which may have purchased the fraudulently

certified products described herein.

179.    The acts identified herein are part of an association that exists for unlawful purposes.

180.    Defendants have conducted and/or participated, directly and/or indirectly, in the conduct of the affairs of the alleged enterprise through a pattern of racketeering activity as defined herein in violation of 18 U.S.C. § 1962(c).

***Prayer for Relief***

181.    Plaintiffs seek compensatory damages for, among other things, the sum Defendants essentially stole from Plaintiff.  Plaintiffs accordingly seeks an award of three times the damages it sustained, and the recovery of reasonable attorneys' fees and costs, as well as any other relief as authorized by law.

<div align="center">

**SECOND CAUSE OF ACTION**
**Civil Violation of RICO,**
**<u>18 U.S.C. § 1962(d) By Conspiring to Violate 18 U.S.C. § 1962(c)</u>**

</div>

182.    Plaintiffs hereby restate and incorporate by reference the foregoing Paragraphs as if fully set forth herein.

183.    Defendants, in violation of 18 U.S.C. § 1962(d), knowingly, willfully, and actually agreed to further a scheme in violation of 18 U.S.C. § 1962(c), with persons known and unknown, as specifically alleged herein.

184.    That scheme included the operation or management of an unlawful enterprise through a continuous pattern of racketeering activity as alleged herein.

185.    Defendants and other persons, known and unknown, knowingly, purposefully, and actually committed at least one overt act in furtherance of the conspiracy as described herein.

186.    The conspiracy commenced on or before March 2020 and is ongoing.

187.    The conspiracy's purpose was to obtain money from Plaintiffs to Defendants' own benefit by way of the fraudulent scheme described herein and to defraud Plaintiffs and others to whom Defendants sold and continue to sell its fraudulently certified face masks.

188.    Defendants have directly, illegally, and proximately caused and continue to cause injures to Plaintiffs in violation of 18 U.S.C. § 1962(d).  Plaintiff's injuries were reasonably foreseeable consequences of Defendants' conduct.

*Prayer for Relief*

189.    Plaintiffs seek compensatory damages for, among other things, the sum Defendants essentially stole from Plaintiff.  Plaintiffs accordingly seeks an award of three times the damages it sustained, and the recovery of reasonable attorneys' fees and costs, as well as any other relief as authorized by law.

### THIRD CAUSE OF ACTION
### Common Law Fraudulent Misrepresentation

190.    Plaintiffs hereby restate and incorporate by reference the foregoing Paragraphs as if fully set forth herein.

191.    Defendants had a duty to disclose material facts to Plaintiffs.

192.    Defendants knowingly made false and fraudulent misrepresentations of material fact as described herein.  These misrepresentations include full and partial, affirmative misstatements as well as omissions.

193.    Defendants knew these misrepresentations to be false and fraudulent.

194.    Defendants made these misrepresentations as described herein with the intent to induce Plaintiffs to act in reliance.

195.    Plaintiffs acted in reasonable reliance of Defendants' false and fraudulent misrepresentations and suffered pecuniary damage.

*Prayer for Relief*

196.     Plaintiffs seek compensatory damages, punitive damages, as well as any other

relief as authorized by law.

## FOURTH CAUSE OF ACTION
## <u>Breach of Purchase Orders</u>

197.     Plaintiffs hereby restate and incorporate by reference the foregoing Paragraphs as

if fully set forth herein.

198.     Plaintiffs entered into Purchase Orders with 3B Tech for the purchase of certified,

conforming KN95 face masks.

199.     The Purchase Orders provided that 3B Tech was to provide CE and FDA

Certified KN95 face masks.

200.     When 3B Tech, Zhu and Barbour were confronted with the fraudulently

altered/fake testing and reports, Defendants initially agreed that they would swap conforming

product for the falsified product.

201.     However, the swap never occurred.

202.     3B Tech failed to deliver product that was identified on the Purchase Orders and

as such, breached the terms and conditions of the Purchase Orders.

203.     As a result of the breaches, Plaintiffs have suffered damages.

*Prayer for Relief*

204.     Plaintiffs seek compensatory damages, for among other things, the amounts paid

to Defendants that Defendants did not return or refund, and any other damages sustained;

interest; as well as any other relief as authorized by law.

**PRAYER FOR RELIEF**

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request that the Court:

(a) award compensatory, consequential, exemplary, treble and punitive damages to Plaintiffs as

appropriate and in an amount to be determined at trial; (b) award attorneys' fees and costs to

Plaintiffs; (c) interest; and (d) award Plaintiffs any other relief afforded by law.

**JURY DEMAND**

Plaintiffs demand a jury trial as to all claims so triable.

Dated: June 11, 2021

<div style="margin-left:40%">

/s/ M. Celeste Bruce
M. CELESTE BRUCE (Bar No. 10710)
Rifkin Weiner Livingston LLC
4800 Hampden Lane, Suite 820
Bethesda, Maryland 20814
cbruce@rwllaw.com
301.951.0150 (p)
301.951.0172 (f)

</div>

46