**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **AMA SYSTEMS, LLC**, *et al.*, | * | |
| **Plaintiffs,** | * | |
| v. | * | **Case No.: DLB-21-1472** |
| **3B TECH, INC.,** *et al.*, | * | |
| **Defendants.** | * | |

**MEMORANDUM OPINION**

Plaintiffs AMA Systems, LLC ("AMA") and Bluemar Promotions, LLC ("Bluemar") filed suit against defendants 3B Tech, Inc. ("3B Tech"), Pro-Com Products, Inc. ("Pro-Com"), Salusen, Inc. ("Salusen"), Jian Qing "Johnny" Zhu, Brett Barbour, and Michael Johnson, and any unknown affiliated entities or persons acting in concert. ECF 1. In their amended complaint, plaintiffs allege defendants engaged in and continue to engage in a conspiracy to manufacture, market, and sell fraudulently certified personal protective equipment during the COVID-19 pandemic. ECF 33. Against all defendants, plaintiffs claim a civil violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), specifically 18 U.S.C. § 1962(c) (Count I); conspiracy to violate RICO (Count II); and common law fraudulent misrepresentation (Count III). Against 3B Tech, plaintiffs claim breach of contract (Count IV). Plaintiffs also claim breach of contract against 3B Tech, Salusen, Zhu, and Barbour (Count V).

Defendants move to dismiss the two RICO counts for failure to state a claim. ECF 36. The motion has been fully briefed. ECF 37 & 38. No hearing is necessary. *See* Loc. R. 105.6. For the following reasons, the motion to dismiss is granted.

## I.      Background[1]

Near the onset of the COVID-19 pandemic, the strain on the healthcare system and the unprecedented increase in demand across all sectors of healthcare resulted in a severe shortage of personal protective equipment ("PPE").  ECF 33, ¶ 5.  Face masks or filtering facepiece respirators are a form of PPE.  *Id.* ¶ 6.  Face masks may be designated by certifying marks that indicate conformance to certain standards of effectiveness.  *Id.* ¶ 9.  Relevant to this action are three types of certifications applicable to face masks manufactured in China: compliance with the requirements of emergency use authorizations ("EUAs") issued by the Food and Drug Administration ("FDA"), conformance to KN95 standards indicating similarity to N95 masks commonly used in the United States, and CE certification or FFP2 conformance indicating compliance with the requirements of European Union directives and regulations.  *Id.* ¶¶ 6–9.  Face masks identified with these certifications can be sold for higher prices.  *Id.* ¶ 10.  Manufacturers of face masks have their products independently tested to obtain these certifications.  *Id.* ¶ 9.

Plaintiff AMA provides "analysis and deployment services" for its clients.  *Id.* ¶ 13. Plaintiff Bluemar provides "logistics and distribution of products, among other services."  *Id.* ¶ 14. In late March 2020, AMA reached out to Bluemar about securing PPE, including face masks.  *Id.* ¶ 59.  Bluemar, in turn, entered discussions with 3B Tech to purchase PPE.  *Id.* ¶ 60.  Each defendant represented to plaintiffs that face masks manufactured in China under the Salusen label had been tested by one or more of four different independent testing entities and that the products had passed those tests and could be identified with the above certifications.  *Id.* ¶¶ 9, 35.  Bluemar ordered face masks from 3B Tech, paid for them through a series of wire transfers to 3B Tech, and

---

[1] As is proper on a motion to dismiss, the Court takes all well-pleaded allegations contained in the amended complaint as true.  *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (citing *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016)).

delivered the masks to AMA.  *Id.* ¶ 46.  Plaintiffs later discovered the masks did not comply with FFP2 technology, were not CE or FDA certified as represented, and were stamped with fraudulent certifications.  *Id.*

3B Tech is an Indiana-based importer, distributor, and seller of various products, including products manufactured in China.  *Id.* ¶ 16.  Pro-Com is a California-based importer and distributor specializing in consumer electronics and packaged goods.  *Id.* ¶ 17.  Salusen is an Indiana-based online retailer of PPE.  *Id.* ¶ 20.  Zhu is the incorporator, president, owner, and former CEO of 3B Tech; an owner of Pro-Com; and an owner of Salusen.  *Id.* ¶¶ 16–17, 20.  Zhu is also an owner of non-party Shenzhen Centurion Technology Company ("SCT"), a manufacturing plant in China that produces healthcare supplies including face masks.  *Id.* ¶ 15.  Barbour is the vice president, registered agent, and former interim CEO of 3B Tech; an owner of Pro-Com; and an owner, as well as the incorporator, president, and resident agent, of Salusen.  *Id.* ¶¶ 20, 25.  Johnson is the senior vice president of Pro-Com and may have a role with 3B Tech and/or Salusen.  *Id.* ¶¶ 27, 30.  Essentially, as relevant to plaintiffs' claims, SCT manufactures face masks, and 3B Tech and Pro-Com import and distribute the masks under the brand Salusen.  *Id.* ¶¶ 15–34.  The individual defendants collectively own and/or operate the entity defendants.  *Id.*  Plaintiffs also sue "Does 1–10" and anticipate amending their complaint to add the names and capacities of other involved in the alleged scheme when they become known.  *Id.* ¶ 31.

Bluemar made three purchase orders with 3B Tech for SCT-produced masks.  First, on April 6, 2020, Bluemar ordered 50,000 "K95 Masks—FDA approved" at a cost of $100,000.  *Id.* ¶ 64.  Prior to this initial purchase, Zhu (on behalf of 3B Tech) informed Bluemar that SCT had begun manufacturing PPE products and could supply certified PPE; that Zhu was chartering planes to bring SCT's face masks to the United States; and that he had the White House as a customer for

SCT's masks.  *Id.* ¶¶ 60, 62–63.  At the time, SCT's website stated the KN95 face masks it manufactures have "CE and FDA certification issued by DEKRA, Germany, ASTM, level3 and other international test reports."  *Id.* ¶ 61.  Zhu and 3B Tech confirmed in an April 13 email to Bluemar that the ordered KN95 face masks were FDA and CE certified and had passed filtration tests required for identification as FFP2.  *Id.* ¶ 65.

Bluemar placed a second purchase order on April 15 for 250,000 "KN95 Disposable Face Mask—Packaged 50 per carton in sleeves of 10 each," at a cost of $500,000.  *Id.* ¶ 67.  The order required the masks be marked KN95, be manufactured by Salusen, and be FDA and CE certified with specific certificates.  *Id.*  Bluemar requested photographs of the masks to forward to AMA, and 3B tech provided images of the masks and the inner packaging and cartons.  *Id.* ¶ 69.  After reviewing these images, AMA raised questions, which Bluemar emailed to Barbour.  *Id.* ¶¶ 69–70.  Specifically, Bluemar asked to confirm the FDA certification and inquired whether all the packaging would be branded with the Salusen logo, whether all the images were of the Salusen product, and whether the masks would be stamped with the certifications.  *Id.* ¶ 70.  Over email, Barbour and Zhu explained the masks and packaging would not be identified with the Salusen label or logo to save time and cut costs, but that the masks were still Salusen KN95 masks and the universal product code would remain the same.  *Id.* ¶ 71.  Bluemar responded on April 19, indicating it would move forward with the second purchase but revising the purchase order to reflect the parties' discussion.  *Id.* ¶¶ 73–75.  Bluemar made its third and final purchase order on April 29, for 500,000 face masks KN95 disposable masks, FDA and CE certified and marked KN95, at a cost of $1,000,000.  *Id.* ¶¶ 76–78.

3B Tech shipped 250,000 face masks on April 27; 50,000 on April 28; and 250,000 on May 4.  *Id.* ¶ 79.  Each delivery was shipped from Pro-Com to AMA, with freight costs paid by

Bluemar and passed on to AMA.  *Id.*  The delivered masks were stamped with what appeared to be CE certification and a FFP2 stamp of approval; additionally, the packaging contained the designation "FFP2 Europe EN 149:20001 + A1:2009 Classified" and "FDA N10066564."  *Id.* ¶¶ 80, 83.  The stamps and statements on the packaging were false.  *Id.* ¶¶ 81, 84.  Plaintiffs allege that each defendant knew the stamps and statements on the packaging were false as the deliveries passed through their hands.  *Id.* ¶¶ 82, 85.  Between April 7 and May 21, AMA wired funds to Bluemar, and Bluemar wired funds to 3B Tech.  *Id.* ¶ 86.

Between March and June, defendants made multiple false representations to plaintiffs regarding the masks.  *Id.* ¶¶ 101–92.  These representations occurred over telephone, email, and Skype calls.  *Id.*  The false representations were generally responses to plaintiffs' questions and concerns and were meant to reassure plaintiffs about the certification status of the masks and defendants' and SCT's compliance with various regulatory requirements.  *Id.*  The complaint contains detailed allegations, but a handful of examples will suffice for now.  First, when asked for an FDA Certification, defendants provided an FDA Registration (a different document that does not certify the product is authentic or conforming).  *Id.* ¶¶ 107–10.  When plaintiffs attempted to contact the private registration agent identified in the FDA Registration, they received no answer.  *Id.* ¶ 111.  When a potential customer of AMA called the agent, a recording stated: "[W]e are not a PPE company."  *Id.* ¶ 112.  Second, defendants provided reports from SMQ and DEKRA, two testing entities, that indicated the face masks had passed certain tests.  *Id.* ¶¶ 128, 147.  When Bluemar later contacted SMQ and DEKRA, they each responded that the reports did not conform with the originals—that the masks had not passed the tests and the reports had been altered to show they had.  *Id.* ¶¶ 132, 154.  Third, defendants provided a second set of test results and a CE Certificate, and Bluemar later learned the Certificate and some test results concerned different

products and the remaining test results could not be linked to the masks sold to plaintiffs. *Id.* ¶¶ 136–142, 175–192.

Following these revelations, plaintiffs demanded a refund. *Id.* ¶ 193. 3B Tech and Zhu initially agreed to provide a refund, but later negotiated with plaintiffs to "swap out" the non-conforming and fraudulently certified masks for authentic, certified masks. *Id.* ¶¶ 195–96. By August 6, defendants still had not provided authentic masks, so plaintiffs again demanded a full refund. *Id.* ¶ 200. 3B Tech, Salusen, Zhu, and Barbour refused. *Id.* As of August 31, 2021— when plaintiffs filed their amended complaint—defendants and SCT continued to market and sell face masks. *Id.* ¶¶ 201–04.

## II.    Standard of Review

A Rule 12(b)(6) motion to dismiss for failure to state a claim "tests the legal sufficiency of a complaint" and "should be granted unless the complaint 'states a plausible claim for relief.'" *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017), *as amended* (Jan. 20, 2017) (quoting *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012)); *see* Fed. R. Civ. P. 12(b)(6). To survive the motion, the "complaint need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)). Stated differently, the complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Importantly, a Rule 12(b)(6) motion "does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *Butler v. United States*, 702 F.3d 749, 752 (4th Cir. 2012) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)). In ruling on a Rule 12(b)(6) motion, the Court must accept all the plaintiff's factual allegations as true and draw

all reasonable inferences in the plaintiff's favor. *In re Birmingham*, 846 F.3d at 92 (citing *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)).

## III.   Discussion

### A.   RICO violation

Under 18 U.S.C. § 1962(c), it is unlawful "for any person employed by or associated with any enterprise" in interstate or foreign commerce "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."  The RICO statute provides "a private civil right of action to '[a]ny person injured in his business or property by reason of a violation of' the RICO provisions."  *ESAB Grp., Inc. v. Centricut, Inc.*, 126 F.3d 617, 626 (4th Cir. 1997) (quoting 18 U.S.C. § 1964(c)).  "[T]o provide society with a powerful response to the dangers of organized crime[,]" a successful RICO plaintiff "may recover not only costs and attorney's fees, but also *treble* damages."  *U.S. Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 317 (4th Cir. 2010) (citing 18 U.S.C. § 1964(c)).

The Supreme Court has described RICO's penalties as "drastic."  *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 233 (1989).  The Fourth Circuit has advised courts should "not lightly permit ordinary business contract or fraud disputes to be transformed into federal RICO claims."  *Flip Mortg. Corp. v. McElhone*, 841 F.2d 531, 538 (4th Cir. 1988).  Rather, civil RICO is "a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity."  *Awappa*, 615 F.3d at 317 (quoting *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006)).  To state a civil RICO claim, a plaintiff must plausibly allege: (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.  *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985).

Defendants argue plaintiffs have failed to plausibly allege the second, third, and fourth elements of civil RICO.  ECF 36.

### 1.   Distinct RICO Enterprise

"[T]o establish liability under 18 U.S.C. § 1962(c), one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). That is, the "person" alleged to have violated RICO must be separate and distinct from the "enterprise" or tool through which the RICO violation occurred. *Chambers v. King Buick GMC, LLC*, 43 F. Supp. 3d 575, 588 (D. Md. 2014); *Mitchell Tracey v. First Am. Title Ins. Co.*, 935 F. Supp. 2d 826, 842 (D. Md. 2013). The RICO statute defines "person" to include "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). An "enterprise" "includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "A RICO enterprise is characterized by 'continuity, unity, shared purpose and identifiable structure.'" *Chambers*, 43 F. Supp. 3d at 589 (quoting *United States v. Fiel*, 35 F.3d 997, 1003 (4th Cir. 1994) (citation omitted)). An enterprise requires proof of three elements: (1) an ongoing organization, (2) the associates of which function as a continuing unit, and (3) existence apart from the alleged pattern of racketeering activity. *United States v. Turkette*, 452 U.S. 576, 583 (1981); *Chambers*, 43 F. Supp. 3d at 589 (citing *Proctor v. Metro. Money Store Corp.*, 645 F. Supp. 2d 464, 477–78 (D. Md. 2009)).

Plaintiffs allege an association-in-fact enterprise comprising defendants, including the employees and agents of the entity defendants, and non-party SCT. ECF 33, ¶ 208. "An association-in-fact enterprise is not defined by a formal legal structure, but is instead characterized by the association of its members 'for a common purpose of engaging in a course of conduct.'" *Bailey v. Atl. Auto. Corp.*, 992 F. Supp. 2d 560, 581 (D. Md. 2014) (quoting *Turkette*, 452 U.S. at

583).   An association-in-fact enterprise "need not have a hierarchical structure or chain of command; decisions may be made on an ad hoc basis and by any number of methods."   *Boyle v. United States*, 556 U.S. 938, 948 (2009).   Plaintiffs allege the unnamed enterprise "consists of persons associated together for the common and shared purpose of the fraudulent manufacture, marketing and sale of PPE goods," with defendants "directly engaged in the production, distribution, and/or acquisition of goods and services in interstate and international commerce." ECF 33, ¶ 209.

Defendants argue the entity defendants are not distinct from the alleged RICO enterprise. They highlight allegations that the entity defendants are owned, in whole or in part, by Zhu, that the racketeering activity of the individual defendants was undertaken in a representative capacity on behalf of one or more of the entity defendants, and that the entity defendants work together (e.g., Salusen and 3B Tech share offices).   ECF 38, at 2–5 (citing ECF 33, ¶¶ 15–34).

The question of whether a defendant corporation is distinct from an alleged RICO enterprise that includes the corporation is more complicated than it first appears.   "[F]ederal courts have encountered significant conceptual difficulties when attempting to apply the distinctness requirement in the context of complex relationships among affiliated and non-affiliated corporations and individuals."   *In re ClassicStar Mare Lease Lit.*, 727 F.3d 473, 490 (6th Cir. 2013).   Defendants premise their distinctiveness argument on a seminal Second Circuit case, *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339 (2d Cir. 1994). *Riverwoods* involved a defendant bank and an alleged RICO enterprise consisting of the bank and two of its loan officers.   *Id.* at 341.   The Second Circuit held that, under the distinctness requirement, a corporation may not be both a RICO person/defendant and a RICO enterprise along with its employees because "a corporation can only function through its employees and agents,"

so "the enterprise is in reality no more than the defendant itself." *Id.* at 344.  The Court stated that while "a corporate entity may not be both the RICO person and the RICO enterprise[,]" this rule "does not foreclose the possibility of a corporate entity being held liable as a defendant under section 1962(c) where it associates with others to form an enterprise that is sufficiently distinct from itself." *Id.*  Elaborating, the Court noted its prior holdings that "a section 1962(c) claim may be sustained where there is only a partial overlap between the RICO person and the RICO enterprise, and that a defendant may be a 'RICO person and one of a number of members of the RICO enterprise[.]'"  *Id.* (citations omitted).  In a later case, the Second Circuit extended its reasoning in *Riverwoods* to reject a RICO claim against a corporation where the alleged enterprise comprised a corporation and its subsidiaries operating in a "unified corporate structure guided by a single corporate consciousness."  *U1it4less, Inc. v. FedEx. Corp.*, 871 F.3d 199, 206–07 (2d Cir. 2017).

Defendants also point to a Fourth Circuit case, *Entre Computer Centers, Inc. v. FMG of Kansas City, Inc.*, 819 F.2d 1279 (4th Cir. 1987), *overruled on other grounds by Busby v. Crown Supply, Inc.*, 896 F.2d 833 (4th Cir. 1990), with a similar holding.  In *Entre Computer Centers*, the Fourth Circuit affirmed the dismissal of a civil RICO claim where the plaintiff alleged the enterprise consisted of a corporate defendant, its officers and directors, and its franchises.  *Id.* at 1287.  *Entre Computer Centers* relied on an earlier Fourth Circuit case that held a RICO "'enterprise' was meant to refer to a being different from, not the same as or part of, the person whose behavior the act was designed to prohibit . . . ."  *United States. v. Comput. Scis. Corp.*, 689 F.2d 1181, 1190–91 (4th Cir. 1982) (stating "we would not take seriously . . . an assertion that a defendant could conspire with his right arm, which held, aimed and fired the fatal weapon"), *overruled on other grounds by Busby*, 896 F.2d 833.  The earlier case was a criminal RICO

prosecution and involved an enterprise identified in the indictment as consisting of an unincorporated division within the defendant corporation. *Id.* at 1190.

These cases support the proposition that a corporation may not be liable under § 1962(c) for associating in an alleged enterprise that consists only of its own employees, agents, subdivisions, subsidiaries, franchises, or members. *See U1it4less*, 871 F.3d at 206 (discussing the distinctness or "non-identity" requirement); *ClassicStar*, 727 F.3d at 490 (same); 77 C.J.S. RICO § 28 (May 2022).  Likewise, a corporation cannot be liable under § 1962(c) for associating in an enterprise with its parent when the two entities "operate as part of a single, unified corporate structure." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 121 (2d Cir. 2013); *ClassicStar*, 727 F.3d at 492 (recognizing a "functionalist" approach that treats corporate defendants as "distinct from RICO enterprises when they are functionally separate, as when they perform different roles within the enterprise or use their separate legal incorporation to facilitate racketeering activity").  In both situations, the law views the enterprise as identical to the corporate defendant.  To draw on (and perhaps abuse) an analogy courts have commonly used in this area, an association of independent corporations can constitute a distinct RICO enterprise, like an association of five basketball players makes a distinct team.  But an association of actors that are not independent and instead are all parts of a larger legal entity cannot constitute a distinct RICO enterprise, just as one player does not combine with his hands and feet to create a distinct team.  In the latter situation, the "team" (enterprise) is really just the one player (the unified corporation).  Each of the above cases is consistent with this rule, as are the numerous other cases cited by the parties.  *See, e.g.*, *Bailey*, 992 F. Supp. 2d at 583 (holding alleged enterprise comprising a car dealership, its parent corporation, and the parent's other subsidiaries—all defendants—was not distinct); *Chambers*, 43 F. Supp. 3d at 591 (reaching opposite outcome compared to *Bailey* when the alleged enterprise

comprised multiple independent car dealership defendants); *Gondel v. PMIG 1020, LLC*, No. CCB-08-1768, 2009 WL 248681, at *4–5 (D. Md. Jan. 22, 2009) (holding alleged enterprise comprising a corporation, an LLC managed by the corporation, and another corporation owned by the other two—all defendants, and the first two owned by the same individual—was not distinct), *aff'd*, 351 F. App'x 791 (4th Cir. 2009); *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 214 F.3d 776, 781 (6th Cir. 2000) ("An organization cannot join with its own members to undertake regular corporate activity and thereby become an enterprise distinct from itself.") (citing *Comput. Scis. Corp.*, 689 F.2d at 1190).

Plaintiffs allege an enterprise consisting of the three entity defendants (3B Tech, Salusen, and Pro-Com), an entity that is not a defendant (SCT), the three individual defendants who are owners and/or officers of the entities, and possibly others currently not known.  ECF 33, ¶¶ 15–34, 207–11.  Plaintiffs do not allege that any one entity defendant is the enterprise, or that the entities share a unified structure.  None is allegedly a subsidiary or a franchise, either of each other or an external corporation.  Rather, the enterprise consists of separate entities with some common owners and officers.  Together, these actors allegedly make up an association-in-fact enterprise with the purpose of manufacturing, marketing, and selling fraudulently certified PPE.  ECF 33, ¶¶ 207–11.

It is true that 3B Tech, Salusen, Pro-Com, and SCT are allegedly owned by Zhu and/or Barbour.  But common ownership does not necessarily foreclose distinctness.  The Second Circuit addressed that question in *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256 (2d Cir. 1995). *Securitron* involved two corporate defendants jointly constituting a RICO enterprise.  *Id.* at 263. The racketeering acts in *Securitron* were committed by an individual who was the president and owner of one of the corporate defendants and, for part of the relevant period, the principal owner

of the other. *Id.* The corporations also shared office space. *Id.* The Second Circuit nonetheless found the corporations distinct from the alleged enterprise because they were "active, operating businesses rather than two stacks of stationery," had distinct lines of business, and played separate roles in the alleged enterprise. *Id.* In *dicta*, the Second Circuit went even further and stated "even if [the individual] owned 100% of the shares of each corporation, the corporations would be separately existing legal entities capable of constituting an association-in-fact enterprise." *Id.* The Second Circuit reaffirmed this holding in 2017. *See U1it4less*, 871 F.3d at 206 ("Where . . . a natural person controls two active corporations that operate independently in different lines of business, receive independent benefits from the illegal acts of the enterprise, and affirmatively use their separate corporate statute to further the illegal goals of the enterprise, we will regard each of the three entities as distinct from their coordinated enterprise under Section 1962(c)."). The Eleventh Circuit reached a similar conclusion in a similar case. *See United States v. Goldin Indus., Inc.*, 219 F.3d 1271, 1277 (11th Cir. 2000) (discussing *Securitron* and holding an alleged enterprise distinct because the corporation defendants under common ownership were incorporated in different states, had separate customer bases and ongoing businesses, and could act independently to advance their own interests).

This Court likewise has held defendant corporations with common ownership were nonetheless distinct from the alleged RICO enterprise. *Starr v. VSL Pharm., Inc.*, 509 F. Supp. 3d 417, 436 (D. Md. 2020). In *Starr*, the alleged RICO enterprise consisted of three defendant pharmaceutical companies, two non-party manufacturers of the substance that was the subject of the litigation, and non-party representatives of "the Cavazza family" who had ownership interests in both the defendants and the manufacturers. *Id.* at 430–32. The Court concluded that while "the Cavazza Family, directly or indirectly, has a controlling interest in each of their companies[,]" the

alleged enterprise was distinct from the defendants because the plaintiffs alleged "each [defendant], as a separate entity, took its own specific acts separate from other acts taken by the Cavazza Family." *Id.* at 436. Such is the case here, where the entity defendants are separate entities—albeit connected to the same individuals—that allegedly engage in transactions apart from the joint scheme to sell fraudulently certified PPE. ECF 33, ¶¶ 15–23. For example, 3B Tech deals in "various products, *including* products manufactured by Chinese factories owned by Zhu," *id.* at 16 (emphasis added); and Pro-Com describes itself as "specializing in consumer electronics and packaged goods," not just PPE, *id.* at 17. 3B Tech and Salusen are based in Indiana while Pro-Com is in California. *Id.* ¶¶ 16, 17, 20. These allegations create the reasonable inference that the corporations have distinct identities and businesses despite common ownership.

Drawing all reasonable inferences in favor of the plaintiffs, the Court views the entity defendants as members of a team, not just the arms and legs of a single player. Plaintiffs' allegations satisfy the distinctness requirement.

### 2. Predicate acts of racketeering activity

Racketeering activity is defined by the RICO statute to include a wide range of criminal conduct. 18 U.S.C. § 1961(1); *Al-Abood ex rel. Al-Abood v. El-Shamari*, 217 F.3d 225, 238 (4th Cir. 2000). Among the predicate criminal acts in the RICO statute are enumerated federal offenses, 18 U.S.C. § 1961(1)(B)–(F), and "any act or threat involving . . . murder, kidnapping, gambling, arson, robbery, bribery, [or] extortion . . . which is chargeable under State law and punishable by imprisonment for more than one year," 18 U.S.C. § 1961(1)(A). Plaintiffs allege multiple instances of two types of purported racketeering activity: Maryland statutory theft crimes and federal mail and wire fraud. Defendants argue the former are not racketeering activity under § 1961(1) and the latter are not alleged with the required particularity.

### a.   *Statutory theft crimes*

Plaintiffs allege defendants committed predicate acts of racketeering activity by committing multiple instances of two Maryland statutory crimes, "Unauthorized Control Over Property," Md. Code Ann., Crim. Law § 7-104(a), and "Unauthorized Control Over Property–By Deception," *id.* § 7-104(b).   ECF 33, ¶¶ 232–45.   Defendants argue these theft crimes are not racketeering activity because they do not fall within the generic definition of the enumerated state law crimes of murder, kidnapping, gambling, arson, robbery, bribery, or extortion.

In determining whether a state crime constitutes a predicate act of racketeering activity under the RICO statute, courts look beyond how states label criminal offenses and ask whether the conduct punished by state law falls within one of the listed generic offense categories.   *Scheidler v. Nat'l Org. for Women, Inc.*, 537 U.S. 393, 410 (2003) (holding "the state extortion offense for purposes of RICO must have a similar requirement" to a requirement recognized by "the Model Penal Code and a majority of States"); *see also United States v. Nardello*, 393 U.S. 286, 293–94 (1969) (interpreting the Travel Act, which also designates generic categories of state predicate crimes, as looking to the substance of state law crimes rather than formal labels); *United States v. Gattis*, 877 F.3d 150, 155–56 (4th Cir. 2017) (employing similar categorical approach to compare state offense with generic offense listed in the federal sentencing guidelines).   So, for example, if a state criminalizes conduct that falls within the generic definition of extortion, then such criminal conduct counts as racketeering activity for purposes of RICO regardless of whether the state calls the offense extortion.   *Scheidler*, 537 U.S. at 410.

Theft is not one of the enumerated generic crimes in the RICO statute.   Plaintiffs argue instead that §§ 7-104(a) and (b) are theft crimes that fall within the generic definition of robbery. The Court disagrees.   The generic definition of robbery is the "misappropriation of property under

circumstances involving [immediate] danger to the person." *Gattis*, 877 F.3d at 156 (quoting 3 Wayne R. LaFave, *Substantive Criminal Law* § 20.3, at 173 (2d ed. 2003)).[2]  As explained by the Fourth Circuit, the immediate danger element in this definition involves the use of force or the threat of immediate physical harm.  *Id.* at 157.  Theft under §§ 7-104(a) and (b) does not require proof of force or the threat of immediate physical harm.[3]  Moreover, plaintiffs do not allege defendants used force or threatened to physically harm them.  And while it may be academic given the focus on function over form, it is worth noting Maryland courts have observed that the distinction between theft and robbery "has ancient origins in the common law."  *West v. State*, 539 A.2d 231, 233 (Md. 1988).  The distinction is also recognized in the Model Penal Code, which separates "Robbery" (§ 222.1) from "Theft by Unlawful Taking or Disposition" (§ 223.2) and "Theft by Deception" (§ 223.3).

Plaintiffs cite cases suggesting the RICO statute and its list of qualifying predicate acts should be interpreted broadly.  These cases may so hold, but plaintiffs have not identified a case holding a state theft crime falls within the generic definition of robbery absent some element of the use of force or the threat of immediate physical harm.  To the contrary, other courts have held that state theft crimes, similar to the theft statutes at issue here, do not constitute racketeering activity under § 1961(1).  *See Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 184 (2d Cir. 2008) ("Ordinary theft offenses and conspiracies to commit them are not among the predicate activities defined in 18 U.S.C. § 1961(1)."); *Dennis v. Gen. Imaging, Inc.*, 918 F.2d 496, 512 (5th

---

[2] *Gattis* provided a definition of generic robbery for purposes of the federal sentencing guidelines. Nothing suggests the analysis would be different under the RICO statute.

[3] Maryland punishes "a taking of property of any value whatsoever which is accomplished by violence or putting in fear" under a different section of its criminal laws, conveniently identified as "Robbery."  Md. Code Ann., Crim. Law § 3-402; *Spitzinger v. State*, 655 A.2d 685, 688 (Md. 1995).

Cir. 1990) ("It is far from certain that [the alleged misappropriation of funds under Louisiana law] can serve as RICO predicate acts since theft is not one of the enumerated state law offenses that constitute racketeering activity.").

The alleged Maryland theft crimes do not constitute predicate acts of racketeering activity under 18 U.S.C. § 1961(1).

### b.   *Mail and wire fraud*

Plaintiffs also allege instances of mail and wire fraud.  ECF 33, ¶¶ 219–31.  Mail and wire fraud are federal crimes expressly included in the RICO statute's list of predicate acts constituting "racketeering activity."  18 U.S.C. § 1961(1) (referring to 18 U.S.C. §§ 1341 (mail fraud) & 1343 (wire fraud)).  "Mail fraud under 18 U.S.C. § 1341 and wire fraud under 18 U.S.C. § 1343 have two essential elements: (1) the existence of a scheme to defraud and (2) the use of the mails or wire communication in furtherance of the scheme."  *United States v. Curry*, 461 F.3d 452, 457 (4th Cir. 2006); *see also United States v. Pasquantino*, 336 F.3d 321, 332 n.5 (4th Cir. 2003) ("Because the mail and wire fraud statutes share the same language in relevant part, we apply the same analysis to both offenses.").  Wire usage includes the internet and email.  *Brasko v. Howard Bank*, No. SAG-20-3489, 2021 WL 1662464, at *5 (D. Md. Apr. 27, 2021) (citing cases).  The mailing element may be satisfied even by "innocent" communications that contain no false information.  *Schmuck v. United States*, 489 U.S 705, 715 (1989).

Defendants argue plaintiffs' allegations of mail and wire fraud do not meet the Rule 9(b) heightened pleading standard for fraud-based claims.  "When mail and wire fraud are asserted as predicate acts in a civil RICO claim, each must be pled with particularity, pursuant to Rule 9(b)."  *Proctor v. Metro. Money Store Corp.*, 645 F. Supp. 2d 464, 473 (D. Md. 2009) (citing *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989)).  Rule 9(b) states, in "alleging fraud or

mistake, a party must state with particularity the circumstances constituting fraud or mistake." Such circumstances include "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Weidman v. Exxon Mobil Corp.*, 776 F.3d 214, 219 (4th Cir. 2015) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)). Nonetheless, a "court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts." *Harrison*, 176 F.3d at 784.

In discussing "the interplay of the more liberal notice pleading standard of Rule 8" and Rule 9(b) in the context of RICO mail fraud, this Court has "acknowledged the difficulty that arises in pleading a RICO suit against multiple defendants[.]" *Chambers*, 43 F. Supp. 3d at 595. In such cases, this Court has "determined that it is 'not necessary that a plaintiff elucidate every single detail of the alleged fraud.'" *Id.* at 595–96 (quoting *WW, LLC v. Coffee Beanery, Ltd.*, No. WMN-05-3360, 2012 WL 3728184, at *10 (D. Md. Aug. 27, 2012), and citing *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1074–75 (D. Md. 1991)). Rather, the critical question is "how much detail is necessary to give adequate notice to an adverse party and enable him to prepare a responsive pleading." *Id.* at 596 (quoting *Kerby v. Mortg. Funding Corp.*, 992 F. Supp. 787, 800 (D. Md. 1998)).

Defendants contend the complaint does not identify the fraud-based racketeering violations with particularity. The Court disagrees. Plaintiffs allege enough detail to meet Rule 9(b)'s heightened pleading standard. True, some of plaintiffs' allegations are written in broad and vague language. *See, e.g.*, ECF 33, ¶¶ 49–57. But this is so because they summarize and introduce the more detailed allegations that follow. *Id.* ¶¶ 58–200. Plaintiffs allege a scheme to sell fraudulently

certified face masks. *Id.* ¶¶ 35–36, 49. This scheme, as employed against plaintiffs, began in March 2020 and involved numerous communications over email, phone, and Skype, as well as several wire transfers for payment. Plaintiffs allege the date, sender, recipient, and contents of each of several wire transfers providing payment for the masks. *Id.* ¶ 86. They allege the date, sender, recipients, and contents of more than a dozen communications relating to the alleged scheme. *See, e.g.*, *id.* ¶¶ 65, 71, 95, 98, 102, 104–05, 107, 112–15, 119, 125, 128–29, 134, 136, 140–41, 144, 147, 156, 158, 160, 172, 176, 179, 191, 196–98, 201. They allege the date, sender, recipient, and contents of mailed packages of the face masks in question. *Id.* ¶ 79. Finally, they explain at length the nature of the fraud, including, for example, false KN95 stamps, *id.* ¶¶ 80–81; false representations about defendants' business with other entities, *id.* ¶ 95; altered certification test results, *id.* ¶¶ 125–33; and false links between the masks sold and purported test results, *id.* ¶¶ 175–192. These allegations adequately convey "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *See Weidman*, 776 F.3d at 219.

The Court is satisfied that defendants know enough to prepare a defense and that plaintiffs have substantial prediscovery evidence of the communications in question. *See Harrison*, 176 F.3d at 784. Rule 9(b) does not require more than plaintiffs offer. *See Brasko*, 2021 WL 1662464, at *5 (holding Rule 9(b) satisfied when the plaintiffs identified "with specificity (by date, amount, and third-party marketing company laundering the kickback) Defendant's use of interstate wires"); *Chambers*, 43 F. Supp. 3d at 596–97 (denying motion to dismiss RICO claim based on mail and wire fraud when the plaintiff "outlined the alleged scheme . . . , a time frame for the alleged scheme, and the role of mail and wires in the scheme" as well as dates and participants in specific communications and transactions); *Coffee Beanery*, 2012 WL 3728184, at *11 (holding plaintiffs

"have outlined the alleged scheme to defraud, a time frame for the scheme, who was targeted by the scheme, the contents of the allegedly fraudulent communications that were sent using the mails and wires, and what Defendants hoped to obtain through the scheme").

Plaintiffs sufficiently allege predicate acts of racketeering activity in the form of mail and wire fraud.

### 3. Pattern of Racketeering Activity

Defendants challenge whether plaintiffs have alleged a pattern of racketeering activity. The RICO statute requires "at least two" acts of racketeering activity within a 10-year period. 18 U.S.C. §§ 1961(5), 1962(c). To establish the necessary pattern, a plaintiff also must show (1) a relationship between the predicate acts and (2) that they "amount to or pose a threat of continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 239 (1989). Defendants' challenge focuses on the continuity requirement.

The continuity requirement may be met by either "a closed period of repeated conduct" or "past conduct that by its nature projects into the future with a threat of repetition." *Id.* at 241. Courts refer to these alternatives as closed-ended and open-ended continuity, respectively. Closed-ended continuity may be established "by proving a series of related predicates extending over a substantial period of time." *Id.* at 242. Open-ended continuity is established if "the racketeering acts themselves include a specific threat of repetition extending indefinitely into the future," or if "the predicate acts or offenses are part of an ongoing entity's regular way of doing business." *Id.* Courts employ a fact-based, "commonsensical" approach to determine whether the continuity requirement is met. *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 684 (4th Cir. 1989); *H.J. Inc.*, 492 U.S. at 241. Relevant factors include the breadth of the goal, the number of perpetrators, the number of victims, the length of the scheme or transaction, and the "scale on which racketeering

is conducted" such as the "variety of stratagems" employed.  *Menasco*, 886 F.2d at 684.  "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement: Congress was concerned in RICO with long-term criminal conduct."  *H.J. Inc.*, 492 U.S. at 242.

Defendants argue plaintiffs allege only a run-of-the-mill contract dispute that took place over several months, and that the Fourth Circuit has not allowed such incidents to be transformed into civil RICO claims.  They cite *Menasco*, in which the Fourth Circuit held the plaintiff had not alleged a pattern of racketeering activity.  886 F.2d at 685.  There, the Court began by explaining the pattern requirement "acts to ensure that RICO's extraordinary remedy [of treble damages] does not threaten the ordinary run of commercial transactions; that treble damage suits are not brought against isolated offenders for their harassment and settlement value; and that the multiple state and federal laws bearing on transactions . . . are not eclipsed or preempted."  *Id.* at 683.  "Congress contemplated that only a party engaging in widespread fraud would be subject to such serious consequences."  *Id.*  Turning to the allegations before it, the Court found

> [P]laintiffs' allegations fail to satisfy the continuity prong of RICO's pattern requirement.  Defendants' actions were narrowly directed towards a single fraudulent goal.  They involved a limited purpose: to defraud [the plaintiffs] with respect to their oil interests.  They involved but one perpetrator: [defendant].  They involved but one set of victims: [plaintiffs].  Finally, the transaction took place over approximately one year.  Clearly, these acts do not constitute "ongoing unlawful activities whose scope and persistence pose a special threat to social well-being."

*Id.* at 684 (quoting *Int'l Data Bank, Ltd. v. Zepkin*, 812 F.2d 149, 155 (4th Cir. 1987)).  The Court also found that vague and conclusory allegations about the existence of dummy corporations designed to divert fraudulent assets and other fraudulent acts against "various individuals" lacked the specificity necessary to show a distinct threat of continuing racketeering activity.  *Id.*

Plaintiffs do not plausibly allege closed-ended continuity.  At bottom, they allege a single scheme, occurring over a six-month period, with the objective of defrauding plaintiffs through the sale of fraudulently certified PPE.  This scheme involved acts of mail and wire fraud, committed almost exclusively by Zhu and Barbour as representatives of the entity defendants.  The racketeering predicates occurred between late March and August 2020, mostly concentrated before July.  ECF 33, ¶¶ 38–200.  Plaintiffs placed three orders for the fraudulently certified masks in April.  *Id.* ¶ 76.  Payments were wired between April and May, with the last wire transfer to a defendant occurring on May 21.  *Id.* ¶ 86.  The variety of the alleged fraud evolved from lying about certification to falsifying test results.  These allegations do not describe repeated conduct "extending over a substantial period of time," *H.J. Inc.*, 492 U.S. at 241–42, or "ongoing unlawful activities whose scope and persistence pose a special threat to social well-being,'" *Zepkin*, 812 F.2d at 155.  Rather, they are on par with the allegations in *Menasco*, which did not rise to the level punishable by the RICO statute.  *See Menasco*, 886 F.2d at 684.

Plaintiffs try to dance around the continuity requirement by zooming in and separating out the alleged predicate acts.  But the fact that plaintiffs made three purchase orders based on numerous and somewhat-evolving misrepresentations does not change the fact that the complaint describes a solitary fraudulent goal with few, closely connected victims (selling fraudulently certified PPE to plaintiffs, primarily Bluemar) and few perpetrators (primarily Zhu and Barbour) executed over a manner of months.  While Bluemar and AMA did not plan on using the PPE themselves, this does not broaden the class of victims to include their customers.  The complaint does not allege any direct interaction between defendants and the plaintiffs' customers.  *See* ECF 33, ¶¶ 92–94 (alleging a prospective customer for the PPE reached out to AMA, who in turn reached out Bluemar, who in turn reached out to defendants).  Plaintiffs also attempt to twist the

"social well-being" language in *Zepkin* and *Menasco* to cover the public health implications of selling defective PPE, but the Court cannot separate that phrase from the preceding language requiring "ongoing unlawful activities" with sufficient "scope and persistence." Here, the alleged scope and persistence of the criminal activity are narrow and limited. One fraudulent deal over three to six months does not rise to the level at which courts have found closed-ended continuity.[4]

Whether plaintiffs have alleged open-ended continuity is a harder question. Plaintiffs allege "Defendants' related acts of racketeering activity have occurred on numerous occasions" since early 2020 and have injured "other market participants," including "SB Richards Company, hospitals, and government entities—all of which Defendants claimed to have sold PPE to and which may have purchased the fraudulently certified products[.]" ECF 33, ¶¶ 247, 249. They also allege defendants' websites continue to represent that the face masks they sell are certified, which plaintiffs allege remains untrue. *Id.* ¶¶ 201–04.

While it is a closer call, the Court cannot plausibly infer open-ended continuity from plaintiffs' vague allegations of other victims and ongoing sales. These allegations, which comprise only a fraction of the more than 300 allegations in the complaint, appear to be an afterthought to plaintiffs' focus on their own transaction. Plaintiffs do not allege any other entity purchased fraudulently certified PPE from defendants, only that some "may" have. The complaint contains no information about any potential racketeering activity related to other sales of PPE by

---

[4] This Court recently held allegations of "a multi-year enterprise involving a substantial number of false and misleading marketing and advertising materials disseminated through a nationwide distribution and sales network that victimized numerous individuals across the United States" were sufficient to survive a motion to dismiss when the alleged victims "generally have health conditions" such that there was "the potential to adversely impact the health of a significant number of individuals." *Starr v. VSL Pharm., Inc.*, 509 F. Supp. 3d 417, 441 (D. Md. Dec. 2020). While plaintiffs also suggest a scheme with public health implications, *Starr* is distinguishable because the activity in that case occurred over a much longer duration and clearly affected numerous victims.

defendants.  Moreover, the existence of other victims appears to be based on Barbour's alleged statement to Bluemar that defendants were selling face masks to governmental agencies and private customers, *id.* ¶ 95, a statement plaintiffs allege was in fact false, *id.* ¶ 97.

More detail is required to allege open-ended continuity and the threat of future criminal conduct.  In *Menasco*, the Fourth Circuit rejected a similar argument supported by vague and conclusory allegations about other fraudulent acts against unidentified victims.  *Menasco*, 886 F.2d at 684.  Likewise, in *Foster v. Wintergreen Real Estate Co.*, the Fourth Circuit held allegations of other victims lacked the requisite particularity to establish open-ended continuity.  363 F. App'x 269, 274 (4th Cir. 2010) (unpublished) (per curiam).  While unpublished opinions are not binding precedent in this circuit, the Court finds *Foster* informative.  The defendants in *Foster* were real estate agents and the company that employed them, and the plaintiffs alleged they had committed numerous acts of mail and wire fraud, including lying about being members of a listing service and using it to list properties.  *Id.* at 270–71.  While the plaintiffs alleged the existence of hundreds of other victims, the Fourth Circuit found the allegations lacked detail.  *Id.* at 274.  Specifically, a list of properties handled by the defendants but not included on the listing service and a "vague reference" to interviews with a number of non-party sellers about whether they consented to the omission of their properties from the listing service were not enough "to plead with particularity that any specific person was defrauded other" than the plaintiffs.  *Id.*  As a result, the plaintiffs had not alleged "a 'distinct' threat of continuing racketeering activity."  *Id.* (quoting *Menasco*, 886 F.2d at 684).  This Court, too, has required plaintiffs to allege the existence of other victims with particularity.  *Compare Layani v. Ouazana*, No. ELH-20-420, 2021 WL 805405, at *38 (D. Md. Mar. 3, 2021) (holding allegations of ten known but unnamed non-party victims and ongoing "efforts to recruit new investors" by the defendants did not satisfy Rule 9(b)), *with Layani v.*

*Ouazana*, No. SAG-20-420, 2022 WL 294286, at *4–5 (D. Md. Feb. 1, 2022) (holding amended complaint that added "some particularity about the total number of victims and the identities and descriptions of some additional victims" by including "direct quotations from several of the victims establishing misconduct in their cases" survived a motion to dismiss). Plaintiffs' vague and unspecified allegations of other potential victims do not meet this bar.[5]

The Fourth Circuit has expressed hesitation "about approving a RICO claim based on predicate acts of mail and wire fraud, because '[i]t will be the unusual fraud that does not enlist the mails and wires in its services at least twice.'" *Al-Abood*, 217 F.3d at 238 (quoting *Anderson v. Found. for Advancement, Educ. & Employ. of Am. Indians*, 155 F.3d 500, 506 (4th Cir. 1998)). Essentially, courts should not allow plaintiffs to turn "garden-variety fraud claims" into civil RICO violations. *Id.*; *see also Foster*, 363 F. App'x at 274 (holding allegations of "multiple instances of mail and wire fraud over the course of an arguably substantial period of time" was nonetheless "garden-variety fraud" and not above the routine) (unpublished). Plaintiffs seek to do just that, and the Court will not permit it when the thrust of the complaint concerns a single business interaction over several months. Without other victims, the totality of the circumstances described

---

[5] Another unpublished Fourth Circuit case, *CVLR Performance Horses, Inc. v. Wynne*, 524 F. App'x 924 (4th Cir. 2013) (unpublished), warrants brief discussion because it found open-ended continuity. *CVLR* involved allegations that the defendant fraudulently advertised one of his businesses as a bank, "used this entity in various ways to facilitate his fraudulent schemes," continued "to advertise [it] on the internet" as a bank while the appeal was pending, and committed particular frauds against three other named victims. *Id.* at 925–26. On the issue of open-ended continuity, the panel reasoned the alleged scheme had no built-in ending point—there was no indication the defendant's "conduct was to be limited to only the identified victims"—and the defendant continued to advertise as a bank. *Id.* at 928–29. The allegation of ongoing fraudulent advertising is similar to plaintiffs' allegation that defendants continue to advertise fraudulently certified PPE, but the particularized allegation of three other victims is not present here. The panel did not explain how the identification other victims affected its analysis. While it is not necessary to distinguish *CVLR* because it is unpublished and therefore not binding, the detailed allegations of other victims in that case make it distinguishable.

by plaintiffs' allegations do not reflect criminal activity "above the routine." *See Foster*, 363 F. App'x at 274 (quoting *HMK Corp. v. Walsey*, 828 F.2d 1071, 1074 (4th Cir. 1987)). "Courts considering schemes that were of short duration, involving a narrow focus, a single victim, and posing no threat of continuing future criminal activity, have consistently found that no pattern of racketeering activity was established." *Walsh v. Mitchell*, No. DKC-08-1897, 2010 WL 3719919, at *9 (D. Md. Sept. 17, 2010) (citing cases). Plaintiffs allege slightly more than this baseline, but not enough to allege a pattern of racketeering activity. Count I is dismissed.

### B. Conspiracy

Defendants also move to dismiss plaintiffs' RICO conspiracy claim. ECF 36, at 1, 3, 5. Defendants do not devote any attention to the RICO conspiracy claim independent from the RICO claim, so the Court assumes they argue only that a RICO conspiracy claim cannot stand alone without an underlying RICO violation. The RICO conspiracy provision, 18 U.S.C. § 1962(d), makes it unlawful "for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section." Because plaintiffs fail to state a plausible civil RICO violation, the associated RICO conspiracy claim is dismissed.

## IV.   Conclusion

Plaintiffs fail to allege the requisite continuity to establish a pattern of racketeering activity. Accordingly, Counts I and II are dismissed. Defendants shall respond by July 5, 2022.

DATED this 14th day of June, 2022.

_____
Deborah L. Boardman
United States District Judge