# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | | |
|---|---|---|
| AMA SYSTEMS, LLC<br>8160 Lark Brown Road<br>Elkridge, Maryland 21075 | * | |
| and | * | |
| BLUEMAR PROMOTIONS, LLC<br>199 Constitution Ave<br>Bldg 1, Units 1&2<br>Portsmouth, New Hampshire 03801 | * | Case No. 1:21-cv-1472 |
| Plaintiffs, | * | **SECOND AMENDED COMPLAINT** |
| vs. | | **JURY TRIAL DEMANDED** |
| 3B TECH, INC.<br>3431 William Richardson Drive<br>Suite B<br>South Bend, Indiana 46628 | * | |
| Serve On:<br>Brett Barbour<br>Registered Agent<br>3431 William Richardson Dr.<br>South Bend, Indiana 46628 | * | |
| and | | |
| PRO-COM PRODUCTS, INC.<br>1250 Bixby Drive<br>City of Industry, California 91745 | * | |
| Serve On:<br>Peggy Lin<br>Registered Agent<br>1250 Bixby Drive<br>City of Industry, CA 91745 | * | |
| and | | |
| | * | |

SALUSEN, INC.
10034 Billet Court
Granger, Indiana 46530

                                                          \*

    <u>Serve On</u>:
    Brett Barbour
    10034 Billet Court
    Granger, Indiana 46530            \*

and

JIAN QING "JOHNNY" ZHU          \*
10204 Adams Road
Granger, Indiana 46530

and                                            \*

BRETT BARBOUR
10034 Billet Court
Granger, Indiana 46530                 \*

and

MICHAEL JOHNSON               \*
1250 Bixby Drive
City of Industry, California 91745

and                                            \*

BCO LAB, INC.
3431 William Richardson Drive
South Bend, Indiana 46628            \*

    <u>Serve On</u>:
    Sung L. Hyun
    Registered Agent                \*
    11335 E 400N
    Grovertown, Indiana 46531

and                                            \*

ZAKE INTERNATIONAL, INC. d/b/a
ZAKE USA d/b/a ZAKE GROUP
3431 William Richardson Drive        \*
South Bend, Indiana 46628

Serve On: *
Brett Barbour
Registered Agent
3431 William Richardson Dr.
Suite B *
South Bend, Indiana 46628

and
*
JOHN DOES 1-10,

Defendants.
*
\*       \*       \*              \*       \*       \*

## SECOND AMENDED COMPLAINT

For their Second Amended Complaint, Plaintiffs, AMA Systems, LLC ("AMA") and Bluemar Promotions, LLC ("Bluemar") (collectively, "Plaintiffs"), by counsel, hereby state and allege as follows for their claims and causes of action against all Defendants:

As the COVID-19 pandemic began to devastate human life and economies in early 2020, Defendants began a fraudulent scheme to profit from the fear and uncertainty circling the globe. In short, they conspired to manufacture, market and sell fraudulently certified personal protective equipment ("PPE") to Plaintiffs and others, knowing that the equipment was destined, in part, to reach desperate institutional and individual consumers. Defendants' fraudulent and unlawful scheme is the subject of this litigation.

Defendants are individuals and companies operating in the United States and abroad, and comprise *inter alia* 3B Tech, Inc. ("3B Tech"); Pro-Com Products, Inc. ("Pro-Com"); Salusen, Inc. ("Salusen"); Jian Qing "Johnny" Zhu ("Zhu"); Brett Barbour ("Barbour"); Michael Johnson ("Johnson"), BCO Lab Inc. ("BCO"), Zake International, Inc. d/b/a Zake USA d/b/a Zake Group ("Zake USA") (collectively, "Defendants"), and to include any unknown pseudonyms, affiliated

entities or persons acting in concert.  Perhaps most troubling and as further detailed, Defendants are still engaged in this fraudulent scheme.

Defendants' conspiracy succeeded in exacting hundreds of thousands of dollars in payments from Plaintiffs, as well as others who purchased PPE that was falsely certified. Plaintiffs seek compensatory and treble damages, as well as attorneys' fees, punitive damages and any other relief this Honorable Court deems appropriate for the fraudulent deprivation of Plaintiffs' property in excess of $500,000 for this outrageous fraud.

## BACKGROUND

1.      On December 30, 2019, "the Program for Monitoring Emerging Diseases notified the world about a pneumonia of unknown causes in Wuhan, China."  "Undiagnosed pneumonia—China (Hubei): Request for information," ProMED post (2019); https://promedmail.org/promed-post/?id=6864153

2.      By January 9, 2020, the Centers for Disease Control and Prevention ("CDC") began screening international passengers arriving at JFK International, San Francisco International and Los Angeles International airports, and by January 21, 2020, the CDC had confirmed the first reported case of Covid-19 in the United States. https://www.ajmc.com/view/a-timeline-of-covid19-developments-in-2020

3.      The United States declared a public health emergency on February 3, 2020, on the heels of thousands of reported cases and a rising death toll worldwide. https://www.ajmc.com/view/a-timeline-of-covid19-developments-in-2020  And, by "February 4, 2020, pursuant to Section 564(b)(1)(C) of the Federal Food, Drug, and Cosmetic Act (the Act) (21 U.S.C. §360bbb-3(b)(1)(C)), the Secretary of the Department of Health and Human Services (HHS) determined that there is a public health emergency that has a significant potential to affect

national security or the health and security of United States citizens living abroad, and that involves the virus that causes Coronavirus Disease 2019 (COVID-19). Pursuant to Section 564 of the Act, and on the basis of such determination, the Secretary of HHS then declared on March 2, 2020, that circumstances exist justifying the authorization of emergency use of personal respiratory protective devices during the COVID-19 outbreak, subject to the terms of any authorization issued under that Section."  https://www.fda.gov/media/136664/download

4.     By early March 2020, "the World Health Organization ("WHO") declared COVID-19 a pandemic—a disease outbreak occurring over a wide geographic area and affecting an exceptionally high proportion of the population."  https://www.yalemedicine.org/news/2019-novel-coronavirus#:~:text=SARS%2DCoV%2D2,in%20Wuhan%2C%20China

5.     Hospitals quickly became overwhelmed with intensely sick individuals and the strain on the healthcare system, as well as the unprecedented increase in demand across all sectors of healthcare and the public at large, resulted in a severe shortage of PPE.

6.     In order to address, in part, the shortage of PPE, which was particularly acute in certain areas in the United States, including Maryland, the FDA "issued EUAs [emergency use authorizations] for certain PPE products including face shields, other barriers, and respiratory protective devices such as respirators."  If face masks, or filtering facepiece respirators ("FFRs") manufactured in China satisfied the EUA requirements, then the product and its manufacturer were identified on the FDA's "Appendix A," also known as the "White List."

7.     KN95 technology refers to filtering facepiece respirators that are manufactured in China. KN95 masks are identified by the Centers for Disease Control and Prevention ("CDC") as "a type of filtering facepiece respirator that are commonly made in China and are similar to N95 masks commonly used in the United States."  *See*  https://www.cdc.gov/coronavirus/2019-

ncov/prevent-getting-sick/types-of-

masks.html#:~:text=KN95%20masks%20are%20a%20type,in%20the%20United%20States

8.      If PPE was stamped with a CE mark, that mark identified to the purchaser/user that the product meets the requirements for health, safety and consumer protection that are identified in European Union directives and regulations.  The CE mark allows the movement of PPE within the internal market of the European Community.  FFP standards refer to the European Standard (EN 149:2001) that identifies FFRs as: FFP1, FFP2, and FFP3 with corresponding minimum filtration efficiencies of 80%, 94%, and 99%.  FFP2 respirators (94%) are approximately equivalent to N95 face masks, making them recommended for use in the prevention of airborne infectious diseases.

9.      To obtain these certifying marks, manufacturers have their products independently tested.  As set forth in more detail herein, each defendant represented at differing times that the face masks manufactured in China, under the Salusen label as distributed by Pro-Com to 3B Tech and sold to Plaintiffs and others, had been subject to testing by Shenzhen Academy of Metrology & Quality Inspection ("SMQ"); SGS IBR Laboratories ("SGS"); the Guangdong Testing Institute ("GQI"); and DEKRA Testing and Certification (Shanghai) Ltd. ("DEKRA") and that the product to be sold to Plaintiffs had passed those tests.  The face masks could then be identified as conforming to KN95 standards, CE Certified and/or FFP2 conforming (in conformance with European standards and meeting EN 149:2001), and/or meeting the FDA EUA requirements.

10.      When face masks are identified with these certifications, it signifies that the face masks meet certain filtration performance requirements, among other requirements.  Thus, the

certifications are significant as they provide assurance to the purchaser and ultimately, end-user about the efficacy of the product.  It also means that a higher price can be charged for the PPE.

11.     This action arises out of Defendants' fraudulent sale of 550,000 non-conforming KN95 face masks to Plaintiffs – 250,000 of which have yet to be accepted for return or refunded by Defendants.

12.     All the KN95 face masks sold by Defendants and purchased by Plaintiffs were manufactured by SCT in SCT's "Factory A," are from the same lot number: 202004010, and marked with the same UPC Code: 6552955444109.  Some of the face masks in this lot were received in cartons branded with "Salusen," while others were packaged in cartons without the Salusen name, at Defendants' direction.  All the face masks and cartons were received in large cardboard boxes labeled Procom Products.

13.     Of the 550,000 masks that were initially paid for to 3B Tech by Plaintiffs, Defendants shipped 500,000 non-conforming KN95 face masks to Plaintiffs.  3B Tech refunded Bluemar for the 50,000 face masks that were not shipped.  In June 2020, after it was revealed the face masks were counterfeit, Defendants initially agreed to accept the return of all 500,000 face masks and refund Bluemar for all masks.  Ultimately, however, 3B Tech only accepted the return of, and refunded Bluemar for 250,000 of the 500,000 shipped face masks.

14.     In May and June 2020, if not earlier, Defendants tested the SCT face masks and confirmed they do not conform to KN95 performance or filtration standards.

15.     During this litigation, testing of the SCT face masks revealed that some of the face masks only filtered out 35% of particles, while others filtered out 63% or 73% of particles.  Thus, the SCT masks sold by 3B Tech to Plaintiffs and others should more appropriately be called KN35, KN63 or KN73 face masks.

16.     Despite Defendants' agreement to refund the face masks, Defendants' independent testing of the face masks which revealed the face masks were counterfeit, and Plaintiffs' independent testing of the face masks during this litigation, Defendants refuse to refund Bluemar for the remaining 250,000 face masks.

## JURISDICTION AND VENUE

17.     There are three sources of jurisdiction in this Court.  First, this is an action to prevent and restrain violations of 18 U.S.C. § 1962.  18 U.S.C. § 1964.  Second, the Parties' citizenship is completely diverse and the amount in controversy exceeds $75,000 exclusive of interests and costs.  28 U.S.C. § 1332.  Third, a substantial part of this action arises under the laws of the United States.  28 U.S.C. § 1331.

18.     Venue is proper in the United States District Court for the District of Maryland, Northern Division because a substantial part of the events or omissions giving rise to the claims occurred in the District.  28 U.S.C. § 1391(b)(2); *see also* 28 U.S.C. § 1965(b) (providing that a suit may be brought in a district as the ends of justice require).

## <u>PARTIES</u>

19.     Plaintiff **AMA SYSTEMS, LLC** is a "Concept-to-Market" Maryland Limited Liability Company that provides analysis and deployment services for products and services both domestically and globally.  AMA has its principal place of business in Elkridge, Maryland.

20.     Plaintiff **BLUEMAR PROMOTIONS, LLC** is a New Hampshire Limited Liability Company that provides logistics and distribution of products, among other services.  Bluemar has its principal place of business in Portsmouth, New Hampshire.

*Defendants and the Supply Chain*

21.     Defendant **JIAN QING "JOHNNY" ZHU** ("Zhu) is a resident of the State of Indiana and believed to reside at 10204 Adams Road, Granger, Indiana 46530.  Zhu is the owner of non-party **Shenzhen Centurion Technology Company** ("SCT"), a manufacturing plant in China producing disposable masks and other healthcare related supplies. Zhu represented that SCT is "our factory" where the KN95 face masks at issue in this lawsuit were manufactured. Zhu is also an owner of non-party **Zake International Trading (Shenzhen) Co., Ltd.** ("Zake China"), a Chinese entity used by Zhu, 3B Tech, Pro-Com and/or Zake USA to import, or facilitate the importation of, SCT face masks and other PPE and items into the United States.

22.     Defendant **3B TECH, INC.** ("3B Tech") is a corporation organized under the laws of the State of Indiana with its principal place of business at 3431 William Richardson Drive, Suite B, South Bend, Indiana and is an importer, distributor and seller of various products, including products manufactured by Chinese factories owned by Zhu, including SCT.  At all relevant times, 3B Tech's incorporator, president and owner was Zhu.  Its registered agent and Vice President is Brett Barbour.  Both Zhu and Barbour have been 3B Tech's CEO.

23.     Defendant **PRO-COM PRODUCTS, INC.** is an importer and distributor, describing itself as "a full-service distributor specializing in consumer electronics and packaged goods" and is located at 1250 Bixby Drive, City of Industry, California 91745.  Pro-Com does not manufacture KN95 face masks, but rather imports products into the United States on behalf of SCT and Zake China, and sells KN95 face masks to customers.  Defendant Michael Johnson is identified on its website as a Senior Vice-President of Pro-Com.  The companies and products identified for sale on the Pro-Com website are owned by and/or associated with Zhu, Barbour,

3B Tech and Zake USA.  At all relevant times, Pro-Com was owned by Zhu and Barbour based upon information and belief.

24.     Pro-Com imported the subject face masks from SCT and Zake China into the United States, and distributed them to Defendant Salusen, Inc. and 3B Tech for the eventual sale and distribution to prospective purchasers.

25.     3B Tech imported the subject face masks from SCT and Zake China into the United States for the eventual sale and distribution to prospective purchasers.

26.     Defendant **SALUSEN, INC.** ("Salusen") is an online retailer of personal protective equipment ("PPE") located at 3431 William Richardson Drive, Suite B, South Bend, Indiana.  Salusen describes itself as a supplier of PPE, providing products "through our expertise and partnerships in development, manufacturing and logistics" and which has "partnered with the leading global logistics company, Pro-Com Products."  Brett Barbour is identified as the Incorporator, President and Resident Agent of Salusen.  It is believed that Barbour and Zhu are owners of Salusen.

27.     Salusen does not manufacture face masks.  As Zhu and Barbour explained to Plaintiffs on May 2, 2020, Salusen is the U.S. Brand for their products which are distributed by Pro-Com, specifically stating: "Our products are under U.S. brand Salusen and distributed by Pro-com Products."

28.     Salusen shares the same office as 3B Tech, Zake USA and now, BCO Lab.

29.     At all relevant times, Zhu was an owner of non-party Chinese manufacturer SCT, non-party Chinese entity Zake China, as well as the owner and management of co-defendants Salusen, 3B Tech, Pro-Com and Zake USA.   At all relevant times, Zhu is also was the President

and CEO of 3B Tech. Zhu misrepresented that the face masks were conforming KN95 technology, CE and FDA certified, and verified by third-party laboratories.

30.     At all times relevant hereto, Zhu was acting in his individual capacity and/or in a representative capacity as an agent and representative of Salusen, 3B Tech, Pro-Com and Zake USA.

31.     Defendant **BRETT BARBOUR** ("Barbour") is a resident of the State of Indiana and believed to reside at 10034 Billet Court, Granger, Indiana 46530. Barbour is an owner of co-defendants Salusen and Pro-Com. Barbour is also the President and registered agent of Salusen. Barbour also has continuously maintained a role at co-defendant 3B Tech, as he is its registered agent, its Vice President, and at certain times he has been 3B Tech's interim CEO. Barbour misrepresented that the face masks were conforming KN95 technology, CE and FDA certified, and verified by third-party laboratories. Barbour also altered third-party testing documentation to fraudulently represent that the face masks were conforming KN95 technology and to conceal Defendants' collective fraud.

32.     At all times relevant hereto, Barbour was acting in his individual capacity and/or in a representative capacity as an agent and representative of Salusen, 3B Tech and Pro-Com.

33.     Defendant **MICHAEL JOHNSON** ("Johnson") is a resident of California, and is the Senior Vice-President of co-defendant Pro-Com. He is specifically identified on the FDA registration as the contact point for Pro-Com. Johnson altered third-party testing documentation to fraudulently represent that the face masks were conforming KN95 technology and to conceal Defendants' collective fraud. Johnson concealed third-party testing documentation from Plaintiffs that revealed the face masks were nonconforming KN95 technology to further Defendants' collective fraud.

34.     At all times relevant hereto, Johnson was acting in his individual capacity and/or in a representative capacity as an agent and representative of Pro-Com.

35.     In March 2020 Zhu introduced himself as CEO of 3B Tech to the Plaintiffs and introduced Barbour and Johnson as his "partners."

36.     Thus, upon information and belief Johnson may also have a role with and be an agent and representative of 3B Tech and/or Salusen.

37.     Defendant **ZAKE INTERNATIONAL, INC. d/b/a ZAKE USA d/b/a ZAKE GROUP** ("Zake USA") is an Indiana corporation located in South Bend, Indiana with the same office address as 3B Tech and Salusen.  Zake USA markets itself as being an entity that brings the biggest global brands to the North American market, and offers business to business distribution with Pro-Com.  At all relevant times, Zhu has owned a portion of Zake USA.  At all relevant times, Zhu has operated Zake USA.  At all relevant times, Zhu has been the management for Zake USA.

38.     Upon information and belief, Zake USA is the U.S. counterpart to Zake China.

39.     Upon information and belief, Zake USA assisted in the purchase, importation, sale and/or distribution of the SCT face masks sold to Plaintiffs by 3B Tech.  At various times, Zhu, Barbour, and Johnson used @zake.com e-mail addresses when they were communicating about the SCT face masks and the sale of those face masks to Plaintiffs.

40.     Upon information and belief, Defendant **BCO LAB, INC.** ("BCO Lab") is the successor in interest to 3B Tech.

41.     3B Tech was acquired by BCO Lab effective January 1, 2021.  The acquisition was announced by 3B Tech and Brett Barbour in December 2020.  Employees of 3B Tech were advised to continue to report to the "same management team" and that "[a]ll support procedures

and contacts remain unchanged." To effectuate the acquisition, Zhu requested his lender "to replace 3B Tech Inc" with "BCO Lab Inc" in certain financing documents, and in the organizational chart of Zhu's companies. 3B Tech previously did business under the assumed name of "Better Choice Online." BCO Lab now does business under the assumed name of "Better Choice Online." 3B Tech was the original merchant entity and seller for Amazon's Better Choice Online Storefront. Amazon's Better Choice Online Storefront now indicates the current merchant and seller has been changed from 3B Tech to BCO Lab.

42. Defendant Does 1-10 are unknown to Plaintiffs who therefore sue them under fictitious names. Plaintiffs will amend their Complaint to add such names and capacities when they become known.

43. Defendants each carried out a different role in the supply chain of the subject counterfeit face masks – from manufacture to customer delivery.

44. The counterfeit masks were to be manufactured with the Salusen label/brand in China, imported into the United States for distribution by Pro-Com and/or Zake USA, distributed by Pro-Com to Salusen and/or 3B Tech, and then sold and distributed by 3B Tech to Plaintiffs and others for re-sale to third-party end users.

45. Zhu used Zake China and its United States' counterpart, Zake USA, to bring the nonconforming face masks into the United States.

46. Zhu is Zake China's legal representative.

47. Zhu used Zake China to purchase more than five million (5,000,000) face masks from SCT so he could import them into the United States and resell them to his American clients through Zake USA, 3B Tech, Pro-Com and Salusen.

48.     The face masks Zhu claims were purchased by Zake China from SCT are the exact face masks that are in Pro-Com and Salusen packaging, were sold by 3B Tech, and shipped to Plaintiffs and other non-parties identified in this Second Amended Complaint.

49.     In other litigation, Zake USA and 3B Tech have agreed to be treated as the same entity and jointly and severally liable.

50.     Defendants were each other's preferred vendors prior to March 2020 and through the present.

## NATURE OF THE ACTION

51.     Soon after the COVID-19 pandemic took grip of the United States in March 2020, Defendants began a fraudulent and criminal scheme to sell fraudulently certified KN95 face masks that were allegedly the subject of an Emergency Use Authorization ("EUA") application being sought from the Food & Drug Administration ("FDA") by Defendants.  Defendants, have each claimed and/or represented at various times that the face masks were: conforming KN95 technology; CE and FDA certified; stamped FFP2; EU conforming; and/or had been independently verified as conforming by third-party laboratories.  Each of Defendants' representations were false and documents Barbour, Pro-Com, Zhu, Johnson, 3B Tech, and/or Salusen provided to Plaintiffs to support the false representations were altered and/or fake.

52.     Defendants' motivation was to profiteer from the public health emergency, which is not only unethical and fraudulent, but criminal.

53.     These were the early days of the pandemic and it was not yet known that fraudulent PPE was being sold as conforming product, nor was the extent of these fraudulent schemes even contemplated.  Plaintiffs had no knowledge of any frauds concerning the sale of

PPE or the use of fraudulently altered certifying reports when it entered into the Purchase Orders for the purchase of the subject face masks with 3B Tech.

54.    In March 2020, Bluemar began discussions with 3B Tech for the purchase of PPE. Defendants represented that the PPE being purchased from Defendants were certified KN95 Disposable face masks, which met or exceeded applicable governmental standards.

55.    The face masks, it was later learned, were not certified as alleged and had not met filtration and/or other standards. The documentation that was provided as support for the conformity certifications had been altered and/or falsified, which meant that the product's ability to protect human life was not as represented; or, the documentation provided was authentic but it could not be connected to the product that was sold by Defendants. These fraudulent representations were made all the worse because certified KN95 face masks could be used in healthcare and related settings, while nonconforming and uncertified face masks did not provide the same level of protection that was necessary and vital in those settings.

56.    Defendants claimed that Shenzhen Centurion Technology Company ("SCT"), located in Pinghu District, Shenzhen City, China, manufactured the face masks that were being offered for sale to Plaintiffs. SCT, on its website, claims and continues to claim to manufacture KN95 masks that are EU, CE and FDA certified.

57.    Specifically, 3B Tech alleged that "[t]he enterprise has passed the white list of the Ministry of Commerce, and its products have passed the EU en149, en14683, type IIR certification standards, CE and FDA certification issued by DEKRA, Germany, ASTM, level 3 and other international test reports. Based on strict quality control and assurance system, we can ensure a higher and more stable quality level."

58.     Together with its co-conspirators Pro-Com, Salusen, Barbour, Johnson, Zake USA, Zake China and SCT (and others yet to be identified), 3B Tech altered testing documentation to include false and misleading representations regarding the PPE, and tried to conceal their fraud through various companies, communications and reports, violating the law and done to profit illegally.

59.     The fraudulent representations, certifications and documents were all meant to "authenticate" the masks manufactured by SCT: as conforming KN95 technology; having FDA and CE Certifications; FFP2 and EU conforming; and that the face masks had been independently validated by laboratories and testing facilities, including SMT, SGS, GQI and DEKRA.

60.     None of these representations were true.

61.     These representations were part of the illegal and deceptive scheme perpetrated on Plaintiffs and others, including hospitals and governmental agencies during the pandemic to extract higher fees for the face masks.

62.     Bluemar ordered face masks from 3B Tech, which were delivered to AMA and paid for through a series of wire transfers to 3B Tech.  It was later discovered by Plaintiffs that the face masks did not comply with KN95 or FFP2 technology, were not CE or FDA certified as alleged, and were stamped with fraudulent certifications.

63.     Defendants did not merely perpetrate a fraud on Plaintiffs.  There are numerous other victims of Defendants' fraud throughout the United States.

64.     Non-parties Vonnic, Inc., Kim Por ("KC") Lin, SP Richards Company, MANCON, Pike Systems, Inc. and Monoprice, Inc. were sold non-conforming counterfeit KN95 face masks from one or more Defendants, including but not limited to 3B Tech, Pro-Com

and Zake USA.

65.     Non-parties Vonnic, Inc., KC Lin, SP Richards Company, MANCON, Pike Systems, Inc. and Monoprice, Inc. purchased and received non-conforming counterfeit KN95 face masks from one or more Defendants, including but not limited to 3B Tech, Pro-Com and Zake USA.

66.     Upon information and belief, non-party First Century Sales LLC was also sold non-conforming counterfeit KN95 face masks from Pro-Com and 3B Tech.  In the alternative, First Century Sales LLC was strictly an agent for Pro-Com and 3B Tech, selling the non-conforming counterfeit KN95 face masks on behalf of Pro-Com and 3B Tech to others.

67.     During the pendency of this litigation, Defendants continued to perpetrate their fraud and engage in illegal activity as they continued to offer for sale the non-conforming KN95 face masks through websites, including Salusen.com, procomproducts.com and centurion-med.com.

68.     During the pendency of this litigation, Defendants' masks were offered for sale on splatterguard.com, which makes the same false claims as Defendants have made regarding the authenticity and conforming nature of the face masks.

69.     Testing of the face masks at issue in this case, sold by Defendants to Plaintiffs and other non-parties, reveals the face masks do not conform to KN95 filtration or performance level standards.

70.     The face masks at issue in this case, sold by Defendants to Plaintiffs and other non-parties, do not meet the GB 2626-2006 (KN95) labeling requirements and thus are not KN95 masks.

71.     The face masks at issue in this case, sold by Defendants to Plaintiffs and other non-parties, do not have a CE Certification.

**THE SCHEME**

72.     In response to the critical shortage of and need for PPE, including filtering facepiece respirators ("FFRs") in the United States, the FDA issued an umbrella EUA for certain FFRs manufactured in China. Defendants saw an opportunity and willingly engaged in a fraudulent and criminal scheme to sell fraudulently certified PPE to unsuspecting third-parties, including Plaintiffs, hospitals and governmental entities. Defendants continue to market and sell the fraudulently certified PPE.

73.     Defendants represented to Plaintiffs, at various times and as further detailed herein, that the face masks manufactured by SCT in China were conforming KN95 technology, FDA and CE Certified, FFP2 conforming, and had been tested by SMQ, SGS, GQI and DEKRA.

74.     These statements made by Defendants to Plaintiffs that the face masks were conforming KN95 technology, FDA and CE Certified, FFP2 conforming, and had been tested and approved by SMQ, SGS, GQI and/or DEKRA were false when made.

75.     These statements made by Defendants to Plaintiffs were made intentionally and for the purpose of deceiving Plaintiffs and misleading Plaintiffs into purchasing the subject face masks from Defendants.

76.     The Defendants knew at the time they were negotiating the sale of the face masks to Plaintiffs in March and April 2020 that the Plaintiffs would rely upon Defendants' representations that the face masks were conforming KN95 technology, FDA and CE Certified, FFP2 conforming, and had been tested and approved by SMQ, SGS, GQI and/or DEKRA.

77.     The Defendants knew that the Plaintiffs would not have purchased the face masks, and the Plaintiffs would not have purchased them, if the face masks were not conforming KN95 technology, FDA and CE Certified, FFP2 conforming, or had failed the testing and not been approved by SMQ, SGS, GQI and/or DEKRA.

78.     Plaintiffs did reasonably rely upon Defendants' statements that the face masks were conforming KN95 technology, FDA and CE Certified, FFP2 conforming, and had been tested and approved by SMQ, SGS, GQI and/or DEKRA in deciding to purchase the face masks from Defendants.

79.     Defendants also made intentional statements to Plaintiffs, both oral and written, as set forth herein, for the purpose of deceiving and misleading Plaintiffs regarding the quality of the KN95 face masks after 3B Tech's sale to Bluemar in attempts to (i) entice Plaintiffs into purchasing additional face masks from 3B Tech, Pro-Com and Salusen, despite their non-conforming nature; and (ii) ensure Plaintiffs would re-sell or use the subject face masks instead of returning them to 3B Tech or requesting a refund.

80.     With regard to the testing performed by DEKRA, SMQ and SGS related to the SCT face masks relevant to Defendants' fraudulent scheme, the face masks that were tested were provided by and identified as manufactured by SCT.  After testing, reports were issued to Defendants, and Defendants criminally altered those reports, concealed the true reports, and/or fraudulently represented that the reports were linked to the SCT manufactured face masks.

81.     With regard to certain testing performed by SGS and GQI, the face masks presented for declaration of conformity to KN95, FFP and CE Certification requirements did meet those requirements.  However, the face masks that were tested by these facilities were not, and cannot be connected or otherwise linked to, SCT's face masks that were sold to Plaintiffs

and others.  For these tests, SGS and GQI tested entirely different face masks than the masks that are the subject of this litigation.

### A. *Sale of the Fraudulently Certified KN95 Face Masks*

82.     As the nation was in the grip of the early days of the pandemic and as first responders, businesses, State and local governments, hospitals, and individuals were left scrambling to find and purchase PPE, including face masks, AMA undertook to fill the void for its customers.

83.     In late March 2020, AMA began contacting its business connections to determine their ability to supply PPE.  AMA reached out to Bluemar to inquire as to whether Bluemar could secure PPE, including face masks.

84.     Bluemar, in turn, reached out to 3B Tech to purchase certified PPE.  3B Tech had contacted Eddie Chung of Bluemar in early March 2020, informing him that Zhu was the owner of Shenzhen Centurion Technology Co., Ltd., a manufacturing plant located in China that had switched over to manufacturing PPE products, and that 3B Tech could supply certified PPE.

85.     SCT represents on its website that the KN95 face masks that it manufacturers have "CE and FDA certification issued by DEKRA, Germany, ASTM, level3 and other international test reports."  *See* https://www.centurion-med.com.  These were the same representations that 3B Tech, Salusen, Zhu, Barbour and others at various times had made to Bluemar as further and more specifically detailed herein.

86.     In late March 2020 or early April 2020 Zhu told John Cosco and/or Eddie Chung of Bluemar that he was chartering planes to bring his company, SCT's face masks to the United States.

87.     In late March 2020 or early April 2020 Zhu told John Cosco and/or Eddie Chung

of Bluemar that he had the White House as a customer for the subject face masks. Based on the representations made to Bluemar by 3B Tech that it could supply CE and FDA certified KN95 face masks, on April 6, 2020, Bluemar placed Purchase Order #100058 with 3B Tech for 50,000 "K95 Masks—FDA Approved" at a cost of $100,000.

88. By email dated April 13, 2020, forwarded to Eddie Chung of Bluemar, Zhu and 3B Tech confirmed that the KN95 face masks being ordered by Bluemar and sold to AMA were FDA and CE Certified and had passed filtration tests required to be identified as FFP2.

89. Zhu made these representations in his individual capacity and/or in his representative capacity on behalf of 3B Tech, Salusen, Pro-Com and/or Zake USA.

90. Bluemar then placed a second Purchase Order #100061 dated April 15, 2020, for 250,000 "KN95 Disposable Face Mask—Packaged 50 per carton in sleeves of 10 each." The Purchase Order required that the face masks "must say KN95," were to be manufactured by Salusen and be FDA Certified with Certificate No. JF-FDA-0328-0116 and CE Certified with CE Certificate No.: 4Q200407M.SCTUU98. The cost was $500,000.

91. In response, 3B Tech issued Sales Order # SO1452261 identifying it had sold 250,000 of the following items to Bluemar: "11001437 face masks KN95—BTY" "Salusen SFFP22 face masks KN95—BTY" "50pcs/box" "meet FDA /CE" "UPC: 819187021148".

92. Bluemar requested images or photographs of the product to be supplied so that Bluemar could provide those to AMA. On April 16, 2020, 3B Tech sent to Bluemar a number of images of the Salusen face masks, the inner packaging and cartons. Bluemar forwarded the images to AMA. In response, AMA raised questions regarding the face masks, asking for further clarification of the certifications and manufacturer.

93.     On April 17, 2020, John Cosco of Bluemar sent an email to Barbour raising

questions regarding the product based on the images that 3B Tech had provided.  Specifically,

John Cosco asked whether all packaging, bags and cartons would be branded with the Salusen

logo; whether all of the images sent to Bluemar by Barbour were of the Salusen product; whether

the face masks would be stamped with the certifications; and asked that 3B Tech confirm the

FDA certification.

94.     After various email communications between Zhu, Barbour, and Eddie Chung and

John Cosco of Bluemar throughout the day on April 17, 2020, Zhu explained that although

neither the face masks nor packaging would be identified with the Salusen label or logo, the face

masks were KN95 Salusen masks as identified in the images and that the UPC (universal product

code) would remain the same.  Zhu further explained that to manufacture the face masks with the

Salusen labels and logos, the cost would be higher and the delivery schedule would be delayed

by weeks.  Zhu also stated that because of "Chinese Custom[s]" ever-changing rules, what would

be printed on the masks would be dictated by regulations "to insure (sic) they can be exported."

95.     Zhu made these statements in his individual capacity and/or on behalf of 3B Tech,

Salusen, Pro-Com and/or Zake USA.

96.     On April 18, 2020, Johnny Zhu stated that the UPC code for the KN95 face masks

manufactured by SCT would be 6552955444109.

97.     On April 19, 2020, John Cosco of Bluemar responded to Zhu and Barbour

indicating that based on the representations made by Zhu and Barbour, including: confirming the

UPC Code; that the face masks would be Salusen face masks but without the logos; that the

cartons would have K95 or FFP2 printed on them; and that the masks themselves would also be

stamped with the certifications, Bluemar, would move forward with purchasing the face masks.

98.     In response, Bluemar revised Purchase Order #100061 to reflect the parties'
discussions and representations made by Zhu and Barbour and the parties' agreement.

99.     In reliance on the representations made and certifications provided by 3B Tech,
Zhu and Barbour in March and April 2020, Bluemar entered into purchase orders with AMA for
the face masks.

100.     To fulfill the AMA purchase order, Bluemar entered into three purchase orders
with 3B Tech for KN95 face masks:

| Date | Purchase Order | Quantity Certified KN95 Face Masks |
| --- | --- | --- |
| April 6, 2020 | Purchase Order #100058 | 50,000 |
| April 15, 2020, revised April 19, 2020 | Purchase Order #100061 | 250,000 |
| April 29, 2020 | Purchase Order #22728 | 500,000 |

101.     Purchase Order # 22728 provided that for $1,000,000, 3B Tech would supply
Plaintiffs 500,000 KN95 disposable masks, that the "Masks must say KN95", and that the "PO is
for KN95 MASKS FDA NO: 1066564."

102.     The Purchase Orders between Bluemar and 3B Tech, as well as between Bluemar
and AMA, specifically identified the type, certification and registration of the KN95 face masks
to be purchased: "FDA Certified: Certificate No.: JF-FDA-0328-0116" and "CE Certified:
Certificate No.: 4Q200407M.SCTUU98."

103.     3B Tech shipped 250,000 face masks on April 27, 2020; 50,000 face masks on
April 28; and 250,000 face masks on May 4.  Each time, the face masks were shipped from Pro-
Com to AMA Systems by LTL carriers.  Each time, in addition to the cost of the face masks,

freight was charged for each shipment that was paid by Bluemar and ultimately passed on as a cost to AMA.

104.    Some of the face masks that arrived were stamped with what appeared to be the CE Certification and FFP2 and KN95 stamps of approval identified on the Purchase Orders. Some of the face masks only had the KN95 stamp embossed on the mask.



105.    These stamps on the face mask were false as the masks were neither CE Certified nor did they meet the requisite FFP2 or KN95 requirements.

106.    As the face masks passed through the hands of each Defendant on their way to Plaintiffs, each Defendant knew the CE, FFP2 and KN95 stamps were false and misleading.

107.    In addition, the face masks were identified in packaging containing the designation "FFP2 Europe EN 149:2001 + A1:2009 Classified," "FDA No.: 10066564," and "KN95 Filter Performance."






108.    The statements on the product packaging were false as the masks did not meet the requisite FFP2 or KN95 requirements.

109.    As the face masks passed through the hands of each Defendant on their way to Plaintiffs, each Defendant knew the statements on the packaging were false and misleading.

110. To pay for the face masks, AMA wired funds to Bluemar and Bluemar wired funds to 3B Tech. *See* Chart below.

| Date | Amount | Wire Sent By | Wire Received By |
|---|---|---|---|
| April 7, 2020 | $77,031.74 | Bluemar | 3B Tech |
| April 16, 2020 | $250,000 | AMA Systems (deposit for masks) | Bluemar |
| April 16, 2020 | $250,000 | Bluemar | 3B Tech |
| April 20, 2020 | $27,000 | Bluemar | 3B Tech |
| April 22, 2020 | $50,000 | Bluemar | 3B Tech |
| April 28, 2020 | $268,802 | Bluemar | 3B Tech |
| April 29, 2020 | $200,000 | Bluemar | 3B Tech |
| April 30, 2020 | $739,698.21 | AMA Systems ($567,500 for KN95 + freight $60,288 for Nonsterile + freight $111,910.21 for KN95 + freight) | Bluemar |
| April 30, 2020 | $50,000 | Bluemar | 3B Tech |
| May 4, 2020 | $555,000 | AMA Systems (KN95) | Bluemar |
| May 4, 2020 | $250,000 | Bluemar | 3B Tech |
| May 6, 2020 | $310,700 | AMA Systems (KN95 + freight) | Bluemar |
| May 21, 2020 | $5,821.26 | Bluemar | 3B Tech |
| June 22, 2020 | $500,000 | 3B Tech | Bluemar |
| June 23, 2020 | $555,000 | Bluemar | AMA Systems |

111. After the face masks were purchased from 3B Tech and delivered by Pro-Com/3B Tech to AMA, Plaintiffs became aware that the FDA did not issue a certification for SCT-

manufactured KN95 face masks, despite 3B Tech, Zhu, and Barbour's representations in March and April 2020 that the masks would be "FDA approved" and "FDA Certified." Rather, manufacturers register with the FDA for their devices to be sold in the United States. However, a registration is not a certification.

112.    For the product to be CE Certified, the product must have a declaration of conformity and a marking. A manufacturer declares by way of a declaration of conformity that the product at issue complies with applicable requirements to include having been testified by the appropriate body. A CE marking must be affixed to a product in a manner that is legible and cannot be removed easily from the product.

113.    After the face masks were purchased and delivered, Plaintiffs became aware that the face masks were not CE Certified, and that the "CE Marking" stamped on the face masks is fraudulent and a misrepresentation. There is no declaration of conformity for the face masks. Plaintiffs learned this on July 3, 2020, by way of an email from Entecerma to Jennifer Cosco at Bluemar.

114.    There is no notifying body or notifying body number identified on the face masks associated with the "CE" marking.

115.    Plaintiffs also did not become aware until June 14, 2020 that the SCT-manufactured KN95 face masks had not passed filtration tests, among others, although Defendants had represented to Plaintiffs in March and April 2020 that the face masks had met or exceeded filtration and other certification requirements.

116.    Plaintiffs now know that the filtration tests results that were provided by Defendants were altered, tampered with, and/or were performed on different products as more fully described in the allegations herein.

117.    Plaintiffs now know that Defendants had the face masks independently tested and concealed the results of those tests when the face masks failed.

118.    The SCT-manufactured KN95 face masks Plaintiffs purchased and received from Defendants are identified by UPC Code 6552955444109 and from Lot Number 202004010.

119.    Other customers of Pro-Com, 3B Tech and Zake USA received the same face masks.

### B.    Sale of Face Masks by AMA to Third Parties

120.     AMA began marketing for sale the SCT-manufactured KN95 face masks to end-users, including governmental agencies and health care providers as the product had been represented by 3B Tech, Salusen, Zhu, and Barbour: "FDA Certified: Certificate No.: JF-FDA-0328-0116" and "CE Certified: Certificate No.: 4Q200407M.SCTUU98."

121.    In May 2020, AMA was contacted by a prospective customer, who inquired as to authenticity and legitimacy of the KN95 face mask certifications.  A prospective customer asked AMA about the FDA Certification, the FFP2 certification, among other certifications, and also asked for documents supporting the claims of certification.

122.    In response to questions from a prospective customer, AMA reached out to Bluemar and asked for verification of the authenticity of the SCT-manufactured KN95 face masks.  Specifically, AMA on May 5, 2020 asked for written verification of the GB2626 testing, which must be performed by a CNAS accredited laboratory; the Chinese factory business license; and the Chinese local license showing that the factories had been approved to produce the KN95 face masks.

123.    Bluemar in turn contacted 3B Tech regarding the verification of testing and the information related to the manufacturer.  To support their scheme, Barbour in a Skype

communication on May 8, 2020, to John Cosco and Eddie Chung of Bluemar represented to Bluemar that 3B Tech was selling millions of the SCT-manufactured KN95 face masks to customers, such as governmental agencies and private customers including SP Richards Co., a nationally-known distributor of janitorial, sanitizing, and other business supplies.  In the same Skype communication, Barbour represented that "KN95 is actually tougher than K95 standard which is what the U.S. uses. … We as an U.S. company have very restrict (sic) guidelines on the masks we purchased from the factories and we have QC [quality control] personnel stay at factories 24/7 to ensure the qualities.  We also on weekly perform informal random sample tests by third testing companies: that 3B Tech was selling the SCT-manufactured KN95 face masks to a hospital network in Indiana; and that 'we' have $5 million in product insurance covering masks."

124.    Barbour made these statements in his individual capacity and/or on behalf of 3B Tech, Salusen and Pro-Com.

125.    These statements were false.

126.    Barbour also informed Bluemar that "federal agents" had visited 3B Tech's warehouse to verify that 3B Tech had PPE stock to include certified, conforming face masks. Barbour represented that this verification permitted 3B Tech to sell PPE to governmental agencies.

127.    Barbour made these statements in his individual capacity and/or on behalf of 3B Tech, Salusen and Pro-Com.

128.    These statements were false.

### C. *Altered, Fraudulent and Misrepresented Certifications*

129.     As further detailed, it is now known that the SCT-manufactured KN95 face masks that 3B Tech sold to Bluemar were not CE Certified, nor FDA Certified as the FDA does not certify individual product.  In these circumstances, the FDA would permit the import and sale of certain PPE that conforms to requirements based on the use.  It was discovered after the face masks had been delivered and paid for that the SCT-manufactured KN95 face masks failed conformity tests performed by two independent testing facilities.  And, it is now known that Defendants altered and/or tampered with the test results received from independent third-party testing facilities, and concealed other failing test results, to make it appear that the masks had passed and were conforming.

#### 1. *The "FDA Certification" Misrepresentation*

130.     In March and April 2020 3B Tech, Zhu, Barbour and Salusen represented to Bluemar that they were selling "FDA approved" and "FDA certified" KN95 face masks.  These representations were made orally as well as in writing to Plaintiffs. *See*, *e.g.*, Defendants' websites and Purchase Orders.

131.     On May 11, 2020 John Cosco of Bluemar again contacted Barbour by email regarding the face masks.  Although Mr. Cosco had been informed that SCT had applied for and was in the process of receiving an EUA for the face masks, he contacted Barbour to determine why SCT (the factory) was not yet on the FDA-approved manufactures list for "non-NIOSH KN95 Masks."[1]  Mr. Cosco informed Barbour that the face masks were intended for sale to

---

[1]Non-NIOSH (National Institute for Occupational Safety and Health) KN95 Masks refers to those face masks that have not been approved by NIOSH and are manufactured in China (KN95 technology) but meet certain requirements with regard to filtration, among other requirements.  *See* https://www.fda.gov/medical-devices/coronavirus-disease-2019-covid-19-emergency-use-authorizations-medical-devices/faqs-euas-non-niosh-approved-respirators-during-covid-19-pandemic

government agencies and as such, that the manufacturer was not on the FDA approved list was problematic. This was especially so given that 3B Tech, Zhu, Barbour and Salusen had represented that the face masks were "FDA Certified."

132.    Barbour responded by email on May 11, 2020 to reaffirm his prior representations, including that "[o]ur product does meet and exceed the KN95 standards and FFP2 Standards." In the same email, Barbour pushed back against the questions from Bluemar, asking whether Bluemar had experienced any problems with the construction of the face masks.

133.    Barbour also stated in this email that the FDA was using alternative standards when FDA-cleared or NIOSH approved respirators were not available. Those alternative standards were those "used in other countries." Those certifications included the FFP standard (referring to the European Standard (EN 149:2001)), which Defendants represented the face masks met. Defendants also alleged that the face masks had received CE Certification (European Union standards).

134.    Defendants knew that the face masks were not FDA Certified. Defendants knew that they did not have certifications that were "used in other countries," yet continued to press to Plaintiffs that their product was certified and conforming.

135.    On May 20, 2020 during a Skype call with Eddie Chung of Bluemar, Barbour sent to him the alleged FDA Certification for SCT, the alleged CE Certification for the face masks and a test result report from SMQ that was alleged to be for the face masks.

136.    Barbour sent these documents and made these statements in his individual capacity and/or on behalf of 3B Tech, Salusen and Pro-Com.

137.    These statements were false and the documents were altered and/or fabricated.

138.    Further, the FDA related documents were drafted and/or submitted by Johnson

acting in his individual capacity or on behalf of Pro-Com. The FDA Certification that

Defendants provided to Plaintiffs was not a certification, but rather was an FDA Registration,

which in this case is notification that a foreign entity has registered to sell product in the United

States. An FDA Registration is not a certification by the FDA that the product is authentic or

conforming.

139. The FDA Registration identified J & F Technology Services, LLC in Union, New

Jersey as the private registration agent. Plaintiffs attempted to contact J&F Technology Services

LLC by telephone at the number provided, but no one answered the phone.

140. A potential customer of AMA had also reached out to J & F Technology Services

directly to try and clarify information related to the alleged "FDA Certification." When the

potential customer called J & F Technology Services, the recording at that number stated that

"we are not a PPE company." John Cosco of Bluemar provided this information to Barbour on

May 2, 2020. In response, Barbour forwarded an email from Zhu dated May 2, 2020 and

informed John Cosco of Bluemar that the phone number is for the agency that was authorized to

issue FDA registration in China. The email also stated that at the factory, no customer service

center exists, there are no sales staff at the factory to take calls and that Pro-Com "will become

[the factory's] U.S. distribution agent."

141. Zhu represented by email dated May 27, 2020 to Eddie Chung of Bluemar that

"our company Pro-com Products" had an FDA registration to distribute certified KN95 face

masks.

142. Zhu also informed Eddie Chung on May 27, 2020 that Pro-Com was responsible

for the quality and authenticity of the face masks, as well as all issues or problems with the

products once they were accepted for delivery within the United States.

143.     In that same email communication, Zhu stated that Pro-Com represented the factory in China—SCT.  Zhu stated that Pro-Com "acts as [SCT]'s sole agent in the U.S. and fully responsible for [SCT]'s products sold in the U.S. in this case, [SCT]'s independent FDA registration starts to fade, and it becomes appendix of Pro-com's FDA."  Zhu again represented that Pro-Com had filed for and was seeking emergency use authorization ("EUA") from the FDA for the KN95 face masks.

144.     The EUA required that certain information be provided to the FDA regarding the product to be authorized.  Among the information that was requested by the FDA in support of the EUA applications was:

> Indicate whether the product currently has marketing authorization in another regulatory jurisdiction, such as the European CE Mark, Australian Register of Therapeutic Goods (ARTG) Certificate of Inclusion, Health Canada License, or Shonin approval from the Ministry of Health, Labour, and Welfare in Japan, and attach any relevant documentation, such as the marketing authorization letter or certificate, or corresponding information such as the certificate of conformity.

145.     Based on information and belief, the test results provided to the FDA for the SCT-manufactured KN95 face masks were the altered or fraudulent reports and/or reports that could not be linked to a manufacturer of the product tested.  SCT does not appear on the FDA "whitelist" for approved KN95 PPE.

146.     The test results and reports provided to the FDA were submitted by Johnson on behalf of Pro-Com and/or 3B Tech.

147.     Barbour represented to Eddie Chung of Bluemar during a telephone call on May 27, 2020, that he would provide Pro-Com's FDA Certificate that linked Pro-Com products to the SCT factory.

148.     Barbour, 3B Tech and Salusen did not provide this information.

149.    Trying to obtain further information regarding the link between SCT, 3B Tech and Pro-Com, John Cosco of Bluemar also asked Zhu by email on May 28, 2020, to provide information that would link Pro-Com's FDA registration to SCT-manufactured KN95 face masks.

150.    Also on May 28, 2020, Barbour sent via email: "Johnny [Zhu], please see the email below from John Cosco.  I have sent Eddie [Chung] the FDA provided by Mike [Johnson].  They do not refer to any specific manufacturer."

151.    Neither Zhu, 3B Tech, Salusen nor Pro-Com provided the requested information.

152.    No further information was provided by Defendants regarding the FDA "certification," the EUA approval or SCT's link to Pro-Com's FDA registration.

### 2.  Defendants Alter the SMQ Testing Results

153.    In March and April 2020 3B Tech, Zhu, Barbour and Salusen represented to Bluemar that they were selling KN95 face masks that "met FFP2 requirements."  These representations were made orally as well as in writing. *See, e.g.*, Defendants' websites and Purchase Orders.

154.    Face masks that do not pass the SMQ test do not meet FFP2 requirements.

155.    The purported SMQ testing report was issued on April 11, 2020.

156.    In furtherance of the scheme, on or about May 20, 2020, 3B Tech sent the KN95/GB2626 report from the Shenzhen Academy of Metrology & Quality Inspection by attachment to Skype from Barbour to Eddie Chung of Bluemar.  The SMQ Report indicated that the face masks had passed the filtration tests required for certification.  As such, this report could provide the basis for claiming that the KN95 face masks met the FFP2 requirements, among others.  *See* Skype Screenshot below.



157.    The SMQ Report indicated that the test period was from April 2, 2020 through April 11, 2020.  The testing was of fifty (50) KN95 disposable respirators alleged to have been manufactured by SCT, and which product had been delivered by SCT representatives.  The purpose of the tests was to determine, among other things, whether the face masks met the required filtration efficiency percentages.  The conclusion on the face of the report that Barbour provided to Plaintiffs on behalf of 3B Tech, Salusen and/or Pro-Com was that the face masks were conforming, having met those requirements.

158.    When Barbour, 3B Tech, Salusen and/or Pro-Com provided the SMQ Report to Bluemar, Barbour, 3B Tech, Salusen and Pro-Com knew it was false, that the SMQ report had been altered, and that the face masks had not met the requisite filtration efficiency requirements.

159.    When Defendants sold and delivered the face masks to Plaintiffs, they knew the SMQ Report was false and that the face masks had not met the requisite filtration efficiency requirements.

160.    On August 12, 2020, Bluemar reached out to SMQ and asked whether the report that had been provided to Bluemar by Defendants was authentic.  SMQ immediately responded

that the report, No.: WT204021672 "is (sic) not conform with the original." The SMQ Report that Defendants provided to Bluemar was confirmed by SMQ to have been altered. The face masks had not met the filtration efficiency requirements. The SMQ Report is fraudulent.

161. Upon information and belief, Johnson, Pro-Com, Barbour, 3B Tech, Zhu, Zake USA and/or Salusen altered and or fabricated the SMQ Report.

### 3. The Alleged CE Certification

162. In March and April 2020 3B Tech, Zhu, Barbour and Salusen represented to Bluemar that they were selling "CE Certified" KN95 face masks. These representations were made orally as well as in writing to Bluemar. *See, e.g.*, April 13, 2020 e-mail, Defendants' websites and Purchase Orders.

163. The SCT-manufactured KN95 face masks had been stamped with a CE Certification. *See* Paragraph 79 *supra.*

164. To support their claims of conformity and authenticity, 3B Tech, Salusen, Zhu and Barbour provided to Bluemar by email on April 13, 2020, an alleged "CE Certificate." *See* Image below.





Form QAT_10-M06, version 00, effective since March 25th, 2020

CE Documentation Review

No. 4Q200407M.SCTUU98

**Holder:** Shenzhen Centurion Technology Co., Ltd.
301, Building A, 38minan Road, Pinghu Community, Pinghu Street, Longgang District, Shenzhen

**Review goal:** Verification of the presence of Technical Documentation compatible with the Medical Devices Directive 93/42/EEC Annex VII

**Product:** Single-Use Medical Face Mask (Not Sterile)
**Model(s):** YY01, YY02
**Classification:** Class I (Not Sterile)
(accordingly to the Manufacturer's declaration)

**Review output:** This document has been issued on a voluntary basis and upon request of the manufacturer. It is our opinion that the Technical Documentation shared with us by the manufacturer is compatible with the European Standard for Medical Devices. The manufacturer is responsible for the CE Marking process, and not exempted to carry out all necessary compliance activities. This document has been issued on the basis of the regulation on ECM Voluntary Mark for the certification of products. RG01_ECM rev.3 available at: www.entecerma.it

Date of issue 07 April 2020
Approver
ECM Service Director
Luca Regbèny

Expiry date 06 April 2025
Technical Expert
Amanda Rogue

**Ente Certificazione Macchine**
Via Cà Bella, 243 - 40053 Valsamoggia Loc. Castello di Serravalle (Bo) Italy
☎ +39.0516705141 🖶 +39.0516705156 ✉ info@entecerma.it 🖳 www.entecerma.it

165.     This purported CE Certificate was issued on April 7, 2020.

166.     3B Tech, Salusen, Zhu and Barbour knew the CE Certificate was false when they provided it.

167.     When Defendants sold and delivered the face masks to Plaintiffs, they knew the CE Certificate was false and that the face masks were not CE certified.

168.     On July 3, 2020, Jennifer Cosco of Bluemar reached out to Ente Certificazione Macchine ("ECM") by email to inquire as to the authenticity of the alleged "CE Certification."

169.     In response to Bluemar's inquiry, ECM informed Jennifer Cosco of Bluemar that the CE Certificate Validation that had been provided to Bluemar by 3B Tech, Salusen, Zhu and

Barbour was not a declaration of conformity as had been represented by 3B Tech, Salusen, Zhu and Barbour, but rather was a documentation review related to a different product (surgical masks) and not even the product identified on the Purchase Orders.

170.     ECM further stated "we have never issued any CE certification of any sorts for this company."

171.     Thus, the "certification" provided by 3B Tech, Salusen, Zhu and Barbour to Bluemar to support their claim that the KN95 face masks were CE Certified was neither a certification nor was the documentation review performed by ECM for the subject KN95 face masks.  Rather, the review was for surgical face masks, an entirely different product.  Thus, 3B Tech, Salusen, Zhu and Barbour had fraudulently identified and stamped the KN95 face masks as CE Certified, knew that the face masks were non-conforming at the time of marketing, sale and delivery to Plaintiffs, and deceived Plaintiffs simply to make a profit.

### 4.  *Defendants Alter the DEKRA Report Results (and DEKRA invoice)*

172.     In March and April 2020 3B Tech, Zhu, Barbour and Salusen represented to Bluemar that they were selling KN95 face masks that "met FFP2 requirements."  These representations were made orally as well as in writing to Bluemar. *See, e.g.*, Defendants' websites and Purchase Orders.

173.     Face masks that do not pass a DEKRA test do not meet FFP2 requirements.

174.     On June 4, 2020, Eddie Chung of Bluemar asked Barbour by Skype for the EN149 Test.  This test was for the purpose of demonstrating the conformity of the KN95 face masks with FFP2 technology, which was printed on the face masks (in addition to the alleged CE Certification).

175.    On June 4, 2020, Barbour via a Skype attachment provided the "DEKRA Testing and Certification" Report dated May 19, 2020 ("DEKRA Report") that purported to demonstrate that the KN95 face masks manufactured by SCT and sold by 3B Tech, Salusen and other Defendants was CE Certified (as stamped) and met the filtration requirements.

176.    The purported DEKRA Report that Barbour, on behalf of Pro-Com, 3B Tech and/or Salusen, provided to Bluemar stated that "the mask **meet** (sic) the Corona SARS-CoV-2 test requirement."   (Emphasis added.)

177.    Barbour, 3B Tech, Pro-Com and Salusen knew the DEKRA Report was false when they provided it.

178.    Upon information and belief, Johnson, Pro-Com, Barbour, 3B Tech, Zhu, Zake USA and/or Salusen altered and/or fabricated the DEKRA Report.

179.    Barbour, 3B Tech, Pro-Com and Salusen knew the original, unaltered DEKRA Report they provided to Bluemar had stated, instead, that "the mask **does <u>not</u>** meet the Corona SARS-CoV-2 test requirement."  (Emphasis added.)

180.    DEKRA is an international testing and certification company that provides, among other services, testing and certification of products, including conformity to EU and FDA standards and directives for PPE.

181.    To determine the authenticity of the report, Ted Argeroplos of AMA contacted DEKRA by email communication on June 10, 2020 to inquire as to whether the face masks manufactured by SCT "had passed all the relevant tests relating to their CPA and that it is 100% FFP2 149:2001 + a1:2009 classified."  A copy of the DEKRA Report that had been provided to Plaintiffs by Barbour on June 4, 2020 was attached to the email.

182.    Daniel Marx of DEKRA responded on the same day via e-mail stating that "as it

seems this report is fraud.  The original of this report is different.  Did you receive this from the mentioned manufacturer?"

183.     Stunned, and trying to determine the extent of the misrepresentations, Eddie Chung of Bluemar contacted Barbour and Zhu by email on June 10, 2020 seeking an explanation for the DEKRA response.

184.     Initially, Zhu responded by email on June 10, 2020 that DEKRA's email statement was wrong, that the DEKRA Report was neither fraudulent nor altered and that he was going to "sue" anyone who said that it was.

185.     Zhu knew his statement was false when made.

186.     Zhu further wrote that "I have checked with China.  The report is absolutely genuine! I am not sure who this guy is but this becomes a very serious accusation and may trigger a law suite (sic) upon himself."  Zhu claimed that the KN95 face masks manufactured by SCT "have passed the test (which was provided to you), and they are waiting on getting certification from Deka (sic) at the moment."

187.     Zhu knew his statement was false when made.

188.     By this time Defendants had already received a test report from SGS informing them that the SCT face masks did not meet the KN95 performance or filtration standards and were thus not KN95 face masks.

189.     On June 12, 2020, Barbour provided by attachment to a Skype message to Eddie Chung of Bluemar the invoice for the DEKRA testing.  The invoice received from Barbour purported to represent that SCT had paid DEKRA 120,000 RMB plus tax for the testing.

190.     Barbour knew his statement was false when made.

191.     In response, John Cosco of Bluemar reached out to Daniel Marx of DEKRA on

June 12, 2020 by email, attaching the invoice from DEKRA in Shanghai and asking if Mr. Marx could confirm that the report and invoice were authentic. Maggie He of DEKRA in Shanghai was included on the email communication dated June 12, 2020.

192. On Monday, June 15, 2020 Ms. He of DEKRA responded by email stating that "the report is fake, you can find the genuine one as attached. Also the quotation [invoice] is also fake." She attached the authentic, unaltered DEKRA Report and Invoice to her email correspondence. The authentic invoice, which was provided by Maggie He of DEKRA, provided that SCT had paid only 100,000 RMB plus tax for the test.

193. John Cosco of Bluemar responded by email on same date, again trying to reconcile the altered report and invoice with the representations that had been made by Zhu, Barbour, Salusen and 3B Tech that the KN95 face masks had been tested and met filtration and other requirements. John Cosco included Zhu, Barbour and Johnson on the email communication. John Cosco asked Ms. He of DEKRA: "Thank you for the feed-back and providing the correct report. Can you please confirm that under the authentic report the product passed all relevant sections?"

194. Maggie He responded by email and stated that the face masks had not passed the "Penetration of the filter medium" in clause 2.4, and thus, had not passed the conformity test. Defendants Zhu, Barbour and Johnson also received the email communication from Ms. He.

195. The cover page of the altered DEKRA Report states that "the mask meet (sic) the Corona SARS-CoV-2 test requirement." *See* Image below.



**DEKRA**

DEKRA Testing and Certification GmbH
Standort Essen
Persönliche Schutzausrüstungen

Adlerstraße 29
45307 Essen, Germany

| | |
|---|---|
| Tel | +49.201.52319-0 |
| Fax | +49.201.52319-401 |
| E-Mail | CPA@dekra.com |

**Prüfbericht** / *Test report*
**No. 3417252.10-CPA**

| | |
|---|---|
| **Prüfgegenstand**<br>*Testsubject* | Corona SARS-CoV-2 Atemschutzmaske<br>*Coroan SARS-CoV-2 respiratory protective mask* |
| **Modell**<br>*Type* | FFP2/ KN95 Adult |
| **Hersteller**<br>*Manufacturer* | Shenzhen Centurion Technology Co., Ltd.<br>301. Building A, 38 Minan Road, Pinghu Community, Longgang District<br>Shenzhen, CHINA |
| **Prüfgrundlage**<br>*Test requirement* | Prüfgrundsatz für Corona SARS-Cov-2 Pandemie Atemschutzmasken<br>Rev. 1 vom 26.03.2020<br>*Testing principle for Corona SARS-Cov-2 pandemic respiratory masks<br>rev. 1 of 2020-03-26* |
| **Prüfergebnis**<br>*Test result* | Die Pandemie Atemschutzmaske entspricht den<br>Corona SARS-CoV-2 Prüfanforderung<br>*The pandemic respiratory protective mask meet the<br>Corona SARS-CoV-2 test requirement.* |
| **Datum**<br>*Date of issue* | 19.05.2020 |

Dieser Bericht besteht aus 10 Seiten. *This report consists of 10 pages.*

Eine auszugsweise Veröffentlichung dieses Berichtes bedarf der Zustimmung der DEKRA Testing and Certification

GmbH. Juristisch bindend ist ausschließlich die deutsche Fassung dieses Berichtes.

*Publication of extracts of this report requires agreement of DEKRA Testing and Certification GmbH. We confirm the*

*correctness of the translation of the German original. In the case of arbitration however only the German wording shall be*

*valid and binding.*

DEKRA Testing and Certification GmbH, Handwerkstraße 15, 70565 Stuttgart

Zertifizierungsstelle *Certification Body:* Dinnendahlstraße 9, 44809 Bochum

Telefon +49.234.3696-400, Fax +49.234.3696-401, DTC-Certification-body@dekra.com

**Prüfbericht Nr. /** *Test report no.:*
3417252.10-CPA

**Seite /** *Page*
1 - 10

---

However, the authentic Report cover page provided that "[t]he pandemic respiratory protective mask does not meet the Corona SARS-CoV-2 test requirement." *See* Image below.



**DEKRA Testing and Certification GmbH**
**Standort Essen**
**Persönliche Schutzausrüstungen**

Adlerstraße 29
45307 Essen, Germany

Tel     +49.201.52319-0
Fax     +49.201.52319-401
E-Mail  CPA@dekra.com

### Prüfbericht / Test report
### No. 3417252.10-CPA

| | |
|---|---|
| **Prüfgegenstand**<br>*Testsubject* | Corona SARS-CoV-2 Atemschutzmaske<br>*Coroan SARS-CoV-2 respiratory protective mask* |
| **Modell**<br>*Type* | FFP2/N95 Adult |
| **Hersteller**<br>*Manufacturer* | Shenzhen Centurion Technology Co., Ltd.<br>301. Building A, 38 Minan Road, Pinghu Community, Longgang District<br>Shenzhen, CHINA |
| **Prüfgrundlage**<br>*Test requirement* | Prüfgrundsatz für Corona SARS-Cov-2 Pandemie Atemschutzmasken<br>Rev. 1 vom 26.03.2020<br>*Testing principle for Corona SARS-CoV-2 pandemic respiratory masks*<br>*rev. 1 of 2020-03-26* |
| **Prüfergebnis**<br>*Test result* | Die Pandemie Atemschutzmaske entspricht **nicht** den<br>Corona SARS-CoV-2 Prüfanforderung<br>*The pandemic respiratory protective mask does **not** meet the*<br>*Corona SARS-CoV-2 test requirement.* |
| **Datum**<br>*Date of issue* | 19.05.2020 |

Dieser Bericht besteht aus 10 Seiten. *This report consists of 10 pages.*
Eine auszugsweise Veröffentlichung dieses Berichtes bedarf der Zustimmung der DEKRA Testing and Certification
GmbH. Juristisch bindend ist ausschließlich die deutsche Fassung dieses Berichtes.
*Publication of extracts of this report requires agreement of DEKRA Testing and Certification GmbH. We confirm the*
*correctness of the translation of the German original. In the case of arbitration however only the German wording shall be*
*valid and binding.*

DEKRA Testing and Certification GmbH, Handwerkstraße 15, 70565 Stuttgart
Zertifizierungsstelle *Certification Body*: Dinnendahlstraße 9, 44809 Bochum
Telefon +49.234.3696-400, Fax +49.234.3696-401, DTC-Certification-body@dekra.com

196.     The altered DEKRA Report includes a check mark under the "pass" column for Section 2.4 of the testing performed, representing that the subject face masks passed that test.

197.     However, the authentic DEKRA Report contains a check mark under the "fail" column for Section 2.4, representing that the subject fact masks failed that test.

198.     The altered DEKRA Report states the test results are 5.16, 4.85 and 5.30 – all less than the 6.0% limit for the penetration of filter medium requirement test.

199.     However, the authentic DEKRA Report provides the test results for the filter medium requirement test are 16.63, 15.48 and 15.76, all greater than the 6.0% limit.

200.     Faced with their clear fraud, Zhu wrote to John Cosco of Bluemar on June 15, 2020 by email and stated, "I am still trying to sort out the issues with the factory and 3rd party that handled this."  Zhu also wrote that "[w]e have sent random samples to SGS facility to perform testing on our products."

201.     Zhu concluded in his June 15, 2020 email to Bluemar by writing that if the face masks did not pass "there is no reason we would not take them back."

202.     Zhu knew this statement was false when made.

203.     At this time Zhu already had knowledge that the face masks failed the tests performed at the SGS facility.

204.     Upon information and belief, Zhu's reference to "we" included himself, 3B Tech, Pro-Com, Salusen, and Barbour.

205.     At this time, the "we" referenced in Zhu's e-mail already had knowledge that the face masks failed the tests performed at the SGS facility.

### D.  Defendants' Concealment of Actual Test Results and Purposeful Misdirection to Avoid Refunding Plaintiffs, Keep Profiting from Unsuspecting and Unsophisticated Customers and Further Fraudulent Scheme

206.     In further attempts to avoid refunding Plaintiffs and/or replacing the nonconforming facemasks Defendants sold to Plaintiffs, and in further attempts to continue to deceive and mislead the Plaintiffs, Defendants represented they would test the face masks again through two independent laboratories, SGS and GQI.

207.     Barbour, represented in an email dated May 11, 2020 to John Cosco and Eddie

Chung, copying Zhu, that 3B Tech had gone "above and beyond we have also ordered testing

from SGS, to prove the filtering ability of our KN95 product."  Barbour was referring to SGS,

which company provides, among other services, certificates of conformity for products,

processes, systems or services demonstrating compliance with either national or international

standards and regulations.

208.     In early May, 2020, Mike Johnson on behalf of Pro-Com and Zake USA sent

various types of face masks to SGS in Grass Lake, Michigan, including the SCT manufactured

face masks from Lot No. 202004010 that had been sold to Plaintiffs, and other face masks that

were not manufactured by SCT, such as a plain white non-powered respirator without any

manufacturer, product lot number, or packaging details.

209.     The test report and results for the latter – the unidentifiable masks – came back

first.

210.     Barbour stated to Eddie Chung of Bluemar in a Skype communication that the

face masks passed KN95 filtration tests that had been performed by SGS.  Seemingly to support

this claim, on May 28, 2020, Barbour sent a copy of a SGS Test Report dated May 27, 2020

("May 27, 2020 SGS Test Report") as an attachment to the Skype communication.

211.     This statement was false.

212.     Mike Johnson, Pro-Com, Zake USA, Barbour and 3B Tech knew this statement

was false.

213.     By its contents, the May 27, 2020 SGS Test Report provided that the product

tested – a "white Non-powered Respirator" from Pro-Com Products Inc. - had passed certain

filtration tests.

214.     The white Non-powered Respirator provided to SGS was not labeled and was not a representative sample of the masks sold by Defendants to Plaintiffs.

215.     No manufacturer or product details were identified on this sample (identified in the May 27, 2020 SGS Test Report), compared to the other face mask samples Defendants submitted to SGS for testing.

216.     On June 2, 2020, SGS notified Mike Johnson, Pro-Com and Zake USA that the SCT manufactured face masks from Lot No. 202004010 that had been sold to Plaintiffs failed the efficiency and filtration testing.  In other words, they were not KN95 masks.  See June 1, 2020 SGS Test Report, June 2, 2020 and June 3, 2020 e-mail communications between SGS and Mike Johnson and Pro-Com.

217.     Mike Johnson, Pro-Com and Zake USA decided to conceal these SGS test results.

218.     Mike Johnson and Pro-Com did not tell Plaintiffs anything about these SGS test results.

219.     Despite these June 1, 2020 test results, Defendants continued to maintain that the SCT face masks sold to Plaintiffs met and exceeded KN95 filtration and performance standards.

220.     On June 2, 2020, Mike Johnson on behalf of Pro-Com and Zake USA sent additional samples of the SCT manufactured face masks from Lot No. 202004010 that had been sold to Plaintiffs to SGS for testing.  This time, Mike Johnson, Pro-Com and Zake USA sent the face masks that were in the Salusen branded packaging to SGS.

221.     On June 22, 2020, SGS notified Mike Johnson, Pro-Com and Zake USA that the Salusen branded SCT manufactured face masks from Lot No. 202004010 that had been sold to Plaintiffs also failed the efficiency and filtration testing.  In other words, they were not KN95

masks.  <u>See</u> June 22, 2020 SGS Test Report and e-mail communications between SGS and Mike Johnson and Pro-Com.

222.     Mike Johnson, Pro-Com and Zake USA again decided to conceal these SGS test results and purposefully decided not to tell Plaintiffs anything about these SGS test results.

223.     Despite and contrary to these June 22, 2020 test results, Defendants still continued to maintain that the SCT face masks sold to Plaintiffs met and exceeded KN95 filtration and performance standards.

224.     Defendants failed to produce the June 1, 2020 SGS Test Report, June 22, 2020 SGS Test Report and their communications with SGS in discovery in this case.

225.     Plaintiffs only learned of these results and Defendants' additional concealment from the documents received in response to a third-party subpoena Plaintiffs served on SGS during this litigation.

226.     Upon information and belief, Defendants concealed these test reports so that Zhu and the other Defendants would not have to keep their June 15, 2020 agreement with Bluemar: that if the face masks failed the SGS testing, "there is no reason we would not take them back."

227.     After the DEKRA and SMQ fraudulent reports had come to light, Jennifer Cosco of Bluemar reached out in early July 2020 to the SGS Air Labs Manager and asked whether SGS could validate the May 27, 2020 SGS Test Report as authentic. Ms. Cosco sent an email to Daniel R. Miller, CRS, Air Labs Manager, SGS IBR Laboratories:

> We were provided this document by our supplier (Procom Products) regarding KN95 masks we have purchased from them.  Can you please share what this test is for?  NIOSH from what I have heard is related to N95. Is this a NIOSH level test on the KN95 mask pictured  Do the results of Efficiency % refer to filter %? Additionally, can you share how this test relates back to KN95 that Procom manufacturers?  It's confusing because of the list of manufacturers below the results. How do they relate to Procom or why are they there?

228.     Daniel Miller of SGS responded by email that the May 27, 2020 SGS Test Report and the findings regarding the face masks tested were valid, meaning that the document was authentic.  He confirmed that the face masks were tested "for initial filtration efficiency only using the NIOSH N95 (TEB-APR-STP-0059) method.  It is very similar to the KN95 method (GB2626-2020) and determines whether or not the claimed certification is legitimate."

229.     Jennifer Cosco of Bluemar answered back to Mr. Miller, asking him whether SGS could confirm that the product that SGS tested, and the subject of the May 27, 2020 SGS Test Report, were face masks manufactured by SCT.  Mr. Miller responded on July 3, 2020, stating that SGS could not link these face masks that SGS had tested to the face masks that were manufactured by SCT (or any manufacturer) and had been sold to Plaintiffs:

> **Unfortunately, we cannot link the masks for which you have provided images back to the report.  The non-powered respirators that were tested for that project arrived without any specific identification unique to the samples.  They were simply packaged in a brown cardboard box**.

(Emphasis added).

230.     Jennifer Cosco of Bluemar responded on July 6, 2020 and asked about the "claimed certification" mentioned in the SGS email response because the face masks from Defendants did not contain the certification slip.  Mr. Miller replied, "[m]any of the non-powered respirators imported from China have slips of paper providing certification that the masks meet the requirements for KN-95."

231.     Although Pro-Com had provided a sampling of face masks to SGS, Pro-Com did not identify the manufacturer of the product nor was the manufacturer identifiable from the product sample that was sent to SGS by Pro-Com and Zake USA, and the subject of the May 27, 2020 SGS Test Report: "they were simply packaged in a brown cardboard box."

232.     Effectively, by submitting the face masks to SGS in a "brown cardboard box," there was no way to link the masks provided by Pro-Com to any manufacturer.  As there were no identifying marks or identification of a manufacturer to link the face masks that were tested and the product sold by 3B Tech to Plaintiffs and others, the May 27, 2020 SGS Test Report is meaningless and of no probative value to the quality of the face masks Plaintiffs purchased from 3B Tech.

233.     Rather, the May 27, 2020 SGS Test Report is evidence of Defendants' wrongful acts and continued attempts to effectuate a continued fraud on Plaintiffs in connection with the sale of counterfeit face masks.

234.     SGS' document production reveals that Johnson, Pro-Com and Zake USA provided face masks to SGS for testing that were not manufactured by SCT.  Pro-Com provided a non-descript brown box with no identifiable markings on the box or the mask and did not identify the manufacturer or the source of the face masks.  Plaintiffs also base this belief on the indisputable facts now known that the face masks manufactured by SCT and sold by Defendants to Plaintiffs, as well as others, and continuing to be offered for sale by Defendants, failed four other filtration tests.

235.     Mike Johnson, Pro-Com and Zake USA purposefully sent a sample of conforming white KN95 face masks without any labeling or product information to SGS for testing that they knew would pass the KN95 filtration and efficiency tests.

236.     Mike Johnson, Pro-Com and Zake USA did this so they could obtain an exemplar "passing" test report to circulate to Pro-Com and 3B Tech's current and prospective customers, including Plaintiffs, who were asking for test results regarding the alleged conformity of the face masks being sold by Defendants.

237.     Mike Johnson, Pro-Com, 3B Tech and Zake USA, individually and through their agents, have provided the May 27, 2020 SGS Test Report to multiple non-parties, such as Pike Systems, Inc., First Century Sales LLC, and SP Richards Company, as purported evidence that all masks sold by Pro-Com are conforming KN95 masks.

238.     Defendants provided the May 27, 2020 SGS Test Report to Plaintiffs and concealed the failing test reports from June 1, 2020 and June 22, 2020 in attempts to secure Plaintiffs' agreement to keep the SCT face masks.

239.     In addition to the SGS testing, Barbour, 3B Tech, Zhu, Pro-Com and Salusen also provided a test result from the Guangdong Testing Institute of Product Quality Supervision ("GQI") to Bluemar.  According to its website, GQI is a third-party institute that specializes in product testing and certification.

https://gqi.org.cn/jsp/weben/article/ArticleView.xhtml?columnNo=F02001

240.     3B Tech sent the GQI report on June 5, 2020 to John Cosco of Bluemar to support the position that the KN95 face masks sold to Plaintiffs were conforming and authentic.  The GQI report, similar to the SGS report, is based on testing of face masks that were not the same face masks sold to Plaintiffs nor the face masks that were advertised for sale by Defendants.  The face masks that are pictured in the GQI report (as those that were tested) are not the same face masks sold to Plaintiffs nor are they the same face masks that were advertised on-line for sale by Defendants.  Specifically, the face masks submitted to GQI for testing did not have the CE, FFP2 or KN95 marks stamped on the masks.  *See* Image below:



(And as compared to the masks in Paragraph 79 hereinabove.)

241.    Same as the May 27, 2020 SGS Test Report results, there is no link from identifying marks or identification of a manufacturer between what was tested, and the product sold by Defendants to Plaintiffs and others and still is offering for sale.

### E. Agreement to Refund Non-conforming Masks and The "SWAP"

242.    After Plaintiffs could not confirm the authenticity and conformity of the face masks, Plaintiffs demanded that 3B Tech refund the payments for the 500,000 face masks Defendants shipped to Plaintiffs.

243.    Realizing that their scheme had been uncovered and in response to clear and unmistakable proof that the KN95 face masks that 3B Tech was selling to Plaintiffs were non-conforming and did not have the certifications as had been represented, 3B Tech and Zhu agreed to provide a refund.

244.    More specifically, John Cosco sent an email on June 16, 2020 to Zhu demanding a refund, stating that:

> Thank you for time yesterday and understanding of the seriousness of the situation.  Per our conversation, I spoke with the customer and they're accepting of the 250K buy back with the promise that you will make all reasonable efforts to take back the remaining 250K units for a full refund

upon your investigation of who is accountable for supplying the fraudulent reports.

Can you supply the address of a local non-affiliated 3 party warehouse that Ted can ship the units back at our expensive for your team to inspect and release after payment confirmation.

245. Eventually 3B Tech and Zhu claimed they did not have enough funds to refund Bluemar for all 500,000 masks. Instead of refunding the payments for the remaining 250,000 face masks, 3B Tech and Zhu offered during a telephone call on June 24, 2020 to "swap out" certified, authentic KN95 face masks listed on the FDA's White List for the remaining non-conforming, fraudulently certified face masks that had been sold by Defendants to Plaintiffs.

246. In this June 24, 2020 telephone call, on a June 26, 2020 Skype, and in the various late June and July 2020 e-mails listed herein, 3B Tech, Zhu and Barbour represented and agreed that Plaintiffs would receive FDA "White List" KN95 face masks in exchange for the remaining non-conforming, fraudulently certified KN95 face masks and provided the name of the manufacturer to Plaintiffs: Zhejiang Lily.

247. The inclusion of the replacement KN95 face masks on the FDA White List was a material term of this exchange. If the face masks were not on the FDA White List, then they were not authorized to be imported into the United States or sold within the United States.

248. After a period of due diligence and investigation, Plaintiffs confirmed that the 250,000 Zhejiang Lily face masks 3B Tech, Zhu and Barbour stated they would be providing to Plaintiffs for the swap were on the FDA White List.

249. On July 23, 2020, Jennifer Cosco of Bluemar asked Zhu by email for images of the certified, authentic Zhejiang Lily face masks that were supposedly being shipped by 3B Tech to AMA. In response, Zhu asked Barbour on July 27, 2020 to provide the product information to Bluemar.

250. Two days later, on July 29, 2020, Barbour sent an invoice to Bluemar identifying that the "swap out" KN95 face masks would be coming from a different manufacturing facility: "Hongwu International Limited." That invoice listed the replacement product as KN95 masks being manufactured by Guandong ViDao Medical Technology Co., Ltd., not by Zhejiang Lily.

251. Plaintiffs attempted to verify the authenticity of these newly identified face masks with Barbour. John Cosco of Bluemar asked why the manufacturer had changed, as Zhejiang Lily had originally been identified as the manufacturer of the "swap out" face masks. In response, on July 29, 2020, Barbour stated that "Hongwu is our China Entity." At all relevant times, Hongwu International Limited was owned by Zhu and his ex-wife or soon-to-be ex-wife Jie Wang.

252. This replacement manufacturer identified by Zhu, Barbour, 3B Tech and Pro-Com did not appear on the FDA White List. It was similar to a name of a manufacturer listed on the FDA White List, but not exact.

253. On July 29, 2020, the FDA White List revealed that a "YD-002" model respirator manufactured by "Guangdong Yidao Medical" was authorized to be imported into the United States. However, KN95 face masks manufactured by Guangdong Yidao Medical were not on the FDA White List and thus were not authorized to be imported into the United States.

254. The photos Barbour, 3B Tech and Zhu provided to Bluemar of the forthcoming replacement masks revealed that the face masks they were attempting to force on Plaintiffs were not included on the FDA White List. The photos revealed white face masks stamped with an embossed K95, in packaging that identified the product as a KN95 face mask.

255. Assuming Guangdong Yidao Medical even manufactured KN95 masks at that time, such face masks were not included on the FDA White List and were not authorized to be

imported into or sold within the United States.

256.    According to the FDA White List, Guangdong Yidao Medical was only authorized by the FDA to import non-KN95 face masks into the United States – its YD-002 model.

257.    Ignoring the plain language of the FDA White List, Barbour, 3B Tech and Zhu continued to incorrectly maintain that their Guangdong Yidao Medical KN95 face masks were conforming KN95 masks and authorized to be brought into the United States.

258.    This statement was false.

259.    Defendants knew the statement was false at the time it was made.

260.    A review of the Guangdong Yidao Medical KN95 face masks reveals that they also are counterfeit, non-conforming KN95 masks. They do not meet the GB 2626-2006 (KN95) labeling requirements and thus are not KN95 masks.

261.    This was yet another attempt by Barbour, 3B Tech and Zhu to import into the United States and sell to Plaintiffs non-conforming counterfeit KN95 face masks.

262.    By August 6, 2020, 3B Tech, Salusen, Zhu and Barbour still had not provided any "swap out" face masks that appeared on the FDA White List and, therefore, Plaintiffs once again demanded a full refund.  3B Tech, Salusen, Zhu and Barbour refused to refund the monies paid for the non-conforming, fraudulently certified face masks.

### F.    *The Non-Conforming, Falsely Identified KN95 Face Masks are Part of a Pattern of Fraudulent Activity, Have Been Sold by Defendants to Others, and Continue to be Offered for Sale*

263.    Plaintiffs are not the only victims of Defendants' fraudulent scheme.

264.    Zhu used Zake China to purchase at least five million purported KN95 face masks from SCT.

265. Zhu and his companies, including but not limited to Zake USA, 3B Tech and Pro-Com, imported and sold those five million counterfeit KN95 face masks manufactured by SCT throughout the United States to numerous unsuspecting victims.

266. By May 12, 2020, Pro-Com had sold over one million, 1,312,700, of the non-conforming KN95 face masks manufactured by SCT throughout the United States.

267. On April 21, 2020 Pro-Com and 3B Tech sold at least 520,000 non-conforming KN95 face masks, manufactured by SCT, Lot 202004010, UPC Code 6552955444109, to KC Lin and Vonnic, Inc. These are the same masks 3B Tech sold to Plaintiffs. In connection with this sale to KC Lin and Vonnic, Inc., Pro-Com, 3B Tech and Zhu misrepresented to KC Lin and Vonnic, Inc. (like they mispresented to Plaintiffs) that the face masks were "KN95" face masks and would "meet FDA/CE" Certifications. These face masks have been tested by an independent lab and it has been confirmed these face masks sold to KC Lin and Vonnic, Inc. do not conform to KN95 performance or filtration standards. A visual inspection also reveals that the face masks do not meet the GB 2626-2006 (KN95) labeling requirements. In other words, they are not KN95 masks.

268. In April and May 2020 Vonnic, Inc. sold these non-conforming KN95 face masks, manufactured by SCT, Lot 202004010, UPC Code 6552955444109, to Monoprice, Inc., as well as to Plaintiffs. A visual inspection also reveals that the face masks sold to Monoprice, Inc. do not meet the GB 2626-2006 (KN95) labeling requirements. In other words, they are not KN95 masks.

269. In April 2020, SP Richards Company sent Pro-Com purchase orders for two million (2,000,000) KN95 face masks. To secure the sale of the 2 million KN95 face masks, Pro-Com and Johnson warranted and represented to SP Richards Company that Pro-Com had

$5,000,000 in liability insurance. That was a false statement. In reliance on that statement, amongst others, SP Richards Company purchased thousands of SCT manufactured KN95 face masks from Pro-Com. In connection with this sale, Pro-Com and its representatives stated to SP Richards Company that: (i) the KN95 face masks are made in a factory that meets KN95, CE, and FFP2 standards, and (ii) Pro-Com's personnel were present in the manufacturing facility. SP Richards Company is also given a powerpoint presentation from Pro-Com stating that the face masks meet KN95 and EN 149-2001 standards. These were false statements. In reliance on these statements, SP Richards Company purchased thousands of SCT manufactured KN95 face masks from Pro-Com.

270.    On April 30, 2020, Johnson and Pro-Com sent SP Richards Company a copy of their "independent testing results" and the "SGS test results for Centurion," also known as SCT. The test reports Johnson and Pro-Com sent to SP Richards Company include the same altered DEKRA report and the same May 27, 2020 SGS Test Report that Defendants provided to Plaintiffs.

271.    In April or May, 2020, Pro-Com sold hundreds of thousands of non-conforming KN95 face masks, manufactured by SCT, Lot 202004010, UPC Code 6552955444109, to SP Richards Company and MANCON. These are the same masks 3B Tech sold to Plaintiffs. In connection with this sale to SP Richards Company and MANCON, Pro-Com, Zake USA, Johnson, and 3B Tech mispresented to SP Richards Company and MANCON (like they mispresented to Plaintiffs) that the face masks were "KN95" face masks and "Manufactured to KN95 and EU149:2001 Certification Standards." A visual inspection also reveals that the face masks do not meet the GB 2626-2006 (KN95) labeling requirements. In other words, they are not KN95 masks.

272.     Both SP Richards Company and MANCON resold the masks to their customers, in reliance on Pro-Com's representations regarding manufacture and quality of the SCT KN95 face masks.

273.     In or around March 2021, one of MANCON's customers identified that the SCT manufactured KN95 face masks sold by Pro-Com to SP Richards Company and MANCON were non-conforming KN95 masks. A visual inspection revealed the face masks did not comply with the GB 2626-2006 (KN95) labeling requirements.

274.     In November 2022, MANCON filed a lawsuit against SP Richards Company in the Virginia Beach Circuit Court, Virginia (Case No. CL22007077-00), alleging the face masks they purchased from Pro-Com through SP Richards Company are non-conforming KN95 face masks.

275.     In 2022, SP Richards Company brought to Pro-Com's attention that the face masks SP Richards Company and MANCON received from Pro-Com are non-conforming KN95 face masks.

276.     On March 27, 2020, Dante Batiste of 3B Tech and Zake USA sent Pike Systems a quote for 2000 "KN95 FFP2 Disposable Face Mask."

277.     On March 27, 2020, Dino Vona, a representative of Pro-Com and 3B Tech, also provided Pike Systems a quote for KN95 face masks.

278.     In May 2020, Pike Systems purchased KN95 face masks from Pro-Com.

279.     On May 29, 2020, Pro-Com, by Vince Vona and Dino Vona, e-mailed Pike Systems a copy of the May 27, 2020 SGS Test Report that had been ordered by Pro-Com, Johnson and Zake USA, stating:

> I am very pleased to inform you that our KN95 masks were SGS tested and the results came back that **we have the highest rated masks in the industry! Our KN95 mask**

**efficiency is over 99%.** To put this in perspective, certified NIOSH N95 masks need a minimum efficiency rating of 95%. I attached the SGS test report for you to see as well as pictures of the mask. We know this will give customers more confidence in the product that they are buying so please feel free to share this information with your current and potential customers!

280. Pro-Com knew this statement was false when made.

281. This is the exact same May 27, 2020 SGS Test Report Defendants provided to Plaintiffs and others.

282. 3B Tech and Pro-Com have advertised distributing their products, including face masks, through various national channels, such as Home Depot, Amazon.com, and Target.

283. Upon information and belief, 3B Tech and Pro-Com have sold the same non-conforming KN95 face masks, manufactured by SCT, Lot 202004010, UPC Code 6552955444109 that were sold to Plaintiffs, to Home Depot and Target.

284. Throughout 2020, 3B Tech sold non-conforming KN95 face masks, manufactured by SCT, Lot 202004010, UPC Code 6552955444109, to customers through its Amazon.com storefront, Better Choice Online. These are the same masks 3B Tech sold to Plaintiffs. Upon information and belief, 3B Tech also sold these non-conforming KN95 face masks on Amazon.com to customers through 2021.

285. In January 2022, during the pendency of this litigation, Pro-Com by its agents and representatives have again circulated and distributed the same May 27, 2020 SGS Test Report to repeat and prospective customers, including SP Richards Company, to encourage those potential purchasers to buy Pro-Com's KN95 masks.

286. In 2021 and early 2022, Pro-Com by its agents and representatives sold additional KN95 face masks manufactured by SCT to SP Richards Company for resale. Pro-Com stated to

SP Richards Company that the KN95 face masks being sold to them would be the same masks as those sold in early 2020.

287.    During the pendency of this litigation, representations on the SCT website at https://www.centurion-med.com[2] demonstrate that Defendants are continuing to market and sell the fraudulent KN95 face masks in interstate if not international commerce.  (The website offers translation in nine different languages, including Russian, Arabic, Japanese and Portuguese.) SCT represents on the website that the KN95 face masks have passed the "European standards for the masks, i.e., EU en149, en14683, type IIR certification standards, CE and FDA certified issued by DEKRA, Germany, ASTM, level3 and other international test reports."  These statements are fraudulent and/or unsupported by test results.

288.    During the pendency of this litigation, Pro-Com continues to offer for sale the KN95 face masks with the fraudulent certifications and altered filtration test results: https://procomproducts.com/our-brands/.  One of "our brands" identified on the Pro-Com website is the Salusen PPE, including the KN95 face masks.

289.    During the pendency of this litigation, Salusen has offered the KN95 face masks with the fraudulent certifications and altered filtration test results for sale: https://salusen.com/product/kn95-filtering-facepiece-respirator-mask-n95-ppe-alternative-50pk/. Salusen's website states that the product had been tested to meet CE EN149 and GB2626.  The Salusen PPE can also be purchased on eBay, 3B Tech's former and BCO Lab's current Amazon.com Storefront "Better Choice Online," and through other online providers.

---

[2] Website accessed last on May 31, 2021.

290.     Throughout this litigation, Splatterguard.com has also offered for sale the same non-conforming, fraudulently certified KN95 face masks and has represented on its website that the face masks have both "FDA Certification" and CE Certification—neither of which exists.

### G.  Zhu's admission that the SCT face masks are non-conforming

291.     Zhu admits that the SCT KN95 face masks 3B Tech sold to Plaintiffs are counterfeit and not KN95 masks, as they do not conform to KN95 performance and filtration standards.

292.     The face masks Zake China purchased from SCT are the face masks 3B Tech sold to Bluemar.

293.     On or before September 23, 2020, Zhu asked SCT to refund Zake China for the face masks Zake China purchased from SCT and then sold to their American client Bluemar.[3]

294.     On or around October 13, 2020, Zhu took the position that the face masks 3B Tech sold to Plaintiffs do not conform to KN95 performance and filtration standards and that SCT is legally obligated to refund Zake China its money for the five million face masks, including the face masks 3B Tech sold to Bluemar.

295.     Upon information and belief, Zake China subsequently purchased an additional five million of these same masks from SCT, for a total of ten million (10,000,000) masks.

296.     Upon information and belief, Zake China was obligated to purchase the additional five million non-conforming face masks from SCT pursuant to Chinese law and regulations governing Chinese contracts.

---

[3] Defendants have made inconsistent factual assertions related to this case.  The invoices reveal that 3B Tech sold the SCT face masks to Bluemar. That is not disputed. Defendants admit 3B Tech sold the SCT face masks to Bluemar in answer to interrogatories.  Zhu has also stated that "Zake" sold the SCT face masks to "its client," "its American client," Bluemar.

297.     Upon information and belief, despite Zhu's admission and position, Defendants – including Zhu - continued to sell the non-conforming KN95 face masks manufactured by SCT throughout the United States to unsuspecting victims.

**FIRST CAUSE OF ACTION**
**Civil Violation of the Racketeer Influenced and**
**Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)**
**(Against All Defendants)**

298.     Plaintiffs restate and incorporate by reference the foregoing Paragraphs as if fully set forth herein.

299.     Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c) as previously described herein.  This means committing or attempting to commit federal mail and wire fraud.

*Qualifying Enterprise*

300.     Defendants are individuals, partnerships, corporations, associations, and other legal entities, and any union or group of individuals associated in fact although not a legal entity within the meaning of 18 U.S.C. § 1961(4).

301.     The association in fact consists of (i) Defendants, including their employees and agents; (ii) SCT and Zake China, as set forth herein.

302.     The Enterprise consists of persons associated together for the common and shared purpose of the fraudulent manufacture, marketing and sale of PPE goods as described herein. Defendants are directly engaged in the production, distribution, and/or acquisition of goods and services in interstate and international commerce.

303. The individual engaged in and the structure of the enterprise is ongoing and continuous, as described herein, with an ascertainable structure that is separate and distinct from that of the conduct of the pattern of racketeering activity.

304. Other members of the enterprise may exist but are unknown at this time.

***Pattern of Racketeering Activity***

305. Whether directly or indirectly, Defendants knowingly, willfully, and intentionally committed multiple (and more than two) acts of racketeering activity since March 2020 (or sooner) as described herein, constituting a pattern within the meaning of 18 U.S.C. §§ 1961(1) and l961(5).

306. These acts of racketeering activity, advertising and selling fraudulently certified face masks, using altered test reports, and concealing unfavorable test results while simultaneously representing that the face masks passed those tests to numerous entities and persons are related and amount to and/or pose a threat of continued unlawful activity. As described herein, these acts have similar purposes, results, participants, methods of commissions and distinguishing characteristics such that they are not isolated events. These acts have similar goals and methodology, and they have a requisite degree of proximity.

307. Through a pattern of racketeering activity Defendants knowingly, willfully, intentionally and unlawfully conducted or participated, whether directly or indirectly, in the affairs of the Enterprise. Defendants intended the scheme to obtain money through false representations, fraud, deceit, and other improper and unlawful means.

308. The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the Enterprise. Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

309. Defendants' acts include acts of racketeering activity that are indictable under provisions of applicable State of Maryland and federal criminal laws as alleged herein.

310. Defendants each committed numerous such acts, conspired to commit such acts as alleged herein, and/or aided and abetted such acts.

**Predicate Acts**

311. Defendants participated in the operation and management of the association-in-fact enterprise and the alternative enterprises by overseeing and coordinating the commission of multiple acts of racketeering as described below.

### *Federal Mail and Wire Fraud in Violation of 18 U.S.C. §§ 1341 and 1343*

312. Defendants willfully committed indictable offenses under §§ 1341 and 1343 in that they voluntarily and intentionally devised, intended to devise, and participated in a scheme or artifice with the intent to defraud Plaintiffs of their property (*i.e.,* money) and with the intent to defraud by means of false or fraudulent pretenses, representations and/or promises.

313. Defendants committed these acts with actual knowledge of their illegality.

314. For the purpose of executing their scheme or artifice, Defendants caused delivery of various documents and things, as described herein, by the U.S. Mail and/or by commercial interstate carriers.

315. The use of the U.S. Mail and/or by commercial interstate carriers to execute Defendants' plan or scheme was reasonably foreseeable if not intended.

316. Such documents and PPE travelled interstate and were delivered to AMA in the State of Maryland and within the jurisdiction of this Court.

317. For the purpose of executing their scheme or artifice, Defendants caused the transmission and delivery of wire communications in interstate and foreign commerce to include

various writings, signs and signals such as bank wire transfers, electronic mails and through Skype and telephone calls.

318.    Such wire communications travelled interstate and were delivered to AMA in the State of Maryland and within the jurisdiction of this Court.

319.    The use of interstate wire communications as part of Defendants' plan or scheme was reasonably foreseeable, if not intended.

320.    These aforementioned acts were done intentionally and knowingly with the specific intent to further Defendants' scheme or artifice.

321.    Defendants carried out the scheme in at least China and the United States and at least the State of Maryland and could not have done so without the use of the U.S. Mail, commercial interstate carries, and/or interstate wires.

322.    In furtherance of the scheme to defraud, Defendants communicated among themselves and with Plaintiffs.  These communications were transmitted interstate by wire (*e.g.,* electronic mail and telephone and Skype) and/or through the U.S. mail and/or commercial carriers.  Zhu and Barbour communicated with Bluemar repeatedly with regard to the sale of the PPE; Defendants sent fake and fraudulently altered testing results to Plaintiffs as part of Defendants' illegal scheme and applied for FDA authorization for the KN95 face masks, on information and belief by submitted the fake and fraudulently altered testing results to the FDA.

323.    Plaintiffs reasonably and justifiably relied on Defendants' fraudulent representations and deceptive communications.

324.    Plaintiffs have been damaged as a direct and proximate result of Defendants' acts and participation in such an unlawful enterprise as alleged herein.

### *Theft – Unauthorized Control of Property in Violation of Md. Code Ann. § 7-104(a)*

325.   Defendants willfully committed indictable offenses under Maryland Code Annotated § 7-104(a).  They willfully and knowingly obtained and controlled the property (*e.g.*, money) of Plaintiffs without authorization or conspired to do the same.

326.   Defendants committed these acts with actual knowledge of their illegality.  Defendants had the purpose of depriving Plaintiffs of the property.  Defendants withheld Plaintiffs' property permanently.

327.   Defendants willfully and knowingly used or concealed the property in such a manner as to deprive the owner of the property or knew that the use or concealment would deprive the owner of the property.

328.   These acts were part of a scheme or continuing course of conduct beginning in early 2020 and lasting to the present.

329.   Plaintiffs were the owners of property (*e.g.*, money) at issue here.

330.   As aggregated, pursuant to Section 7-103(f), the value of the property was over $100,000.

### *Theft – Obtaining Control by Deception in Violation of Md. Code Ann. § 7-104(b)*

331.   Defendants willfully committed indictable offenses under Maryland Code Annotated § 7-104(b).  They willfully and knowingly obtained and controlled Plaintiffs' property (*e.g.*, money) by deception or conspired to do the same.

332.    Defendants committed these acts with actual knowledge of their illegality.  Defendants had the purpose of depriving Plaintiffs of the property.

333.   Plaintiffs were the owners of property (*e.g.*, money) at issue here.

334.   Defendants were practically certain that they were creating and confirming a false impression without believing it to be true.  Defendants made false and misleading representations

through wire communications, via Skype and other methods of communications. Defendants also failed to correct such a false impression once created or confirmed. Defendants attempted to prevent Plaintiffs from acquiring the correct information. This deception constituted more than mere puffing, immaterial statements, and exaggerations that would be unlikely to deceive ordinary persons.

335.     Defendants had the purpose of depriving Plaintiffs of the property.

336.     These acts were part of a scheme or continuing course of conduct beginning in early 2020 and lasting to present.

337.     As aggregated pursuant to Section 7-103(f), the value of the property was over $100,000.

338.     A violation of Section 7-104(b) as alleged here involves an act or threat involving activity as enumerated by 18 U.S.C. § 1961(1)(A) and punishable by imprisonment for more than one year.

***Continuity of Conduct***

339.     Defendants' repeated acts of racketeering activity in violation of the laws of the State of Maryland and the United States have been continuous.

340.     Beginning in early 2020 and continuing through this litigation, Defendants' related acts of racketeering activity have occurred on numerous occasions, as described herein, constituting a continuous course of conduct.

341.     By its nature, this conduct poses a distinct threat of future reoccurrence, as described herein, constituting an open-ended continuous course of conduct.

342.     Defendants' violations have directly, illegally, and proximately injured Plaintiffs and other market participants. Defendants have or are in the process of selling at least 5 million

(or 10 million) units of fraudulently certified PPE to persons and entities throughout the United States. For example, Vonnic, Inc., KC Lin, SP Richards Company and MANCON purchased fraudulently certified PPE from Defendants, and have thus been harmed. Other entities, including Monoprice, have purchased Defendants' fraudulently certified PPE through a reseller, and has also been harmed. First Century Sales, LLC is either an agent of Pro-Com, Zake USA and 3B Tech or a reseller of the fraudulently certified PPE from Defendants, as they have sold the subject face masks to others.  If First Century Sales, LLC is a reseller, it has also been harmed. Other entities harmed by Defendants' conduct include hospitals and government entities—all of which Defendants claimed to have sold PPE to and which may have purchased the fraudulently certified products described herein.

343.    Plaintiffs anticipate that additional discovery of Defendants and third-parties will reveal the identity of numerous other victims who purchased Defendants' fraudulently certified PPE based on Defendants' fraudulent misrepresentations.

344.    Plaintiffs anticipate that additional discovery of Defendants and third-parties will reveal that Defendants continued to sell the non-conforming KN95 face masks to others despite the June 1 and 22, 2020 SGS test results which revealed that the face masks manufactured by SCT and being sold by Defendants did not meet KN95 performance or filtration standards.

345.    The acts identified herein are part of an association that exists for unlawful purposes.

346.    Defendants have conducted and/or participated, directly and/or indirectly, in the conduct of the affairs of the alleged enterprise through a pattern of racketeering activity as defined herein in violation of 18 U.S.C. § 1962(c).

347.    This cause of action is also being asserted against BCO Lab in its capacity as a

successor in interest to 3B Tech and to the extent BCO Lab has assumed 3B Tech's liabilities in connection with the subject matter of this action.

***Prayer for Relief***

348.     Plaintiffs seek compensatory damages for, among other things, the sum Defendants essentially stole from Plaintiff.  Plaintiffs accordingly seek an award of three times the damages they sustained, and the recovery of reasonable attorneys' fees and costs, as well as any other relief as authorized by law.

**SECOND CAUSE OF ACTION**
**Civil Violation of RICO**
**18 U.S.C. § 1962(d) By Conspiring to Violate 18 U.S.C. § 1962(c)**
**(Against All Defendants)**

349.     Plaintiffs hereby restate and incorporate by reference the foregoing Paragraphs as if fully set forth herein.

350.     Defendants, in violation of 18 U.S.C. § 1962(d), knowingly, willfully, and actually agreed to further a scheme in violation of 18 U.S.C. § 1962(c), with persons known and unknown, as specifically alleged herein.

351.     That scheme included the operation or management of an unlawful enterprise through a continuous pattern of racketeering activity as alleged herein.

352.     Defendants and other persons, known and unknown, knowingly, purposefully, and actually committed at least one overt act in furtherance of the conspiracy as described herein.

353.     The conspiracy commenced on or before March 2020 and is ongoing.

354.     The conspiracy's purpose was to obtain money from Plaintiffs to Defendants' own benefit by way of the fraudulent scheme described herein and to defraud Plaintiffs and others to whom Defendants sold and continue to sell its fraudulently certified face masks.

355.     Defendants have directly, illegally, and proximately caused and continue to cause injures to Plaintiffs in violation of 18 U.S.C. § 1962(d).  Plaintiffs' injuries were reasonably foreseeable consequences of Defendants' conduct.

356.     This cause of action is also being asserted against BCO Lab in its capacity as a successor in interest to 3B Tech and to the extent BCO Lab has assumed 3B Tech's liabilities in connection with the subject matter of this action.

*Prayer for Relief*

357.     Plaintiffs seek compensatory damages for, among other things, the sum Defendants essentially stole from Plaintiff.  Plaintiffs accordingly seek an award of three times the damages they sustained, and the recovery of reasonable attorneys' fees and costs, as well as any other relief as authorized by law.

**THIRD CAUSE OF ACTION**
**<u>Common Law Fraudulent Misrepresentation</u>**
**<u>(Against All Defendants)</u>**

358.     Plaintiffs hereby restate and incorporate by reference the foregoing Paragraphs as if fully set forth herein.

359.     Defendants had a duty to disclose material facts to Plaintiffs.

360.     Defendants knowingly made false and fraudulent misrepresentations of material facts to Plaintiffs as described in this Second Amended Complaint, including but not limited to the following misrepresentations:

  a. The face masks are certified KN95 face masks that could be used in healthcare and related settings;

  b. The face masks are conforming KN95 Technology;

  c. The face masks are CE Certified technology;

d. The face masks passed filtration tests required to be identified as FFP2 or FFP2 technology;

e. The face masks are EU, CE and FDA certified;

f. The face masks are FDA approved;

g. The face masks were sold to the White House;

h. The face masks were tested and independently validated by third party laboratories, including SMQ, SGS, GTI and DEKRA;

i. The face masks are certified and conform as follows: "FDA Certified: Certificate No.: JF-FDA-0328-0116" and "CE Certified: Certificate No.: 4Q200407M.SCTUU98";

j. The face masks, their product and their stock is legit;

k. The face masks are certified and conform as follows: "FFP2 Europe EN 149:2001 + A1:2009 Classified" and "FDA No.: 10066564"; and

l. Other statements as described in this Second Amended Complaint.

361. These statements were made to Bluemar and/or AMA orally and in writing by Zhu and Barbour.

362. Zhu and Barbour made these statements to Bluemar and/or AMA orally and in writing in their individual and/or representative capacities on behalf of 3B Tech, Salusen and/or Pro-Com.

363. These misrepresentations include full and partial, affirmative misstatements as well as omissions.

364. Defendants knew these misrepresentations to be false and fraudulent.

365.     Defendants made these misrepresentations as described herein with the intent to induce Plaintiffs to act in reliance, i.e., purchasing and accepting the subject face masks.

366.     Plaintiffs acted in reasonable reliance of Defendants' false and fraudulent misrepresentations in deciding to purchase and accept the subject face masks and suffered pecuniary damage as a result.

367.     3B Tech, Barbour, Salusen, Pro-Com, Zake USA and/or Johnson also made false and fraudulent misrepresentations of material facts when they altered the DEKRA Report.

368.     3B Tech, Barbour, Salusen, Pro-Com, Zake USA and/or Johnson made false and fraudulent misrepresentations of material facts when they altered the DEKRA Invoice.

369.     3B Tech, Barbour, Salusen, Pro-Com, Zake USA and/or Johnson made false and fraudulent misrepresentations of material facts when they altered the SMQ Report.

370.     3B Tech, Barbour, Salusen, Pro-Com, Zake USA and/or Johnson altered these reports with the intent to deceive Plaintiffs, and that Plaintiffs would rely upon these altered reports in purchasing and accepting Defendants' face masks.

371.     Johnson and Pro-Com filed and/or applied for the necessary certifications, registrations and tests on behalf of Defendants.

372.     Johnson and/or Pro-Com made false and fraudulent misrepresentations of material facts when they informed 3B Tech, Barbour, Zhu and Salusen that the subject SCT face masks were FDA certified. Those representations were false and Johnson and/or Pro-Com made those representations with the intent to deceive Plaintiffs, knowing that 3B Tech, Barbour, Zhu and Salusen would be providing that information to Plaintiffs, and that Plaintiffs would rely upon that information in purchasing and accepting Defendants' face masks.

373.     Johnson and/or Pro-Com made false and fraudulent misrepresentations of material

facts when they informed 3B Tech, Barbour, Zhu and Salusen that the subject SCT face masks were CE certified.  Those representations were false and Johnson and/or Pro-Com made those representations with the intent to deceive Plaintiffs, knowing that 3B Tech, Barbour, Zhu and Salusen would be providing that information to Plaintiffs, and that Plaintiffs would rely upon that information in purchasing and accepting Defendants' face masks.

374.    Johnson and/or Pro-Com made false and fraudulent misrepresentations of material facts when they informed 3B Tech, Barbour, Zhu and Salusen that the subject SCT face masks were submitted to and tested by SGS and passed SGS's tests.  Those representations were false and Johnson and/or Pro-Com made those representations with the intent to deceive Plaintiffs, knowing that 3B Tech, Barbour, Zhu and Salusen would be providing that information to Plaintiffs, and that Plaintiffs would rely upon that information in purchasing, accepting and retaining Defendants' face masks.

375.    Johnson and/or Pro-Com made false and fraudulent misrepresentations of material facts when they informed 3B Tech, Barbour, Zhu and Salusen that the subject SCT face masks were submitted to and tested by GQI.  Those representations were false and Johnson and/or Pro-Com made those representations with the intent to deceive Plaintiffs, knowing that 3B Tech, Barbour, Zhu and Salusen would be providing that information to Plaintiffs, and that Plaintiffs would rely upon that information in purchasing and accepting Defendants' face masks.

376.    Plaintiffs relied on these misrepresentations, to their detriment, and as a result, have incurred and continue to incur damages.

377.    This cause of action is also being asserted against BCO Lab in its capacity as a successor in interest to 3B Tech and to the extent BCO Lab has assumed 3B Tech's liabilities in connection with the subject matter of this action.

*Prayer for Relief*

378.    Plaintiffs seek compensatory damages, punitive damages, as well as any other relief as authorized by law.

## FOURTH CAUSE OF ACTION
### Breach of Contract
### (Against Defendant 3B Tech and BCO Lab)

379.    Plaintiffs hereby restate and incorporate by reference the foregoing Paragraphs as if fully set forth herein.

380.    Plaintiffs entered into multiple Purchase Orders with 3B Tech for the purchase of certified, conforming KN95 face masks.

381.    The Purchase Orders provided that 3B Tech was to provide CE and FDA Certified KN95 face masks to Plaintiffs.

382.    The terms of these agreements were further confirmed and documented by Sales Orders, Invoices, Receipts and other writings.

383.    Bluemar and 3B Tech entered into the three purchase orders with the intent to confer a direct benefit on a third party, AMA.

384.    At all relevant times hereto, 3B Tech knew that Bluemar entered into these three purchase orders with 3B Tech for KN95 face masks so that Bluemar could fulfill its purchase order(s) and agreement(s) with AMA.

385.    Based on the communications and agreements between Bluemar and 3B Tech, it clearly appears that Bluemar and 3B Tech intended to recognize AMA as the primary party in interest and as privy to the promises contained with the subject purchase orders.

386.    3B Tech delivered the nonconforming face masks directly to AMA.

387.    AMA is a third-party beneficiary to the purchase orders between Bluemar and 3B

Tech.

388.    Plaintiffs did not receive CE and FDA Certified KN95 masks from 3B Tech, as outlined and agreed to in the Purchase Orders, Sales Orders, Invoices and Receipts between 3B Tech and the Plaintiffs.

389.    Plaintiffs did not receive KN95 masks that passed the filtration requirements for FFP2 status, as outlined and agreed to in the Purchase Orders, Sales Orders, Invoices and Receipts between 3B Tech and the Plaintiffs.

390.    3B Tech failed to deliver the product that was identified on the Purchase Orders and as such, breached the terms and conditions of the Purchase Orders.

391.    As a result of these breaches, Plaintiffs have suffered damages.

392.    This cause of action is also being asserted against BCO Lab in its capacity as a successor in interest to 3B Tech and to the extent BCO Lab has assumed 3B Tech's liabilities in connection with the subject matter of this action.

*Prayer for Relief*

393.    Plaintiffs seek compensatory damages, for among other things, the amounts paid to 3B Tech  that 3B Tech did not return or refund, and any other damages sustained; interest; as well as any other relief as authorized by law.

## FIFTH CAUSE OF ACTION
### Breach of Contract
### (Against Defendants 3B Tech, Salusen, Zhu, Barbour and BCO Lab)

394.    Plaintiffs hereby restate and incorporate by reference the foregoing Paragraphs as if fully set forth herein.

395.     3B Tech, Salusen, Zhu and Barbour are in breach of their June 2020 agreement with Plaintiffs to swap out the falsified non-conforming face masks shipped and delivered to Plaintiffs with new, conforming, CE and FDA Certified KN95 face masks.

396.     On or about June 15, 2020, Zhu stated that if the face masks failed the SGS testing, "there is no reason we would not take them back."

397.     The face masks failed the SGS testing, but Zhu refused to take back all 500,000 face masks. Zhu only took back and refunded Bluemar for 250,000 of the 500,000 face masks.

398.     Zhu took the position that he and his companies did not have enough funds at the moment to refund Bluemar for the remaining 250,000 face masks.

399.     Thus, in efforts to mitigate damages, and after Plaintiffs confronted 3B Tech, Salusen, Zhu and Barbour with the fraudulently altered/fake testing and reports, 3B Tech, Salusen, Zhu and Barbour agreed that they would swap conforming product from the FDA White List for the falsified product, including but not limited to the 250,000 units.

400.     3B Tech, Salusen, Zhu, Barbour agreed to provide Plaintiffs with 250,000 new face masks from a specific manufacturer that Plaintiffs had vetted, and that delivery would be within two (2) weeks, a reasonable period of time.

401.     However, that swap never occurred.

402.     Plaintiffs never received conforming product, despite 3B Tech, Salusen, Zhu, and Barbour's representations and agreement.

403.     3B Tech, Salusen, Zhu, and Barbour have refused to swap out the nonconforming product previously sent to Plaintiffs.

404.     As a result of these breaches, Plaintiffs have suffered damages.

405.     This cause of action is also being asserted against BCO Lab in its capacity as a

successor in interest to 3B Tech and to the extent BCO Lab has assumed 3B Tech's liabilities in connection with the subject matter of this action.

***Prayer for Relief***

406.    Plaintiffs seek compensatory damages; interest; as well as any other relief as authorized by law.

## SIXTH CAUSE OF ACTION
### Violation of the New Hampshire Revised Statutes Chapter 358-A, the New Hampshire Consumer Protection Act, N.H. Rev. Stat. § 358-A:1 et seq. (Against All Defendants)

407.    Plaintiffs restate and incorporate by reference the foregoing Paragraphs as if fully set forth herein.

408.    The New Hampshire Consumer Protection Act ("CPA") is a law that protects consumers and businesses from unfair methods of competition and unfair or deceptive business practices.

409.    The CPA applies to business-to-business transactions.

410.    Legal entities such as Plaintiffs may avail themselves of the protections and remedies afforded by the CPA.

411.    Each Defendant is a "person" as defined by the CPA.

412.    Each Plaintiff is a "person" as defined by the CPA.

413.    The CPA defines "trade" and "commerce" to include "the advertising, offering for sale, sale, or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of this state."

414.    Defendants engaged in trade and commerce as defined by the CPA.

415. The CPA applies to the Defendants and the Defendants' acts and omissions because they entered into a contract with Bluemar in New Hampshire, engaged in trade and commerce in New Hampshire, transacted business in New Hampshire, offered for sale goods to Bluemar in New Hampshire, sold goods to Bluemar, entered into agreements with Bluemar in New Hampshire, and engaged in trade and commerce directly affecting people of New Hampshire.

416. The CPA prohibits certain deceptive acts and practices, including but not limited to: "(i) passing off goods as those of another; (ii) causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; (iii) causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another; (iv) using deceptive representations or designations of geographic origin in connection with goods or services; (v) representing that goods have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that such person does not have; … (vii) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; … and (ix) advertising goods or services with intent not to sell them as advertised."

417. As set forth throughout this pleading, Defendants engaged in acts and practices declared unlawful under the CPA.

418. Defendants violated the CPA by engaging in unfair and deceptive business practices.

419. Defendants' sale of products such as the SCT manufactured KN95 face masks using fraudulent certifications and/or fraudulent stamps is a violation of the CPA.

420.     Defendants' representations that the face masks sold to and purchased by Plaintiffs would meet or exceed certain qualities is a violation of the CPA.

421.     Defendants' business practices in connection with the sale of the non-conforming KN95 face masks to Bluemar are unfair, immoral, unethical, oppressive and unscrupulous.

422.     Defendants' business practices in connection with the sale of the non-conforming KN95 face masks to Bluemar caused substantial injury to Bluemar and others.

423.     Defendants' business practices in connection with the post-sale testing and concealment of their knowledge that the face masks were non-conforming, and affirmative statements to the contrary, are unfair, immoral, unethical, oppressive and unscrupulous.

424.     Defendants' business practices in connection with the post-sale testing and concealment of their knowledge that the face masks were non-conforming, and affirmative statements to the contrary, caused substantial injury to Bluemar and others.

425.     Defendants knowingly and willfully violated the CPA through their unfair and deceptive business practices.

426.     As a result of Defendants' knowing and willful violations of the CPA and unfair and deceptive business practices, Plaintiffs have been injured and suffered damages.

427.     As a result of Defendants' knowing and willful violations of the CPA and unfair and deceptive business practices, there has been a significant impact on consumer welfare.

428.     Defendants also violated the CPA by knowingly and willfully creating costly and dangerous situations for endline consumers.

429.     This cause of action is also being asserted against BCO Lab in its capacity as a successor in interest to 3B Tech and to the extent BCO Lab has assumed 3B Tech's liabilities in connection with the subject matter of this action.

*Prayer for Relief*

430.    Plaintiffs seek compensatory damages; treble damages; statutory damages available under the CPA; attorneys' fees; interest; as well as any other relief as authorized by law.

### PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Plaintiffs respectfully request that the Court: (a) award damages to Plaintiffs in an amount no less than ONE MILLION DOLLARS ($1,000,000.00), including but not limited to compensatory, consequential, exemplary, treble and punitive damages as appropriate and in an amount to be determined at trial; (b) award attorneys' fees and costs to Plaintiffs; (c) interest; and (d) award Plaintiffs any other relief afforded by law.

### JURY DEMAND

Plaintiffs demand a jury trial as to all claims so triable.

Dated: December 6, 2022

/s/ Madelaine Katz
M. CELESTE BRUCE (Bar No. 10710)
Madelaine Kramer Katz (Bar No. 19760)
Rifkin Weiner Livingston LLC
4800 Hampden Lane, Suite 820
Bethesda, Maryland 20814
cbruce@rwllaw.com
mkatz@rwllaw.com
301.951.0150 (p)
301.951.0172 (f)